# Exhibit 1



About Us    Contact Us    Privacy Policy

Tuesday, August 19, 2025

Search...

# CAPITOL NEWS ILLINOIS

SUBSCRIBE

Home    News ›    Investigations ›    Programs ›    About Us ›    Media Center ›    Support Us ›

# Citing growing list of duties, Illinois' Raoul seeks a $15M increase in AG budget

Attorney General engaged in growing volume of suits against Trump administration

by Peter Hancock    —    April 21, 2025    in Budget

A A



*Illinois Attorney General Kwame Raoul answers questions during a luncheon interview at the City Club of Chicago on April 1, 2025. (Credit: City Club of Chicago)*

**645**
VIEWS

Facebook            Share            Reddit

SPRINGFIELD — Illinois Attorney General Kwame Raoul is asking state lawmakers for a $15 million increase in his General Revenue Fund budget for the upcoming year, saying his office needs a more "stable" system of funding as it takes on greater responsibilities, including the growing volume of litigation against the Trump administration.

In appearances before House and Senate budget committees in recent days, Raoul said the funding method that has traditionally been used for his office — one that relied heavily on fees and settlements generated by cases the office was involved in — no longer is sufficient to sustain its operations.

"This funding structure has evolved over the years as progressive court reforms have made fines and fees a less stable source of funding," he told the House appropriations committee that oversees his office's budget. "Also, proceeds from settlements or lawsuit damages are unreliable from year to year."

In Fiscal Year 2019, the year Raoul took office, the attorney general's budget totaled $87.7 million, according to state budget records. That included $32.2 million in general revenue funds and $54.5 million in "other state funds," such as fees and settlements. Another $1 million came from federal funds.

Since then, the attorney general's office has more than doubled. For the current fiscal year, the total budget stands at more than $193.7 million, including $105.5 million in general revenue funds and $74.9 million in "other state funds." Federal funds are projected at $13.5 million.

Raoul's proposed increase would bring next year's general revenue fund budget to more than $120 million.

Since 2019, Raoul said, his office's responsibilities have grown substantially. He said the General Assembly has passed 101 new laws — including some at Raoul's own request — that either have added new duties or expanded existing duties of the office while his office has also been busy defending other laws passed by the General Assembly against legal challenges.

"The Attorney General's Office is the sole enforcement agency for violations of the Cannabis Regulation and Tax Act and parts of the SAFE-T Act," he told the House panel. "Our office is working diligently to defend both new and long-standing laws against constitutional challenges. Each of these cases require significant resources, including costs associated with our attorneys, travel to courts across the state, lengthy discovery processes, as well as expert with witness retention."

In addition to those challenges, however, Raoul has taken on additional legal work in recent months challenging actions of President Donald Trump's administration.

Since Trump was sworn into office for a second term on Jan. 20, Raoul has joined in filing 11 federal lawsuits challenging administration actions and has filed another 14 amicus briefs in support of other legal challenges. It is also defending the state against two lawsuits that the Trump administration has filed against Illinois.

"This budget will support supplying the requisite attorneys to step up where the federal government is stepping away, as well as attorneys involved in critical cases to protect our state's interests," Raoul said.

Raoul's office would not provide specific information about the number of attorneys or other staff it would hire with the additional money. A spokesperson in his office told Capitol News Illinois in an email that the money would allow the office "to hire additional attorneys to perform our growing statutorily-required responsibilities in addition to the critical work of vigorously defending the rights of Illinois residents from unconstitutional attacks by the Trump administration."

Raoul also did not provide specific answers to questions from Republican lawmakers about how much his office has spent, or how many hours his attorneys have worked, pursuing litigation against the Trump administration.

"Our attorneys are, you know, they're not billing hours. They're on salary," he said. "And so whether they work 20 hours in a day or eight hours in a day, they are compensated."

Legislative committees are still in the process of holding hearings on each state agency's budget request for the upcoming year. A final budget is expected to be voted on by the end of May.

*Capitol News Illinois is a nonprofit, nonpartisan news service that distributes state government coverage to hundreds of news outlets statewide. It is funded primarily by the Illinois Press Foundation and the Robert R. McCormick Foundation.*

**Tags:**  Donald Trump    federal funding    FY26 Budget    Kwame Raoul    Springfield    Trump Administration



### Peter Hancock

**Statehouse Reporter**

Peter was one of the founding reporters with Capitol News Illinois. He came to Springfield after many years working in Topeka, Kansas, where he covered the Kansas statehouse and other beats. He began his reporting career in 1989 at a small county weekly newspaper and has worked in a variety of settings including both daily and nondaily newspapers, online media and public radio. A native of the Kansas City area, he has degrees in political science and education from the University of Kansas.

## Related Posts

Federal housing credit expansion could increase affordable rental units in Illinois: report

🕒 JULY 22, 2025    👁 1.6K

Housing funding cut in Illinois budget as homelessness increases

🕒 JULY 4, 2025    👁 1.8K





Republish our articles for free, online or in print, under a Creative Commons license.



FACEBOOK          TWITTER          BLUESKY          SOUNDCLOUD          INSTAGRAM

YOUTUBE          RSS



2501 Chatham Road, Suite 200
Springfield, IL 62704
editors@capitolnewsillinois.com

About Us

Contact Us

Media Center

Privacy Policy

Terms of Use

*Capitol News Illinois is a nonprofit, nonpartisan news service covering state government. A service of the Illinois Press Foundation.*



More news from the Illinois Statehouse delivered to your inbox each Wednesday and Saturday.

© 2025 Capitol News Illinois

# Exhibit 2



Office of the
Illinois Attorney General
**Kwame Raoul**



# ATTORNEY GENERAL RAOUL'S OFFICE COLLECTS MORE THAN $1 BILLION IN STATE REVENUE IN 2023

### April 03, 2024

*Raoul Presents Fiscal Year 2025 Budget to Legislators*

**Springfield** – Attorney General Kwame Raoul presented the proposed budget for the Attorney General's office for the next fiscal year to lawmakers today in Springfield. Raoul announced to a legislative committee that his office generated more than $1 billion in revenue on behalf of the state in 2023. The revenue the Attorney General's office collected for the state shows that for every dollar of taxpayer funding the office received in Fiscal Year 2023, it generated $17.55 for the state. Since Raoul took office, the Attorney General's office has generated more than $5.4 billion for the state.

"The Attorney General's office serves our state as the people's law firm, and we are able to bring in needed revenue as we do this critical work," Raoul said. "We have remained steadfast in our work to curb violent crimes in our communities and protect children and our most vulnerable populations. I look forward to building upon our efforts to improve the quality of life in every part of Illinois."

In 2023, the Attorney General's office was able to bring in $290 million through collections litigation, including cases involving the collection of funds for damage to state property, child support enforcement, fines and penalties. The Attorney General's office also collected more than $299 million through tobacco litigation and more than $284 million in estate tax revenues.

In addition to recoveries for the state, the Attorney General's Consumer Fraud Bureau responded to more than 19,000 complaints in 2023. The bureau has returned more than $145 million to Illinois consumers through restitution and savings achieved through mediation and litigation.

To date, the Attorney General's office has secured more than $198 million in payments to Illinois from opioid distributors and manufacturers under settlement agreements following multi-year investigations into the role these companies played in fueling the opioid epidemic. Under the current finalized national opioid settlements, Illinois will receive more than $1.3 billion over 18 years.

Translate Website

Back to News Room

Back to Home Page

  



    

Contact Us

Privacy Policy

| 500 S. 2nd St. | 115 S. LaSalle St. | 1745 Innovation Drive, Suites C & D |
|---|---|---|
| Springfield, IL 62701 | Chicago, IL 60603 | Carbondale, IL 62903 |
| (217) 782-1090 | (312) 814-3000 | (618) 529-6400 |

Individuals with hearing or speech disabilities can reach us by using the 7-1-1 relay service.

# Exhibit 3



Home     News ⌄     Investigations ⌄     Programs ⌄     About Us ⌄     Media Center ⌄     Support Us ⌄

# Lawsuits with Trump administration stretching Illinois attorney general's resources

Raoul involved in multiple suits with other states challenging Trump actions

 by Peter Hancock     —     February 11, 2025    in Budget                    A A



*Illinois Attorney General Kwame Raoul is pictured on the Illinois House floor in May 2023. He told Capitol News Illinois he plans to brief the General Assembly about the cost of the state's ongoing lawsuits against Trump administration policies. (Capitol News Illinois photo by Jerry Nowicki)*

**4.8k**
VIEWS

f   Facebook                              Share                        Reddit

SPRINGFIELD – Illinois Attorney General Kwame Raoul announced this week he has joined yet another multistate lawsuit against the Trump administration, this time over its decision to slash funding for university research grants through the National Institutes of Health.

It was at least the fourth such multistate lawsuit Raoul has joined in the three weeks since President Donald Trump was inaugurated on Jan. 20. And while Raoul admits the cost of those cases is stretching the resources of his office, he said he is not yet ready to ask lawmakers for additional funding to cover those costs.

"And the reason why I'm not going to do that is because I appreciate the place where the legislature (and) state government at large is in terms of its budget," he said in an interview Monday, referring to a projected deficit of more than $3 billion for the upcoming fiscal year.

Instead, Raoul said, he plans to brief lawmakers on the challenges he now faces "to paint the picture for the legislature."

Since taking office for a second term, Trump has issued a flurry of executive orders aimed at slashing federal spending, reducing the size of the federal workforce and cracking down on immigration into the United States.

Many of those actions have prompted lawsuits, particularly from Democratic-led states such as Illinois, challenging the actions as unconstitutional or beyond the scope of the president's authority.

Since the inauguration, Raoul has joined lawsuits seeking to block the administration's proposed [freeze on federal grants and financial aid](); an executive order barring the recognition of "birthright citizenship" for people born in the United States to noncitizen parents; the disclosure of private information to Trump's newly-created Department of Government Efficiency; and, now, limitations on grant awards from the NIH.

**Read more:** [Illinois locked in legal battles with Trump administration over immigration policy]()

In the NIH lawsuit, 22 state attorneys general filed suit Monday to block enforcement of a new directive that sought to cap the administrative overhead costs, known as "indirect costs," of NIH-funded research projects at 15% of the total project cost. The move would have cost research universities in the U.S. an estimated $4 billion annually, including about $67 million annually to the University of Illinois System.

"This is an enormous and unprecedented shift, announced with no warning and with immediate effect," Raoul said during a virtual news conference with his peers in Massachusetts and Michigan, the other lead plaintiffs in the suit.

"That is a huge blow to our universities' ability to conduct life-saving medical research and achieve breakthrough discoveries that make life better for all of us," he said. "The impact of the change would be enormous in Illinois and to the country at large."

A federal judge in Boston quickly [put a temporary hold]() on the order pending further proceedings. A hearing in the case is set for Feb. 21.

In addition to those cases, Raoul's office is defending the state, along with Chicago and Cook County, against a Department of Justice lawsuit challenging state and local laws that limit local law enforcement cooperation with federal civil immigration enforcement actions.

And, while not joining the case as a party, his office filed a friend-of-the-court brief in a lawsuit by 20 other state attorneys general challenging the administration's federal "buyout" plan that seeks to eliminate the jobs of tens of thousands of federal workers.

In an interview with Capitol News Illinois, Raoul said the volume of litigation has become so intense, he would like to add new attorneys who would focus solely on litigation battling the Trump administration.

"The role of state attorneys general has expanded from what it used to be. It has happened on both sides of the aisle," Raoul said. "There's been more involvement of state attorneys general, like during the Obama administration. Republican state attorneys general were very active trying to respond to the administration's executive orders and suing over the Affordable

Care Act and numerous other things. So during Trump's first term, likewise, Democrat attorneys general were involved in trying to protect against federal executive branch overreach."

Raoul noted that his office's budget has grown since he was first elected attorney general in 2018. According to the Commission on Government Forecasting and Accountability, it has more than doubled in six years to just under $194 million in the current fiscal year.

"When I took over as attorney general, we had the worst attrition rate in the country," Raoul said. "We were in essence training lawyers to go work elsewhere. They'd come here, work for three or four years, learn their practice, and go work elsewhere because we couldn't pay them as much. And so we've turned this corner on that."

But it remains unclear how receptive lawmakers or Gov. JB Pritzker would be to a request for a budget increase solely for funding litigation against the Trump administration considering the projected deficit.

In a statement Tuesday, Pritzker said he fully supports Raoul's legal efforts so far, including the suit challenging NIH funding caps, saying it was "important and necessary to stop Trump's increasingly authoritarian executive orders."

Pritzker is scheduled to deliver his budget address to the General Assembly on Wednesday, Feb. 19.

*Capitol News Illinois is a nonprofit, nonpartisan news service that distributes state government coverage to hundreds of news outlets statewide. It is funded primarily by the Illinois Press Foundation and the Robert R. McCormick Foundation.*

**Tags:**   Boston    Chicago    FY26 Budget    Kwame Raoul    Massachusetts    Michigan    Springfield    Trump Administration

U.S. Department of Justice



### Peter Hancock

**Statehouse Reporter**

Peter was one of the founding reporters with Capitol News Illinois. He came to Springfield after many years working in Topeka, Kansas, where he covered the Kansas statehouse and other beats. He began his reporting career in 1989 at a small county weekly newspaper and has worked in a variety of settings including both daily and nondaily newspapers, online media and public radio. A native of the Kansas City area, he has degrees in political science and education from the University of Kansas.



**Related Posts**

Federal housing credit expansion could increase affordable rental units in Illinois: report

🕐 JULY 22, 2025    👁 1.6K

Housing funding cut in Illinois budget as homelessness increases

🕐 JULY 4, 2025    👁 1.8K



Republish This Story



Republish our articles for free, online or in print, under a Creative Commons license.



f  FACEBOOK        𝕏  TWITTER        🦋  BLUESKY        ☁  SOUNDCLOUD        📷  INSTAGRAM

▶  YOUTUBE        📶  RSS

2501 Chatham Road, Suite 200
Springfield, IL 62704
editors@capitolnewsillinois.com

About Us

Contact Us

Media Center

Privacy Policy

Terms of Use

*Capitol News Illinois is a nonprofit, nonpartisan news service covering state government. A service of the Illinois Press Foundation.*



More news from the Illinois Statehouse delivered to your inbox each Wednesday and Saturday.

© 2025 Capitol News Illinois

# Exhibit 4

## OFFICE OF THE ATTORNEY GENERAL
## STATE OF ILLINOIS

### CONTRACT FOR
### SPECIAL ASSISTANT ATTORNEYS GENERAL

| | |
|---|---|
| ATTORNEY FEIN/SSN: 36-3175282 (Miner, Barnhill & Galland, P.C.); 36-3339308 (Hughes, Socol, Piers, Resnick & Dym, Ltd.); 46-3082415 (Edelson P.C.) ATTORNEY DHR I.D. No.: N/A ATTORNEY TELEPHONE: (312) 751-1170 (MBG); (312) 580-0100 (HSPRD); (312) 589-6370 (Edelson) COMMENCEMENT DATE: date of last signature TERMINATION DATE: N/A | CONTRACT NUMBER: APPROPRIATION CODE: CONTRACT AMOUNT: N/A HOURLY RATE: N/A BUREAU ASSIGNMENT: Administration CONTRACT MANAGER: Brent D. Stratton AMENDMENT 1 |

### SYNOPSIS

Provide to the Office of the Attorney General, Public Interest Division, factual review, legal analysis, and all necessary legal and litigation services required in matters as may be assigned by the Office of the Illinois Attorney General regarding investigation and potential litigation concerning alternative retail energy suppliers.

The following parties:

| PARTY 1 | PARTY 2 |
|---|---|
| Miner, Barnhill & Galland, P.C. Hughes, Socol, Piers, Resnick & Dym, Ltd. Edelson P.C. | KWAME RAOUL as Attorney General for the State of Illinois, in his official capacity and not as an individual 500 South Second Street Springfield, Illinois 62701 |
| Herein referred to as SPECIAL ASSISTANT ATTORNEYS GENERAL | Herein referred to as ATTORNEY GENERAL |

contract and agree that by and for the mutual covenants and other consideration contained in this contract, that the persons designated as Party 1 shall perform the services stated in Schedule 1 for which the Attorney General shall make the remunerations provided in Schedule 2. Such services and remunerations shall be in accordance with and subject to the provisions of this contract.

//
//
//
//
//

RECEIVED

JAN 25 2023

ATTORNEY GENERAL
Administration

This contract consists of three schedules, designated Schedule 1, Schedule 2 and Schedule 3, each of which is attached hereto and specifically incorporated herein. These schedules and this page represent the full and complete contract.

**SPECIAL ASSISTANT ATTORNEYS GENERAL**     **ATTORNEY GENERAL**

Miner, Barnhill & Galland, P.C.

By: _Robert S. Libman_ by BJB     Kwame Raoul

By: _____

Robert S. Libman, Shareholder     Nathalina Hudson, Chief of Staff

Date: _1/20/23_     Date: _1/26/23_

Hughes, Socol, Piers, Resnick & Dym, Ltd.

By: _____

Christopher Wilmes, Shareholder

Date: _____

Edelson P.C.

By: _____

Ari Scharg, Partner

Date: _____

This contract consists of three schedules, designated Schedule 1, Schedule 2 and Schedule 3, each of which is attached hereto and specifically incorporated herein. These schedules and this page represent the full and complete contract.

**SPECIAL ASSISTANT ATTORNEYS GENERAL**     **ATTORNEY GENERAL**

Miner, Barnhill & Galland, P.C.     Kwame Raoul

By: _____     By: _____
    Robert S. Libman, Shareholder         Nathalina Hudson, Chief of Staff

Date: _____     Date: _____

Hughes, Socol, Piers, Resnick & Dym, Ltd.

By: _____
    Christopher Wilmes, Shareholder

Date:   1/24/23

Edelson P.C.

By: _____
    Ari Scharg, Partner

Date: _____

This contract consists of three schedules, designated Schedule 1, Schedule 2 and Schedule 3, each of which is attached hereto and specifically incorporated herein. These schedules and this page represent the full and complete contract.

**SPECIAL ASSISTANT ATTORNEYS GENERAL**    **ATTORNEY GENERAL**

Miner, Barnhill & Galland, P.C.    Kwame Raoul

By: _____    By: _____
       Robert S. Libman, Shareholder           Nathalina Hudson, Chief of Staff

Date: _____    Date: _____

Hughes, Socol, Piers, Resnick & Dym, Ltd.

By: _____
       Christopher Wilmes, Shareholder

Date: _____

Edelson P.C.

By: _____
       Ari Scharg, Partner

Date: ___1/24/2023___

Schedule 1:   Page 2 of 20

**SCHEDULE 1**
WORK PROGRAM PARTICULARS
(Special Assistant Attorneys General)

**1.1    SPECIAL ASSISTANT ATTORNEYS GENERAL SERVICES**

The Attorney General hereby retains the Special Assistant Attorneys General to provide professional services as more specifically described herein below, on behalf of the State of Illinois. The Special Assistant Attorneys General shall provide, perform, and undertake such services in accordance with the highest degree of professionalism customary to persons and entities which provide such services.

**1.2    DESCRIPTION OF SERVICES**

The Special Assistant Attorneys General shall provide the legal services necessary to investigate the State's potential claims against or relating to alternative retail energy suppliers (ARES), to advise the Attorney General regarding such claims and potential litigation against the ARES and other potentially responsible parties, including, but not limited to, third-party vendors marketing on behalf of ARES, and with the agreement of the Attorney General, to bring and handle such litigation.

**1.3    TIME FOR DELIVERY OF SERVICES**

The Special Assistant Attorneys General shall begin to provide the services under this contract on the date of its execution by all parties, or as otherwise thereafter requested, and shall work in a timely manner pursuant to a schedule to be decided upon by the parties.

**1.4    METHODOLOGY**

The manner and methodology by which the Special Assistant Attorneys General perform and fulfill the obligations under this contract shall be determined by the Special Assistant Attorneys General using their best professional judgment.

**1.5    CONTROL AND DIRECTION**

The Attorney General shall at all times maintain control and direction over the scope of work being performed under this contract.

**SCHEDULE 2**
FINANCIAL PARTICULARS
(Special Assistant Attorneys General)


**2.1    COMPENSATION**

The Special Assistant Attorneys General will be compensated for all professional services on a contingent basis as follows:

Neither the Attorney General nor the State of Illinois is liable pursuant to this contract to pay compensation to the Special Assistant Attorneys General other than from recoveries, whether by settlement or judgment, or any other proceeding or form, from the ARES that are investigated and/or are defendants in any litigation.

Compensation shall be contingent upon recovery and collection of damages or monetary penalties. The amount of compensation shall be based on the recovery to the extent that such funds are available after reimbursement of all expenses and other required disbursements.

This contingent payment arrangement is based on the significant commitment of resources by the Special Assistant Attorneys General to investigate claims and prosecute the litigation. The Special Assistant Attorneys General have agreed to reduce the amount of contingent fees from its normal fee arrangements based on the public nature of the investigation and any resulting litigation, and the involvement of the Attorney General's Office.

If there is a recovery and collection of damages or penalties on behalf of the State against any defendant during the course of the investigation or litigation by settlement or at the end of the litigation either by settlement or by judgment. or by any other proceeding or form, the Special Assistant Attorneys General will be compensated at the time of recovery and collection as follows:

|  | Pre-discovery | Pre-trial | Trial |
|---|---|---|---|
| First $50 million | 15% | 20% | 25% |
| Next $50 million (*i.e.*, $50-100 million) | 13% | 17% | 20% |
| Remainder (*i.e.*, above $100 million) | 10% | 14% | 18% |

If the Attorney General and the Special Assistant Attorneys General agree to seek an award of attorney's fees and costs from the court, and if the court awards attorney's fees and costs, then such award will be applied first to the compensation paid to the Special Assistant Attorneys General.

**2.2    EXPENSES**

Reimbursement of the costs and expenses incurred by the Special Assistant Attorneys General will be made only out of recoveries or court awards.

The Special Assistant Attorneys General shall be reimbursed for all reasonable, actual, ordinary and necessary, direct non-labor costs and expenses incurred by the Special Assistant Attorneys General in fulfilling the terms of this contract. Lodging and meal expenses will be reimbursed at rates that do not exceed those for State agents in accordance with the travel regulations applicable to State employees. All travel on common carriers will be reimbursed at actual cost not to exceed coach fare on commercial airlines.

If there is a recovery, costs and expenses advanced by the Special Assistant Attorneys General will be reimbursed first, before payment of any attorney's fees.

## 2.3    PAYMENT

The parties to this contract understand that all payments to the Special Assistant Attorneys General will be made pursuant to the contingent compensation and expense reimbursement arrangements detailed in Sections 2.1 and 2.2, above, and shall not be made from or with funds appropriated by the General Assembly.

**SCHEDULE 3**
STANDARD CONTRACT PROVISIONS
(Special Assistant Attorney General Services)

**ARTICLE 1 - GENERAL PROVISIONS**

**3.1.1  AUTHORITY OF THE ATTORNEY GENERAL TO CONTRACT**

This contract is executed under the Attorney General's constitutional authority as the Attorney General of the State of Illinois and in his official capacity as Attorney General and not as an individual.

**3.1.2  CONTRACTING STATUS OF PARTIES**

All actions undertaken by the Attorney General or his agents and employees under this contract are undertaken in their official capacities as representatives of the State of Illinois and not personally.

**3.1.3  AUTHORITY OF SPECIAL ASSISTANT ATTORNEY GENERAL TO BIND PRINCIPAL AND TO CONTRACT**

Any Special Assistant Attorney General binding any principal other than himself or herself must, when required, state and/or evidence the legal authority for his or her agency. If, subsequent to the execution of this contract, the signing person is found not to have the appropriate authority, expressly, impliedly, or in fact or law, then the would-be agent shall be primarily liable under this contract as principal. If the person signing this contract has legal authority to bind its organization, then the person signing this contract shall be held liable under this contract only secondarily as agent to the extent the principal is unable to provide complete relief, and then only to the extent permitted by applicable law. The Special Assistant Attorneys General's capacity to contract is presumed.

The Special Assistant Attorneys General represent and warrant that they possesses all requisite professional licenses and all other legal authority necessary to perform the services required of them hereunder.

**3.1.4  NON-ASSIGNMENT CLAUSE**

The rights and duties of the Special Assistant Attorneys General under this contract may not be assigned or delegated except with the express written approval of the Attorney General. ANY ASSIGNMENT BY SPECIAL ASSISTANT ATTORNEYS GENERAL IN VIOLATION OF THIS PROVISION IS VOID.

**3.1.5  GOVERNING LAW**

This contract shall be governed by and construed according to the laws of the State of Illinois. The Special Assistant Attorneys General shall at all times observe and comply with all laws, ordinances, and regulations of the Federal and State governments and any local government which may in any manner affect the performance of this contract.

**3.1.6  SEVERABILITY**

If any provision of this contract shall be declared invalid, its other provisions shall not be affected.

## ARTICLE 2 - SPECIAL ASSISTANT ATTORNEYS GENERAL

### 3.2.1   QUALIFICATIONS OF SPECIAL ASSISTANT ATTORNEYS GENERAL

Only an individual who is licensed to practice law in the State of Illinois and currently registered as required by Supreme Court Rule 756, or who, pursuant to Supreme Court Rule 707, has been admitted *pro hac vice* to represent the State in litigation covered by this contract, may be appointed or hold the position of a Special Assistant Attorney General. No person may render legal services that involve litigation on behalf of the State of Illinois unless that person has been properly appointed by the Attorney General.

### 3.2.2   TERM OF APPOINTMENT

A person becomes a Special Assistant Attorney General only upon written appointment executed by the Attorney General. The appointment is effective on and from the date of appointment set forth in the appointment letter. The appointment ends upon the occurrence of any one of the following:

1. The appointment is revoked by the Attorney General;
2. At the time specified in the appointment letter;
3. At 11:59 p.m. local time in Springfield, Illinois on June 30 immediately following the date of appointment; or
4. The Special Assistant Attorney General no longer meets the qualifications required to be a Special Assistant Attorney General.

### 3.2.3   STATUS OF A SPECIAL ASSISTANT ATTORNEY GENERAL

An individual who has been appointed a Special Assistant Attorney General represents the Attorney General of the State of Illinois and exercises the delegated authority of the Attorney General. A Special Assistant Attorney General has the authority to perform legal services involving litigation on behalf of the State of Illinois, but such authority is subject to and controlled by the provisions of this contract and the letter of appointment.

### 3.2.4   STATUS OF PERSONS WHO ARE NOT INDIVIDUALS

If the person designated as Special Assistant Attorney General is not an individual, then this Contract shall be deemed a master administration contract that binds Party 1 (*see* page 1, *supra.*), but which does not by itself authorize any individual to be a Special Assistant Attorney General, nor does it bestow on Party 1 the status of a Special Assistant Attorney General. Only individuals who are members of Party 1 firms and who have been specifically appointed Special Assistant Attorneys General by a letter of appointment referencing this contract may act under this contract. Only individuals who have been appointed Special Assistant Attorneys General may render litigation services under this contract.

## ARTICLE 3 - DEFINITIONS AND CONSTRUCTION

### 3.3.1   CONFLICTS BETWEEN PROVISIONS

Whenever there is a conflict between a provision in Schedule 3 of this contract and any other provision of this contract, the provision of Schedule 3 shall be controlling.

### 3.3.2   SECTION TITLES

Section titles in this contract are provided only for convenience and to aid in reading and referencing and shall not be construed to add to, delete from, modify, or limit any provision of this contract.

### 3.3.3    AUTHORITY OF HEADNOTES

Headnotes in this contract are only editorial devices to aid in reading and referencing and shall not be construed to add to, delete from, modify, or limit any provision of this contract.

### 3.3.4    CONTRACT NUMBER REFERENCE

The Attorney General's contract number appearing on the cover page of this contract is the sole official reference for this contract. All other references are for convenience only.

## ARTICLE 4 - FINANCIAL MATTERS

### 3.4.1    PAYMENTS CONTINGENT UPON APPROPRIATION

The Special Assistant Attorneys General understand and agree that all compensation and expense reimbursement payments contemplated by this contract will be made pursuant to the contingent compensation and expense reimbursement arrangements detailed in Sections 2.1 and 2.2, above, and shall not be made from or with funds appropriated by the General Assembly.  However, the Special Assistant Attorneys General are hereby given notice of the fact that pursuant to law (30 ILCS 105/30; 30 ILCS 500/20-60(b)), the Attorney General's ongoing participation in litigation that may result in the recovery and collection of damages or monetary penalties necessary to fund the compensation and expense reimbursement arrangements set out in Sections 2.1 and 2.2, above, that could become contingent upon first having obtained a valid appropriation therefor from the General Assembly, and that no officer shall "contract any indebtedness on behalf of the State, nor assume to bind the State in an amount in excess of the money appropriated, unless expressly authorized by law." If this is a multi-year contract, it is void by operation of said law if the Attorney General fails to obtain the requisite appropriation, if necessary, to facilitate continuation of the litigation contemplated as the source of funds to be used to compensate and reimburse the Special Assistant Attorneys General under this contract.

### 3.4.2    PAYMENTS CONTINGENT UPON EXECUTION

No back dating of any document will obviate the provisions of this Section and NO EMPLOYEE OF THE ATTORNEY GENERAL HAS THE POWER TO MODIFY, WAIVE, DELETE OR OTHERWISE LIMIT THE APPLICATION OF THIS SECTION.

THE ATTORNEY GENERAL SHALL MAKE NO PAYMENTS UNTIL THIS CONTRACT IS SIGNED BY ALL THE SIGNATORY PARTIES AND SHALL NOT BE LIABLE FOR ANY COSTS INCURRED PRIOR TO THE TIME THIS CONTRACT IS SIGNED BY ALL THE SIGNATORY PARTIES.

### 3.4.3    LAPSED FUNDS LIMITATION; REPORTING DEADLINE

The Special Assistant Attorneys General understand and agree that all payments to them as contemplated by contract will be made pursuant to the contingent compensation and expense reimbursement arrangements detailed in Sections 2.1 and 2.2, above, and shall not be made from or with funds appropriated by the General Assembly. The Special Assistant Attorney General is further notified, however, of the lapsed funds provision of the State Finance Act (30 ILCS 105/25), which provides that:

(a)    All appropriations shall be available for expenditure only during the current fiscal year, or for a lesser period if the Act making the appropriation so specifies, but

(b)     That outstanding liabilities as of June 30, payable from appropriations which have otherwise expired, may be paid out of the expiring appropriations during the two-month period ending at the close of business on August 31.

In order to ensure that the Attorney General will have sufficient time to process payments by August 31, the Special Assistant Attorneys General agree that all costs billable under this contract for work or services performed through June 30 in any given year shall be billed and submitted no later than August 15 following said June 30. The Special Assistant Attorneys General expressly agree that time is of the essence in this matter and acknowledge that the Attorney General may not be able to process payment with respect to any cost that is not properly submitted by August 15.

RECOURSE FOR PAYMENT THAT IS NOT PROCESSED BY AUGUST 31 MAY BE HAD, IF AT ALL, ONLY THROUGH THE ILLINOIS COURT OF CLAIMS.

## 3.4.4   DELIVERY OF PAYMENTS

Payment to the Special Assistant Attorneys General under this contract shall be made payable in the name of the Special Assistant Attorneys General and sent to the person and place specified on the cover page of this contract. The disbursement mechanism will be set out in a later amendment to this contract, executed by the parties.

The Special Assistant Attorneys General may change the payee, the person to whom payments are sent, or the place to which payments are sent by written notice to the Attorney General signed by the Special Assistant Attorneys General. No such change or payment notice shall be binding upon the Attorney General until ten (10) business days after actual receipt.

## 3.4.5   ATTORNEY'S LIEN WAIVER

The Special Assistant Attorneys General expressly acknowledge that neither this contract nor any services provided by the Special Assistant Attorneys General pursuant to this contract shall create any rights or claims under the Attorney's Lien Act, 770 ILCS 5/0.01 et seq. The Special Assistant Attorneys General hereby agrees not to assert any rights or claims under the Attorney's Lien Act and hereby waives and relinquishes any and all rights or claims under the Attorney's Lien Act for services rendered pursuant to this contract.

## ARTICLE 5 - PERSONNEL MATTERS

## 3.5.1   CONFLICT OF INTEREST AND ETHICS

The Special Assistant Attorneys General expressly covenant that they have no public or private interest which would conflict in any manner with the performance of this contract or which would violate Article 50 of the Illinois Procurement Code (Procurement Code) prohibiting conflicts of interest (30 ILCS 500/50-1 through 50-75). All the terms, conditions, and provisions of those Sections apply to this contract and are made a part hereof the same as though included herein.   The Special Assistant Attorneys General certify that the disclosures required by section 50-35 of the Procurement Code (30 ILCS 500/50-35), and §1300.5035 of the Attorney General's Procurement Rules (44 Ill. Admin. Code §1300.5035), if applicable, have been made and are true and correct.

Every Special Assistant Attorney General is bound by the Attorney General's Rules of Professional Conduct as now and hereafter amended. The Special Assistant Attorneys General specifically acknowledges that they have been given a copy of the Rules of Professional Conduct, have read them, understand them, and will abide by their terms.

## 3.5.2   CERTAIN PERSONAL AND BUSINESS RELATIONS PROHIBITED

The Special Assistant Attorneys General warrant that no person in any of the Special Assistant Attorney General firms, who is entitled to receive more than 7.5 % of the firm's total distributable income, is an officer or employee of any office of Illinois State government or the spouse or minor child of an officer or employee of Illinois State government.

If a person in any of the Special Assistant Attorney General firms, who is entitled to receive more than 7.5 % of the total distributable income is an officer or employee of Illinois State government or the spouse or minor child thereof, the Special Assistant Attorney General firm warrants that it has obtained an exemption from the Governor pursuant to Section 50-20 of the Procurement Code (30 ILCS 500/50-20).

After the execution of this contract, the Special Assistant Attorneys General are under a continuing obligation as part of the requirements of the contract to notify the Attorney General within five (5) days of any change in circumstances which, if such circumstances existed at the time the contract was executed, would have constituted a breach of any warranty in this Section. Breach of a warrant of this Section voids this contract.

### 3.5.3 HIRING STATE EMPLOYEES PROHIBITED

No State officer or employee may be hired or paid with funds derived directly or indirectly through this contract without the written approval of the Attorney General and compliance with the Procurement Code as applicable (30 ILCS 500/50-13, 50-15, 50-20). Violation of this Section makes this contract void.

### 3.5.4 EQUAL EMPLOYMENT OPPORTUNITY CLAUSE

The Special Assistant Attorneys General agrees to comply, as applicable, with the equal employment opportunity provisions of the Illinois Constitution, the Illinois Human Rights Act (775 ILCS 5/1-101 *et seq*.), and the rules and regulations established pursuant thereto, in connection with employment under this contract.

### 3.5.5 ASSIGNMENT OF SPECIFIC PERSONNEL

Where a particular person or group of persons is specifically designated under this contract to provide the Special Assistant Attorneys General's services hereunder, the Special Assistant Attorneys General shall not make a substitution or change any stated capacity without the prior written consent of the Attorney General.

<div align="center">

**ARTICLE 6 - SUBCONTRACTS**

</div>

### 3.6.1 GENERAL

The Special Assistant Attorneys General shall not subcontract any of the work required under this contract without the prior express written consent of the Attorney General. If such consent is given, the Special Assistant Attorneys General and the Attorney General shall prepare and execute an amendment to this contract stating the names and addresses of said subcontractor and the anticipated amount of money each shall receive hereunder. **Any subcontracts made in violation of this provision are voidable at Attorney General's sole option.**

### 3.6.2 REQUIRED PROVISIONS

Every subcontract or agreement executed in connection with this contract by the Special Assistant Attorneys General and any other party shall contain the following provisions:

(a)    A Payment Contingent Upon Appropriation Clause and a Payment Contingent Upon Execution Clause identical to those included in this contract in Sections 3.4.1 and 3.4.2 above;

(b)    A Lapsed Funds Limitation Clause identical to that included in this contract in Section 3.4.3 above;

<div align="center">

Schedule 3: Page 10 of 20

</div>

(c)    A Conflict of Interest Clause identical to that included in this contract in Section 3.5.1, above.

(d)    An Equal Employment Opportunity Clause identical to that included in this contract in Section 3.5.4 above;

(e)    Certifications in the forms specified below in Sections 3.8.1 through 3.8.21 of this contract; and

(f)    A Records Retention and Right to Audit Clause identical to that included in this contract in Section 3.9.2 below.

## ARTICLE 7 - DATA AND INFORMATION RIGHTS

### 3.7.1  SUBJECT DATA

The term "subject data" when used in this contract means recorded data or information, regardless of the medium, and whether or not copyrighted, that is acquired in the performance of this contract or specified to be or is delivered under this contract, whether such data is final or preliminary. The term includes all analyses, reports, storage tapes, discs or other media, studies, graphs or other documents or information prepared, supplied, commissioned, gathered or generated in the performance of the obligations under this contract, and all documents, materials and computer discs provided by the Attorney General in order that the Special Assistant Attorneys General may perform the services required under this contract.

### 3.7.2  RIGHTS IN FIRST PRODUCED DATA

All subject data first produced in the performance of this contract shall be the sole property of the Attorney General on behalf of the people of the State of Illinois. The Special Assistant Attorneys General agree that they do not acquire and will not assert or claim any rights in subject data and that they will not establish or assert any claim to statutory copyright in subject data. The Attorney General, at his discretion, may copyright subject data in the name of the State of Illinois.

### 3.7.3  INTERESTS IN NON-FIRST PRODUCED DATA

For material which was previously first produced by any of the Special Assistant Attorneys General or for material over which any of the Special Assistant Attorneys General has the authority to grant licenses for use, the Special Assistant Attorney General agrees to grant, and does hereby grant, to the State of Illinois, a royalty free, non-exclusive and irrevocable license throughout the world to publish, translate, reproduce, deliver, perform, use, store, and dispose of, any and all data not first produced or composed in the performance of this contract, but which is incorporated in any work or service provided under this contract.

### 3.7.4  INDEMNIFICATION

The Special Assistant Attorneys General shall indemnify and save and hold harmless the Attorney General, his employees and agents, against any liability, including costs and expenses: (1) for any intentional violation of proprietary rights, copyrights, or a right of privacy, arising out of the publication, translation, reproduction, delivery, performance, use, or disposition of any data created or first produced by any of the Special Assistant Attorneys General under this contract; or (2) based upon any defamatory or any unlawful matter contained in such data.

### 3.7.5  DATA FURNISHED TO THE SPECIAL ASSISTANT ATTORNEY GENERAL

All data supplied to the Special Assistant Attorneys General by the Attorney General, his agents and employees acting within the scope of their official duties, shall remain the sole property of the Attorney General and shall be returned

to the Attorney General upon demand of the Attorney General. In all cases, the Special Assistant Attorneys General will return all such supplied data at the termination of this contract.

Material furnished to the Special Assistant Attorneys General by the Attorney General incorporated in the work or service provided under this contract shall remain the exclusive property of the Attorney General.

### 3.7.6 CONFIDENTIALITY AND NON-DISSEMINATION OF CONTRACT INFORMATION

Except for its own internal use, the Special Assistant Attorneys General shall not publish, permit to be published, or distribute any data or information, oral or written, concerning this contract or derived during the performance of this contract or dealing with any findings, results, conclusions, recommendations or opinions concerning this contract without the written consent of the Attorney General.

Information which is confidential by or pursuant to law or by agreement, including any data produced by this contract or supplied to the Special Assistant Attorneys General by the Attorney General, shall be held confidential at all times by the Special Assistant Attorneys General.

The Special Assistant Attorneys General are hereby designated as the authorized representative of the Attorney General for the purposes of all applicable privileges and confidentiality statutes.

### 3.7.7 EFFECTS ON EXISTING RIGHTS

Nothing contained in this Article 7 shall imply a license to the Special Assistant Attorneys General under any patent or copyright or be construed as affecting the scope of any license or other right otherwise granted to the Attorney General under any patent or copyright.

### 3.7.8 ATTORNEY WORK PRODUCT

All attorney work product is the property of the Attorney General in his official capacity as the Attorney General for the State of Illinois. All information, documents and materials acquired during the course of or pursuant to this contract by the Special Assistant Attorneys General or any individual acting under this contract shall be delivered to the Attorney General on demand or if no demand is made, then upon completion of the contract. Except as otherwise provided, attorney work product is subject to the same controls and restrictions as "subject data" under this Article.

### ARTICLE 8 - SPECIAL ASSISTANT ATTORNEYS GENERAL CERTIFICATIONS

### 3.8.1 BRIBERY CONVICTION CERTIFICATION

The Special Assistant Attorneys General certify that they are not barred from being awarded a contract or subcontract under Section 50-5 of the Procurement Code (30 ILCS 500/50-5), which, except as allowed in that section, prohibits the award of a contract to a person or business that has been convicted, or made an admission as a matter of record, of having bribed or attempted to bribe an officer or employee of any state. The Special Assistant Attorneys General acknowledge that the Attorney General's chief procurement officer ("CPO") may declare this contract void if this certification is false.

### 3.8.2 FELONY CONVICTION CERTIFICATION

The Special Assistant Attorneys General certify that none of them is barred from being awarded a contract or subcontract under Section 50-10 of the Procurement Code (30 ILCS 500/50-10), which prohibits a person or business convicted of a felony from doing business with the State of Illinois or any State agency from the date of conviction until five (5) years after the completion of the sentence for that felony, unless no person held responsible by a prosecutorial

office for the facts upon which the conviction was based continues to have any involvement with the business. The Special Assistant Attorneys General acknowledge that the CPO may declare this contract void if this certification is false.

### 3.8.3   SARBANES-OXLEY ACT CERTIFICATION

The Special Assistant Attorneys General certify that none of them is barred from being awarded a contract or subcontract under Section 50-10.5 of the Procurement Code (30 ILCS 500/50-10.5), which, for a period of five (5) years prior to the date of the bid or contract, prohibits a business from bidding on or entering into a contract or subcontract under the Procurement Code if the business or any officer, director, partner, or other managerial agent of the business has been convicted of a felony under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 *et seq*.) or of a Class 3 or Class 2 felony under the Illinois Securities Law of 1953 (815 ILCS 5/1 *et seq*.). The Special Assistant Attorneys General acknowledge that the CPO shall declare this contract void if this certification is false.

### 3.8.4   NON-ASSISTANCE CERTIFICATION

The Special Assistant Attorneys General certify that none of them is barred from being awarded a contract with the Attorney General or with the State of Illinois under Section 50-10.5(e) of the Procurement Code (30 ILCS 500/50-10.5(e)). Section 50-10.5(e) of the Code prohibits a person or business from bidding on or entering into a contract with the State if the person or business:

(1) assisted the State or the Office of the Attorney General in determining whether there is a need for the contract except as part of a response to a publicly issued request for information; or

(2) assisted the State or the Office of the Attorney General by reviewing, drafting, or preparing any invitation for bids, a request for proposal, or request for information or provided similar assistance except as part of a publicly issued opportunity to review drafts of all or part of these documents.

For purposes of this Certification, "business" includes all individuals with whom a business is affiliated, including, but not limited to, any officer, agent, employee, Special Assistant Attorney General, independent contractor, director, partner, manager, or shareholder of a business.

The Special Assistant Attorneys General acknowledge that the CPO shall declare this contract void if this certification is false.

### 3.8.5   DEBT DELINQUENCY CERTIFICATION

The Special Assistant Attorneys General certify that none of them nor any of their affiliates is barred from entering into a contract or subcontract under Section 50-11 of the Procurement Code (30 ILCS 500/50-11), which prohibits any person who knows or should know that he or she or any affiliate is delinquent in the payment of any debt to the State from entering into a contract under the Procurement Code unless that person or affiliate has entered into a deferred payment plan to pay off the debt. The Special Assistant Attorneys General acknowledge that the CPO may declare this contract void if this certification is false.

### 3.8.6   USE TAX CERTIFICATION

The Special Assistant Attorneys General certify that none of them nor any of their affiliates is barred from entering into a contract or subcontract under Section 50-12 of the Procurement Code (30 ILCS 500/50-12), which prohibits a person from entering into a contract under the Procurement Code unless the person and all the person's affiliates collect and remit Illinois Use Tax on all sales of tangible personal property into the State of Illinois in accordance with the provisions of Illinois' Use Tax Act (35 ILCS 105/1 *et seq*.), regardless of whether the person or affiliate is a "retailer maintaining a place of business within Illinois." The Special Assistant Attorneys General acknowledge that the CPO may declare this contract void if this certification is false.

### 3.8.7   ENVIRONMENTAL PROTECTION ACT CERTIFICATION

The Special Assistant Attorneys General certify that none of them is barred from being awarded a contract or subcontract under Section 50-14 of the Procurement Code (30 ILCS 500/50-14), which prohibits for a period of five (5) years a person or business from doing business with the State of Illinois, including any State agency, if the person or business has been found by a court or by the Pollution Control Board to have committed a willful or knowing violation of the Environmental Protection Act and unless the person or business can show that no person involved in the violation continues to have any involvement with the business or there is no practicable contractual alternative available to the State. The Special Assistant Attorneys General acknowledge that the CPO may declare this contract void if this certification is false.

### 3.8.8 REVOLVING DOOR PROHIBITION CERTIFICATION

The Special Assistant Attorneys General certify that none of them is barred from engaging in any procurement activity with the Attorney General under Section 50-30 of the Procurement Code (30 ILCS 500/50-30). Section 50-30 of the Procurement Code prohibits chief procurement officers, associate procurement officers, State purchasing officers and their designees whose principal duties were directly related to State procurement from engaging in any procurement activity for a period of two (2) years after terminating an affected position relating to the agency most recently employing them in an affected position for a period of at least six (6) months. The prohibition includes but is not limited to: lobbying the procurement process; specifying; bidding; proposing bid, proposal or contract documents on their own behalf or on behalf of any firm, partnership, association, or corporation. This Section applies only to those persons who terminate an affected position on or after January 15, 1999. (30 ILCS 500/50-30.)

### 3.8.9 FORCED LABOR CERTIFICATION

The Special Assistant Attorney General certify, in accordance with Section 10 of the State Prohibition of Goods from Forced Labor Act (30 ILCS 583/10), that none of the equipment, materials or supplies furnished pursuant to the provisions of this contract constitute imported, foreign-made goods which were produced in whole or in part by forced labor, convict labor or indentured labor. The Special Assistant Attorneys General acknowledge that providing a false certification under this Section of the contract may result in: (1) this contract being voided at the Attorney General's option; (2) the Special Assistant Attorneys General being assessed a penalty of $1,000 or an amount equal to 20% of the value of the equipment, materials or supplies produced by forced labor, convict labor or indentured labor; and/or (3) the Special Assistant Attorneys General being suspended from bidding on any State contract for up to 360 days.

### 3.8.10 CHILD LABOR CERTIFICATION

The Special Assistant Attorneys General certify, in accordance with Section 10 of the State Prohibition of Goods from Child Labor Act (30 ILCS 584/1 *et seq.*), that none of the equipment, materials or supplies furnished pursuant to the provisions of this contract constitute imported, foreign-made goods which were produced in whole or in part by labor of a child under the age of 12. The Special Assistant Attorneys General acknowledge that providing a false certification under this Section of the contract may result in: (1) this contract being voided at the Attorney General's option; (2) the Special Assistant Attorney General being assessed a penalty of $1000 or an amount equal to 20% of the value of the equipment, materials or supplies produced by child labor; and/or (3) the Special Assistant Attorney General being suspended from bidding on any State contract for up to 360 days.

### 3.8.11 EDUCATIONAL LOAN CERTIFICATION

The Special Assistant Attorneys General certify that none of them is in default on an educational loan as provided in the Educational Loan Default Act (5 ILCS 385/0.01 *et seq.*).

### 3.8.12 BID-RIGGING AND BID ROTATING CERTIFICATION

The Special Assistant Attorneys General certify that none of them is barred from bidding on contracts with the State of Illinois as a result of a conviction of bid-rigging under Section 33E-3 or of bid rotating under Section 33E-4 of the Criminal Code of 1961 or the Criminal Code of 2012 (720 ILCS 5/33E-3, 5/33E-4).

**3.8.13 DUES TO CLUBS WHICH DISCRIMINATE CERTIFICATION**

The Special Assistant Attorney Generals certify that none of them is prohibited from selling goods or services to the State of Illinois because it pays dues or fees on behalf of its employees or agents or subsidizes or otherwise reimburses them for payment of their dues or fees to any club which unlawfully discriminates (775 ILCS 25/2).

**3.8.14 INTERNATIONAL ANTI-BOYCOTT CERTIFICATION**

The Special Assistant Attorneys General certify and agree that none of them nor any substantially-owned affiliated company of them is participating or shall participate in an international boycott in violation of the provisions of the Federal Export Administration Act of 1979 (50 App. U.S.C. 2401 *et seq*.) or the regulations of the United States Department of Commerce promulgated under that Act.

**3.8.15 DRUG-FREE WORKPLACE COMPLIANCE CERTIFICATION**

To the extent that this contract is subject to the Drug Free Workplace Act (30 ILCS 580/1 *et seq*.), each Special Assistant Attorney General firm certifies and agrees that it will provide a drug free workplace by:

    (a)    Publishing a statement:

        (1)    Notifying employees that the unlawful manufacture, distribution, dispensing, possession, or use of a controlled substance, including cannabis, is prohibited in the Special Assistant Attorney General's workplace.

        (2)    Specifying the actions that will be taken against employees for violations of such prohibition.

        (3)    Notifying the employee that, as a condition of employment, the employee will:

            (A)    abide by the terms of the statement; and

            (B)    notify the Special Assistant Attorney General of any criminal drug statute conviction for a violation occurring in the workplace no later than five (5) days after such conviction.

    (b)    Establishing a drug free awareness program to inform employees about:

        (1)    the dangers of drug abuse in the workplace;

        (2)    the Special Assistant Attorney General's policy of maintaining a drug free workplace;

        (3)    any available drug counseling, rehabilitation, and employee assistance programs; and

        (4)    the penalties that may be imposed upon an employee for drug violations.

    (c)    Providing a copy of the statement required by subsection (a) above to each employee engaged in the performance of any work under this contract and to post the statement in a prominent place in the workplace.

    (d)    Notifying the Attorney General within ten (10) days after receiving notice under part (B) of paragraph (3) of subsection (a) above from an employee or otherwise receiving actual notice of such conviction.

(e)    Imposing a sanction on, or requiring the satisfactory participation in a drug abuse assistance or rehabilitation program by, any employee who is so convicted, as required by Section 5 of the Drug Free Workplace Act (30 ILCS 580/5).

(f)    Assisting employees in selecting a course of action in the event drug counseling, treatment, and rehabilitation is required and indicating that a trained referral team is in place.

(g)    Making a good faith effort to continue to maintain a drug free workplace through implementation of the Drug Free Workplace Act (30 ILCS 580/1 *et seq*.).

(h)    If the Special Assistant Attorney General is an individual, the Special Assistant Attorney General certifies that he or she will not engage in the unlawful manufacture, distribution, dispensation, possession, or use of a controlled substance in the performance of the contract.

## 3.8.16  TAXPAYER IDENTIFICATION NUMBER CERTIFICATION

Under penalties of perjury, each Special Assistant Attorney General firm or person executing for each Special Assistant Attorney General firm certifies that the name, taxpayer identification number and legal status listed below are correct. Each Special Assistant Attorney General firm or person executing for each Special Assistant Attorney General firm further certifies that the Special Assistant Attorney General is a U.S. Citizen or other U.S. Person and that the Special Assistant Attorney General is not subject to backup withholding because: (a) the Special Assistant Attorney General is exempt from backup withholding, or (b) the Special Assistant Attorney General has not been notified by the Internal Revenue Service (IRS) that it is subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified the Special Assistant Attorney General that it is no longer subject to backup withholding.

Name: Miner, Barnhill & Galland, P.C.
TIN Number: 36-3175282

Hughes, Socol, Piers, Resnick & Dym, Ltd.
TIN Number: 36-3339308

Name; Edelson P.C.
TIN Number: 46-3082415

(If the Special Assistant Attorney General is an individual, enter individual's name and SSN as it appears on the Special Assistant Attorney General's Social Security Card. If completing this certification for a sole proprietorship, enter the owner's name followed by the name of the business and the owner's SSN or EIN.  If completing this certification for a limited liability company (LLC) that is a disregarded entity, enter the name of the single member (owner) followed by the name of the LLC and a TIN (SSN or EIN) that is assigned to the owner, not the LLC. Check the legal status that corresponds to the owner. For all other entities, enter the name of the entity as used to apply for the entity's EIN and the EIN.)

Each Special Assistant Attorney General firm is performing these services as a: (please check one)

| | | | |
|---|---|---|---|
| _____ | Individual | _____ | Governmental |
| _____ | Sole Proprietorship | _____ | Nonresident alien |
| __X__ | Partnership/Legal Corporation | _____ | Estate or trust |
| _____ | Tax-exempt | _____ | Pharmacy (Non-Corp.) |
| _____ | Corporation providing or billing medical and/or health care services | _____ | Pharmacy/Funeral Home/Cemetery (Corp.) |
| _____ | Corporation NOT providing or billing medical and/or health care services | _____ | Limited Liability Company (select applicable tax classification.) |
| _____ | Other: _____ | | C = corporation |

P = partnership

### 3.8.17  ADA CERTIFICATION

The Americans with Disabilities Act of 1990 (42 U.S.C. 12101 *et seq*.) (the ADA) and regulations promulgated thereunder prohibit discrimination against persons with disabilities by the State of Illinois, whether directly or through contractual arrangements, in the provision of any aid, benefit or service. As a condition of this contract, the Special Assistant Attorneys General certify that services, programs, and activities provided under this contract are and will continue to be in compliance with the ADA.

### 3.8.18  STATE BOARD OF ELECTIONS REGISTRATION CERTIFICATION

Each Special Assistant Attorney General firm certifies that either (*check applicable box*):

X_ The Special Assistant Attorney General is not required to register as a business entity with the State Board of Elections pursuant to sections 20-160 of the Procurement Code (30 ILCS 500/20-160) and Title 44, Section 1300.08 of the Attorney General's Procurement rules with respect to its contracts, bids, and proposals with the Office of the Attorney General or

___ The Special Assistant Attorney General has registered as a business entity with the State Board of Elections with respect to its contracts, bids, and proposals with the Office of the Attorney General and acknowledges a continuing duty to update the registration.

This contract is voidable in accordance with the provisions of Section 50-60 of the Procurement Code (30 ILCS 500/50-60) for the Special Assistant Attorneys General's failure to comply with Section 20-160 with respect to the Special Assistant Attorneys General's contracts, bids, and proposals with the Attorney General.

### 3.8.19  SEXUAL HARASSMENT POLICY CERTIFICATION

As a condition of this Contract, each Special Assistant Attorney General firm certifies that it has in place a written sexual harassment policy that includes, at a minimum, the information set out in paragraph (4) of subsection (A) of Section 2-105 of the Illinois Human Rights Act (775 ILCS 5/2-105(A)(4)). A copy of the policy must be provided to the Office of the Attorney General upon request.

### 3.8.20  [RESERVED]

### 3.8.21  EXPATRIATED ENTITY CERTIFICATION

As a condition of this Contract, the Special Assistant Attorneys General certify that they are not barred from bidding or entering into a contract with the State of Illinois as an "expatriated entity," as that term is defined in Section 1-15.120 of the Procurement Code (30 ILCS 500/1-15.120), or a member of a "unitary business group," as that phrase is defined in the Illinois Income Tax Act (35 ILCS 5/1501(a)(27)) with an expatriated entity as a member. The Special Assistant Attorneys General acknowledge that the CPO may declare this contract void if this certification is false. This certification is not required if the CPO has determined that this Contract is being awarded as a sole source procurement under Section 20-25 of the Procurement Code (30 ILCS 500/20-25), and the notice and hearing requirements of Subsection 50-17(b)(1) of the Procurement Code (30 ILCS 500/50-17(b)(1)) have been met, or the other exception set out in Subsection 50-17(b)(2) has been satisfied.

### ARTICLE 9 - MISCELLANEOUS

### 3.9.1  NOTICES AND BILLINGS

All notices and billings to be served by the provisions of this contract shall be served in person or sent by United States mail with postage fully prepaid to the parties at the address listed on the cover page hereof or as otherwise set forth herein. Either party may designate by notice in writing a new address to which notices or billings must be sent.

### 3.9.2 RECORDS RETENTION AND RIGHT TO AUDIT

The Special Assistant Attorneys General shall maintain and preserve all data, books, supporting documents, and other records relating to the performance of the contract and necessary to support amounts charged to the Attorney General under this contract for a period of three (3) years after the date of final payment to the Special Assistant Attorneys General by the Attorney General under this contract, and for the duration of any audit then in progress. The Special Assistant Attorneys General shall make available all such records for review and audit by the Auditor General of the State of Illinois, the Attorney General, and the Attorney General's CPO and internal auditor. The Special Assistant Attorneys General shall fully cooperate in any audit conducted hereunder and provide full and free access to all relevant materials. The Special Assistant Attorneys General's failure to maintain and preserve the books and records required by this paragraph shall establish a presumption in favor of the State for the recovery of any funds paid by the Attorney General hereunder for which such items are not available.

### 3.9.3 COMMENCEMENT AND TERMINATION

This contract commences on either the commencement date specified on its cover page or the date the last party to this contract signs this contract, whichever is later. This contract shall terminate as set out in Section 3.2.2, above.

### 3.9.4 ATTORNEY GENERAL'S CANCELLATION AND POSTPONEMENT OPTION

This contract may be canceled and terminated by the Attorney General, with or without cause, upon ten (10) days written notice of such action to the Special Assistant Attorneys General. Such cancellation is presumed received when sent. In the event of such termination, the Special Assistant Attorneys General do not waive any rights they may have to seek compensation and/or reimbursement of expenses incurred in their performance under this contract out of any future recovery obtained by the Attorney General in the matters covered by this contract, as permitted by applicable law, and further do not waive any rights they may have to pursue legal action for payment based on the equitable remedy of quantum meruit.

The Attorney General may postpone the due dates of any services to be provided hereunder or reports to be provided hereunder by giving written notice of such action to the Special Assistant Attorneys General, which Notice of Postponement is then incorporated herein by reference.

### 3.9.5 INDEMNIFICATION OF ATTORNEY GENERAL

The Special Assistant Attorneys General shall assume all risk of loss and shall indemnify and save and hold harmless the Attorney General, the State of Illinois, their officers, agents, and employees against any and all liabilities, demands, claims, suits, losses, damages, causes of action, fines, judgments, including attorneys' fees and litigation costs, based upon the Special Assistant Attorneys General's negligence or intentional, wanton, or willful misconduct.

### 3.9.6 INDEPENDENT CONTRACTOR

Nothing in this contract shall be considered to create the relationship of employer and employee between the parties hereto. The Special Assistant Attorneys General shall be deemed at all times to be independent contractors. The Attorney General assumes no liability for the actions or omissions of the Special Assistant Attorneys General under this contract, and this contract is not subject to, and the Special Assistant Attorneys General are not entitled to any benefit provided in, the State Employee Indemnification Act (5 ILCS 350/0.01 *et seq.*).

### 3.9.7 COMPTROLLER FILING NOTICE

The Special Assistant Attorneys General expressly understand that, whenever applicable, a copy of this contract and any amendment(s), cancellation or renewals shall be filed by Attorney General with the State Comptroller as required by law (30 ILCS 500/20-80).

### 3.9.8 MODIFICATION OF CONTRACT

No modification, change, subtraction, addition, or waiver of the terms, conditions, and specifications herein contained, including, but not limited to, the services to be provided by the Special Assistant Attorneys General and the time in which such services are to be completed, shall be binding on the Attorney General unless such modification, change, subtraction, addition, or waiver is first approved in writing by the Attorney General.

### 3.9.9 DEFAULT

If for any cause or reason, the Special Assistant Attorneys General shall default in performance of this contract in accordance with its terms or in any way breach any term of this contract, including, but not necessarily limited to, failure to provide or perform the services specified herein and failure to provide or perform such services within the time specified herein, the Attorney General may immediately terminate this contract by notice thereof to the Special Assistant Attorneys General. In such event, all finished and unfinished documents, data, studies, surveys, records, and reports prepared by the Special Assistant Attorney General under this contract shall become the property of the Attorney General.

In the event of such termination, the Special Assistant Attorneys General do not waive any rights they may have to seek compensation and/or reimbursement of expenses incurred in their performance under this contract out of any future recovery obtained by the Attorney General in the matters covered by this contract, as permitted by applicable law, and further do not waive any rights they may have to pursue legal action for payment based on the equitable remedy of quantum meruit.

### 3.9.10 WAIVERS

The waiver of the Attorney General of any breach or default or failure of the Attorney General to enforce any of the terms and conditions of this contract shall not in any way affect, limit, or waive the right of the Attorney General thereafter to enforce and compel strict compliance with every term and condition hereof.

### 3.9.11 REMEDIES

In the event that either the Special Assistant Attorneys General or the Attorney General breaches any term, provision, or condition of this contract, the party alleging a breach may exercise any right, remedy, or privilege available to it under applicable law in addition to any remedy specifically provided herein. In the event that the party alleging a breach finds it necessary to institute litigation against the other party to enforce its rights under this contract or for any reason emanating from this contract, or any act or omission pertaining to any of the foregoing, a party may recover its legal fees, costs, and expenses in connection with such litigation only if allowed by applicable law.

### 3.9.12 ENTIRE AGREEMENT

The terms and conditions of this contract and all appendices, documents, and attachments which are made a part hereof shall constitute the entire contract between the parties. No other agreements, promises, or representations, oral or otherwise, regarding the subject matter of this contract shall be deemed to exist or bind the Attorney General.

### 3.9.13 BINDING UPON SUCCESSORS

This contract shall be binding upon the successors, heirs, executors, administrators, and assigns of all parties hereto.

### 3.9.14 PROCUREMENT RULES EXEMPTION

Contracts necessary to prepare for anticipated litigation, enforcement actions, and investigations are not subject to the provisions of the Procurement Code or the Attorney General's procurement rules, if approved by the chief legal counsel of the Office of the Attorney General. *See* 30 ILCS 500/1-10(b)(7).

Approval, in required circumstances, is indicated by the signature below.

Brent D. Stratton
Chief Deputy Attorney General

# EXHIBIT F

**State of Illinois**

**Illinois Attorney General**

**Request for Proposals for ARES Litigation**

Project Statement. This request for proposals (RFP) is to solicit proposals from attorneys and law firms to serve as Special Assistant Attorneys General (SPAAGs) to pursue claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), 815 ILCS 505/1 et seq., and the Illinois Telephone Solicitations Act, 815 ILCS 413/1 et seq. against Alternative Retail Energy Supplier (ARES) companies on behalf of the State of Illinois through the Office of the Illinois Attorney General (OAG) (together, the State) on a contingency fee basis. This RFP is divided into the following parts:

• State Contact Information, page 1

• Timeline, page 1

• Proposal Instructions, pages 2-3

• Statement of Work, page 4

• Proposal Contents, pages 5-6

• SPAAG Contract (Attachment A)

**State Contact Information**

Solicitation Manager: Email proposals to:

Name: Brent D. Stratton, Chief Deputy Attorney General

Email: ARESRFP@atg.state.il.us

     Subject: For all emails, please include "ARES RFP" in the "Subject" line

Phone: 312-814-4499 (office); 312-505-2777 (cell)

**Timeline**

| Event | Date | Time |
|---|---|---|
| RFP issue date | December 11, 2020 | N/A |
| Deadline for bidders to submit questions | December 18, 2020 | 5:00 p.m. Central |
| Anticipated date State will answer bidder questions | No later than December 24, 2020 | 5:00 p.m. Central |
| Proposals due | January 8, 2021 | 5:00 p.m. Central |
| Anticipated timeframe oral presentations will be scheduled, if any | No later than January 29, 2021 | N/A |

1

## **Proposal Instructions**

1. <u>Proposal Preparation</u>. Bidders must follow these Proposal Instructions. Bidders must provide the information requested in the Proposal Contents section below.

2. <u>State Contact Information</u>. The sole point of contact for the State concerning this RFP is the Solicitation Manager listed above. Contacting any other State official, employee, agent, or representative about this RFP may result in disqualification.

3. <u>Modifications</u>. The State may modify this RFP at any time. Modifications will be emailed to all interested bidders. This is the only method by which the RFP may be modified.

4. <u>Deficiency notice</u>. The State may notify bidders of a deficiency if it determines that a portion of the RFP was deficient, unclear, or ambiguous. Deficiency notices will state the date by which a response must be provided. Failure to respond to a deficiency notice as specified in the notice may result in disqualification.

5. <u>Questions and Answers</u>. Questions about this RFP must be emailed to the Solicitation Manager no later than the time and date specified above. In the interest of transparency, only written questions will be accepted. The State's answers will be emailed to all interested bidders. Please include the RFP page number and section at issue for each question.

6. <u>Proposal Submission</u>. Bidders must email proposals including attachments to ARESRFP@atg.state.il.us. The State cannot receive email messages with a data volume greater than 25 MB. Therefore, prior to submitting your proposal, please confirm that your message does not exceed that limit. This may require breaking your proposal into one or more email messages, in which case, mark your messages accordingly, e.g., "1 of 2." **Proposal attachments must be in Word format.** Proposals must be received by the State on or before the proposal due date and time stated above.

7. <u>References to External Sources</u>. References and links to websites or external sources may not be used in lieu of providing the information requested in the RFP within a proposal.

8. <u>Evaluation</u>.
   a. A contract will be awarded to the responsive and responsible bidder presenting the best value to the State. The State will determine best value. Best value is more than pricing alone; it includes the qualifications, experience, abilities, capacity, diversity, and cost-effectiveness of bidder proposals after reviewing actual, apparent, or potential conflicts of interest.
   b. Designated State staff will review proposals and issue a recommendation for award to the Attorney General for the final decision. The recommendation to the Attorney General will not include the names of the bidders.
   c. The State may utilize all bidder information to determine best value for services sought. The State may conduct an onsite visit to tour the bidder's work location; require an oral presentation of the bidder's proposal; conduct interviews, independent research, reference checks, and background checks; and request

concessions at any point during the evaluation process. The State will notify all bidders of the award after the decision has been made.

9. <u>Clarification Notice</u>. The State may request clarification of a proposal. Failure to respond to a clarification request may result in disqualification.

10. <u>Reservations</u>. The State reserves the right to:
   a.   Discontinue the RFP process at any time for any or no reason.
   b.   Conduct due diligence.
   c.   Reject any and all proposals received as a result of this RFP.
   d.   Disqualify a bidder for failure to follow the Proposal Instructions or other requirements of the RFP.
   e.   Disqualify a bidder if the State determines an actual, apparent, or potential conflict of interest exists.
   f.   Disqualify a bidder if it is determined the bidder purposely or willfully submitted false or misleading information in response to the RFP.
   g.   Consider late or disqualified proposals if deemed to be in the State's best interests.
   h.   Consider prior performance with the State or other States or units of local government in making an award decision.
   i.   Refuse to award a contract to a bidder that has failed to pay State taxes or has outstanding debt with the State.
   j.   Negotiate with one or more bidders on price, terms, scope, or other deliverables.
   k.   Award multiple, optional-use contracts.

11. <u>General Conditions</u>. The State will not be liable for any costs, expenses, or damages incurred by participation in this solicitation. The bidder agrees that a proposal is considered an offer to do business with the State in accordance with the proposal, including the SPAAG Contract (Attachment A), and that a proposal is irrevocable and binding for a period of 180 calendar days from proposal submission date. If a contract is awarded to the bidder, the State may, at its option, incorporate any part of the bidder's proposal into a contract. This RFP is not an offer to enter into a contract. This RFP may not contain all matters upon which agreement must be reached.

12. <u>Freedom of Information Act</u>. Proposals and resulting contracts are subject to disclosure as required under Illinois's Freedom of Information Act (FOIA), 5 ILCS 140/1 et seq., and other law.

**Statement of Work (SOW)**

1. Introduction and Purpose.

This RFP is to solicit proposals from attorneys and law firms with experience and interest in pursuing claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act), 815 ILCS 505/1 et seq., and the Illinois Telephone Solicitations Act, 815 ILCS 413/1 et seq., against ARES companies on behalf of the State of Illinois on a contingency fee basis.

2. Scope.

The scope of work includes providing all necessary personnel, labor, materials, services, equipment, supplies, time, travel, effort, skill, and supervision required to examine, investigate, recommend, and litigate the State's possible claims against ARES companies.

SPAAGs will be appointed to represent the State in litigation against ARES companies. SPAAGs will develop and propose a litigation strategy to the Attorney General or his designees, including:
- Identifying viable claims and causes of action against ARES companies.
- Identifying possible defendants.
- Pursuing all claims and actions in connection with an approved litigation strategy against defendants approved by the Attorney General.

Prior to providing any legal services on behalf of the State, an attorney must be appointed by the Attorney General as a SPAAG. SPAAGs must consult in advance with and advise the Attorney General's designated representatives regarding all substantive issues affecting the litigation, as set forth in more detail in the SPAAG Contract (Attachment A).

3. Out of Scope.

The work does not include regulatory enforcement or claims under State or federal laws not specifically and expressly agreed to by the Attorney General.

4

## **Proposal Contents**

1. Bidders must submit a detailed proposal addressing each section below.

2. Please re-state the information requested and the section number prior to your response. Attach any necessary supplemental information and appropriately reference it within your proposal.

3. "You" and "your" means the bidder.


## **Section 1 – Bidder Contact Information**

1.1. Identify the bidder's contact person for the RFP process. Include name, title, preferred pronouns, address, email, and phone number.

1.2. Identify the person authorized to sign a contract resulting from this RFP. Include name, preferred pronouns, title, address, email, and phone number.


## **Section 2 – Bidder Background Information**

2.1. Identify the bidder's legal business name, address, phone number, and website.

2.2. Identify the State in which your business is organized.

2.3. Identify the location (city and state) of the office(s) of your firm that would have primary responsibility for this work if awarded a contract, and the location of all other offices of your firm that would have any responsibility for this work.

2.4. Identify the practice group area, if applicable, proposed to handle the work.

2.5. Explain any partnerships and strategic relationships you have that would bring significant value to the State.

2.6. If you intend to use subcontractors to perform the work, disclose:
> (1) the subcontractor's legal business name, website, address, phone number, and primary contact person;
> (2) a description of subcontractor's organization;
> (3) a complete description of the services or products it will provide;
> (4) information concerning subcontractor's ability to provide the services;
> (5) whether the bidder has a previous working experience with the subcontractor, and if yes, provide details of that previous relationship.

2.7. Identify the name and title of the individuals you propose as key personnel. Attach resumes or CVs for each person.

2.8. The State has an interest in having its SPAAGs reflect the diversity of the State of Illinois. Please describe how the bidder and its key personnel would satisfy this interest in diversity.


## Section 3 – Experience

3.1. Describe at least three relevant experiences supporting your ability to successfully perform the work set forth in the SOW. Include a description of services provided and results obtained. Include contact information for the clients you represented.

3.2. Provide publicly available motions, briefs, and other documents relevant to your experience in providing the legal services sought under this RFP.


## Section 4 – Conflict of Interest

4.1. Provide detailed information regarding any prior, current, or anticipated future relationship with any ARES company that could give rise to potential actual or apparent conflict of interest. Disclose such information for both the bidder and any proposed subcontractors.

4.2. Disclose any actual, apparent, or potential conflict of interest between the bidder and any proposed subcontractors and the State of Illinois, including any State entity, official, or employee.

4.3. With respect to any information provided in response to the questions above, provide an explanation of why an actual, apparent, or potential conflict of interest would not arise, or the measures that would be taken to avoid such a conflict.


## Section 5 – SPAAG Contract

5.1. Bidder must affirm agreement with the terms of the SPAAG Contract (Attachment A). If you do not agree, you must provide redline edits to the SPAAG Contract with your proposal, and include justification for requesting deviation from the terms.


## Section 6 – Fee Agreement

6.1. Bidder must submit a proposed Fee Agreement which: (1) aligns with the SPAAG Contract (Attachment A) and (2) clearly sets forth how the bidder proposes to address payment in the event of recovery.

# EXHIBIT G



## OFFICE OF THE ATTORNEY GENERAL
STATE OF ILLINOIS

**KWAME RAOUL**
ATTORNEY GENERAL

June 18, 2024

Matthew J. Piers                          Karen Villagomez
Christopher J. Wilmes                     Charles D. Wysong
Caryn C. Lederer                         Margaret E. Truesdale
Kate E. Schwartz                         Emily Brown
Tory Tilten                              Justin M. Tresnowski

Hughes Socol Piers Resnick & Dym, Ltd.
Three First National Plaza
70 West Madison, Suite 4000
Chicago, IL 60602-5014

Re:    Provide to the Office of the Attorney General, Public Interest Division, factual review,
       legal analysis, and all necessary legal and litigation services required in matters as
       may be assigned by the Office of the Illinois Attorney General regarding investigation
       and potential litigation concerning alternative retail energy suppliers.

Dear Counsel:

I am writing to appoint you as Special Assistant Attorneys General to represent the State of
Illinois in the above referenced matter for the fiscal year ending June 30, 2025. As Special Assistant
Attorneys General, you will serve at the pleasure of the Attorney General and work under the control,
direction and supervision of Brent D. Stratton, Chief Deputy Attorney General. The State of Illinois will
compensate you for services as stated in your contract with this office.

Your appointment is conditioned on your full compliance with the Attorney General's Rules of
Professional Conduct as provided in Rule 8.1.11 (a copy of which is enclosed). As set forth in the
enclosed Rule, we expect that you and your firm will disclose in writing any potential conflict of interest
with the State of Illinois or the Office of the Attorney General. Please direct all correspondence
regarding conflicts to the undersigned. The failure to adhere to this rule will result in termination of
your appointment as a Special Assistant Attorney General. Please indicate your acceptance of this
appointment and your agreement to be bound by its terms by completing and executing the enclosed
Affidavit of Compliance with the Attorney General's Rules of Professional Conduct and returning it to
us as soon as possible.

Very truly yours,

BRENT D. STRATTON
CHIEF DEPUTY ATTORNEY GENERAL

8.1.11     SPECIAL ASSISTANT ATTORNEYS GENERAL

The Attorney General may, at his discretion, appoint Special Assistant Attorneys General to represent the Office in certain matters.  This may occur to resolve a conflict situation arising from the Attorney General's concurrent obligation to represent the State of Illinois and the People of the State of Illinois.  It may also occur due to expertise that exists outside of the Office which is needed for a particular matter.

Special Assistant Attorneys General should be familiar with the Attorney General's Rules of Professional Conduct. Full-time Special Assistant Attorneys General assigned to a bureau of this Office are governed by these rules to the same extent as other Assistant Attorneys General.  Special Assistant Attorneys General appointed by contract on a case-by-case basis are not bound by section 8.1.7.  These Special Assistant Attorneys General must also comply with the following conflict of interest rules.

(a)     Civil Cases.  In matters where the Special Assistant Attorney General or law firm is representing a client against the State of Illinois, the Special Assistant Attorney General must disclose the conflict in writing to the Chief of Staff or designee, who will examine the request and may grant a waiver of the conflict in that particular case.  The Special Assistant Attorney General will be required to provide a written waiver from the private client.  Waivers may be granted if the matter is not substantially similar to one to which a Special Assistant Attorney General or law firm is assigned.  In appropriate cases, the Attorney General may grant a waiver subject to assurances that proper screening has taken place.

(b)     Criminal Cases

        (1)     The Office of the Attorney General has law enforcement responsibilities in the criminal justice field ranging from investigation and prosecution to appeal and collateral criminal proceedings.  In addition, it is the duty of the Attorney General, upon request, to furnish opinions upon matters of criminal law to members of the executive branch and to the State's Attorneys.  No Special Assistant Attorney General and no partner or associate of the law firm shall serve as a full or parttime Public Defender.  No Special Assistant Attorney General, and no law firm with which such Special Assistant Attorney General is a partner or associate may represent or defend any person other than the State of Illinois in any criminal action filed in any court of this State, except as permitted by subparagraphs (2) and (3), following.

        (2)     The Attorney General or Chief of Staff may make specific exceptions to subparagraph (b) (1) of this section in unusual circumstances.  Application for exceptions shall be made by the Special Assistant Attorney General in writing to the Attorney General.  The writing shall state that the applicant believes that representation by applicant or by a member or associate of the law firm of a particular person or of particular persons charged with a misdemeanor or felony (i) will not violate any provision of these rules; (ii) that the applicant has explained and disclosed the possible conflict of interest by reason of the employment by the Attorney General and obtained the client's written waiver thereof; and (iii) that the circumstances justify the exception, together with the grounds for such belief.  Action taken by the Attorney General on such application shall be promptly given in writing to the applicant.  Any such application must be accompanied by an applicant's written disclosure to the client of a possible conflict of interest and by a photocopy of the client's written acknowledgment of receipt of the disclosure and waiver of the conflict of interest.

        (3)     A Special Assistant Attorney General may represent or defend any person in a criminal action in any court of the State in which the charged offense is (i) a traffic violation, or a violation of a municipal ordinance which, under the applicable law, is a misdemeanor and (ii) is punishable only by a fine.  In every such case, the written disclosures by the attorney and the written waiver by the client, as required by subparagraph (2) of this section, shall be first given before undertaking any such representation.  No exception need be sought for or obtained in any such case, provided that the forms of disclosure and of waiver each comply substantially with the form therefore currently approved by the Attorney General.

        (4)     In view of the fact that the Attorney General writes, reviews, or approves all briefs filed on behalf of the People of the State of Illinois on appeal to the Illinois Supreme Court, no Special Assistant Attorney General may represent a defendant in a criminal action on an appeal to the Illinois Supreme Court.

## AFFIDAVIT OF COMPLIANCE WITH

## ATTORNEY GENERAL'S RULES OF PROFESSIONAL CONDUCT

I, _Christopher Wilmes_, a Special Assistant Attorney General, duly appointed to serve by Attorney General Kwame Raoul, do hereby depose and state as follows:

1. That I have read the copy of the Attorney General's Rules of Professional Conduct (Article 8 of the Attorney General's Policy and Procedure Manual) enclosed with the Letter of Appointment;

2. That I am in compliance with each and every one of these rules as provided for in Rule 8.1.11.

3. That I agree to conduct myself in accordance with all provisions of these rules as provided for in Rule 8.1.11.

_____
Affiant

Subscribed and sworn to before me this ___16TH___ day of
___July___, 2024

_____
Notary Public

(SEAL)

**OFFICIAL SEAL**
**GREGORY T MCCAIN**
Notary Public, State of Illinois
Commission No. 983088
My Commission Expires December 08, 2027

Please print or type:

_Christopher Wilmes_
Name of Special Assistant Attorney General

**PLEASE RETURN TO:**
Brent D. Stratton
Chief Deputy Attorney General
Attorney General
State of Illinois
100 W. Randolph St., 12th Floor
Chicago, IL 60601

# Exhibit 5

Hearing Date: 1/30/2024 10:00 AM
Location: Richard J Daley Center
Judge: Wilson, Thaddeus L

FILED
9/29/2023 10:54 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH08494
Calendar, 1
24596852

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois,

    Plaintiff,

    v.

RESIDENTS ENERGY, LLC, a New York limited liability corporation,

    Defendant.

No. **2023CH08494**

## COMPLAINT FOR
## PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the People of the State of Illinois, by and through Kwame Raoul, Attorney General of the State of Illinois, brings this action against Defendant Residents Energy LLC ("Residents Energy" or "Residents"), for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("Consumer Fraud Act" or "CFA"), and the Illinois Telephone Solicitations Act, 815 ILCS 413/1 *et seq.* ("Telephone Solicitations Act" or "TSA").

## INTRODUCTION

1.    Residents Energy has employed fraudulent, unfair, and deceptive business practices to market and sell electricity services to consumers in Illinois. Among other practices, Residents has marketed its services by claiming consumers would save money on their electric bills when, in reality, consumers who switched to Residents virtually always paid considerably more for their electricity than they would have had they not switched.

2.    Though residential electricity has traditionally been supplied exclusively by regulated public utilities, such as ComEd and Ameren (the "default public utility"), the Illinois legislature opened the State's energy market to competition in 1997 and allowed consumers to

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

choose to purchase their electricity from a variety of private suppliers. Since then, numerous Alternative Retail Electric Suppliers ("ARES") like Residents have appeared in Illinois and engaged in telemarketing and in-person solicitations to persuade consumers to select them as their electricity supplier.

3.      Price is the most important consideration for energy consumers. There is no difference in the electricity that Residents supplies as compared to that of the default public utility. The quality of the energy is the same and the electricity is delivered on the same transmission lines. As such, the only reason a consumer switches to an ARES like Residents is for the promise that prices offered in a competitive market are lower than the prices offered by a public utility.

4.      Taking advantage of the deregulated energy market, Residents has used illegal and deceptive marketing practices to lure Illinois consumers into switching their electric supplier to Residents by falsely promising low rates and savings. Through misrepresentations, omissions of material fact, and other deceptive and unfair practices, Residents has tricked thousands of Illinois consumers into paying millions more for their electricity than they would have if they had remained enrolled with their default public utility.

5.      Residents' basic business model in Illinois has been to offer potential customers a first month, introductory rate that is approximately equal to the default utility's rate, and then quickly escalate that rate until it is double or more than the public utility's rate. Residents' telemarketing agents conceal the fact that the quoted rate is merely a first month, introductory rate, and instead suggest that the quoted rate is typical of Residents' rates, and that consumers will save money by switching to Residents. Moreover, Residents' sales agents falsely tell consumers that Residents' rate is historically low and less than the utility's rate; that they have

2

FILED DATE: 9/29/2023 10:54 PM 2023CH08494

never seen Residents' rate higher than the utility rate; and that Residents "shops the market aggressively" to provide lower rates. None of this is true.

6. Residents' sales agents also make numerous false, deceptive, and misleading statements that lead consumers to believe that the agents are affiliated with the utility company, and that the agents are calling to enroll them in an official state-sponsored program that will provide some cost-saving benefit.

7. Despite the agents' representations, customers who switched to Residents nearly always paid more than they would have if they had remained enrolled with the default utility—a lot more. For example, during the period from October 2018 to September 2020, Residents' existing variable account customers on average paid more than the default utility rate *each and every month*, and sometimes double or more than the utility rate. During that two-year period, Residents customers on average paid a staggering 54% more than the default rate the public utility charged, and collectively paid approximately $15 million more than they would have if they had enrolled with the default public utility. Residents' customers have continued to the present day to consistently pay higher rates than the rates charged by the default public utility, and have continued to collectively pay millions of dollars more than they would have if they had enrolled with the default public utility.

8. Moreover, some consumers have found themselves paying Residents' exorbitant rates without ever enrolling with Residents. That is because they were "slammed"—*i.e.*, enrolled without their knowledge or consent. An alarming number of consumers have filed complaints with the Illinois Commerce Commission ("ICC") alleging that were switched to Residents without their authorization, and often without having had any contact with Residents' representatives.

3

FILED DATE: 9/29/2023 10:54 PM    2023CH08494

9.    Accordingly, the State brings this action to stop Residents' illegal conduct, recover the tens of millions of dollars in increased costs that Illinois consumers have paid as a result of Residents' conduct, require Residents to pay civil penalties pursuant to the Illinois Consumer Fraud Act and the Illinois Telephone Solicitations Act, including a mandatory penalty of $50,000 for each violation committed against a senior citizen, and revoke Residents' authority to operate in the State.

<div align="center"><u>**PARTIES**</u></div>

10.    Plaintiff, the People of the State of Illinois, by Kwame Raoul, the Attorney General of the State of Illinois, is authorized to enforce the Consumer Fraud Act and the Telephone Solicitations Act.

11.    Defendant Residents Energy LLC, a New York corporation with its principal place of business in Jamestown, New York, is an ARES certified by the ICC to engage in the sale of electricity to residential retail customers in the service area of the Illinois public electric utilities, ComEd and Ameren. At all relevant times, Residents was engaged in trade and commerce in Illinois by marketing, selling, and promoting electric supply to Illinois residents.

12.    For purposes of this Complaint, any references to the acts and practices of Residents shall mean such acts and practices are by and through the acts of Residents' officers, owners, members, directors, employees, representatives and/or other agents, including third-party vendors retained by Residents to market electric supply on Residents' behalf.

<div align="center"><u>**PUBLIC INTEREST**</u></div>

13.    The Illinois Attorney General believes this action to be in the public interest of the citizens of the State of Illinois and brings this lawsuit pursuant to the Illinois Consumer Fraud Act and the Illinois Telephone Solicitations Act.

<div align="center">4</div>

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to the Court's general jurisdiction and pursuant to 815 ILCS 505/1 *et seq.* and 815 ILCS 413/1 *et seq.*, as the cause of action arises from actions taken by Residents Energy in Illinois.

15.     This Court has personal jurisdiction over Residents because it transacts business in Illinois, including in Cook County.

16.     Venue for this action is proper in Cook County pursuant to Section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, because Residents is doing business in Cook County and some of the transactions out of which this action arose occurred in Cook County.

## TRADE AND COMMERCE

17.     Subsection 1(f) of the Consumer Fraud Act, 815 ILCS 505/1(f), defines "trade" and "commerce" as:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.

18.     At all times relevant to this Complaint, Residents was engaged in trade and commerce in the State of Illinois within the meaning of the Consumer Fraud Act by marketing, selling, and promoting electricity supply to Illinois residents.

## RETAIL ELECTRIC SUPPLY INDUSTRY

19.     Each public electric utility in Illinois has a defined service area and serves all customers in that area. Traditionally, electric utilities have provided both electric supply and the distribution service that delivers the electricity to consumers.

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

20.    The ICC reviews and approves the prices public electric utilities are permitted to charge eligible residential customers for electric supply (the "default utility rate"). This default utility rate reflects the utility's cost for purchasing the electricity.

21.    Public electric utilities, like ComEd and Ameren, are the default suppliers of electricity to consumers in Illinois. However, under the Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 5/16-101 *et seq.*, consumers may choose to purchase their electric supply from an ARES rather than their default public utility. If a consumer decides to switch to an ARES, the consumer continues to pay the default public utility for delivery service but pays the ARES for the electricity itself. Regardless of which entity the consumer selects as their supplier, the default public utility continues to deliver electricity to the consumer's home.

22.    Even if a consumer chooses an ARES for electric supply, the default public utility continues to bill and collect from the customer the total of the supply charge (as set by the ARES) plus the delivery charge (the rate approved by the ICC) and other incidental fees and taxes. The ARES does not send a separate bill to the consumer.

**RESIDENTS ENERGY'S BUSINESS PRACTICES**

23.    In or around March 2016, Residents received a Certificate of Service Authority from the ICC to operate as an ARES in Illinois. Under the certificate, Residents may sell electricity to eligible residential and nonresidential customers in the ComEd and Ameren service areas and has a continuing statutory obligation to comply with all enumerated requirements for certification and "all other applicable laws and regulations," pursuant to 220 ILCS 5/16-115(d)(11) and 220 ILCS 5/16-115A(a)(ii).

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

24.    Since 2016, Residents has engaged in the marketing and sale of electricity to Illinois residential customers in the ComEd and Ameren service areas.

25.    Since 2016, Residents has enrolled tens of thousands of residential customers in Illinois into one its electric supply accounts.

26.    Residents charges its customers based on how much electricity (measured in kilowatt hours, or "kWh") the customer uses each month.  Residents offers different rates (price per kilowatt hour), rate types (fixed rates and variable rates), and lengths of contracts.

27.    Typically, Residents' residential customers in Illinois have been enrolled in Residents' variable rate product, called ResiFLEX.  During the period from October 2018 through September 2020, for example, more than 95% of Residents' residential customers in Illinois were enrolled in its variable rate product.

**Residents Consistently Raised the Rates of its Variable Rate Customers**
**Substantially Above the Default Utility Rate**

28.    Residents' basic business model in Illinois has been to offer potential customers a variable rate product with a first month rate that is approximately equal to the default utility's rate at that time, and then escalate that rate in the following months until it is double or more than the utility's rate.

29.    For example, one Illinois customer who filed a complaint with the ICC in 2022 was charged a first month rate of 6.38 cents per kWh, after which the rate nearly tripled until it was 18.49 cents only ten (10) months later, in August 2022.

30.    This is not an isolated example.  After the first billing cycle, Residents' rates for "existing" variable account customers are nearly always significantly higher than its rates for "new" (*i.e.*, first month) customers.  During the period from October 2018 through September 2020, for example, Residents' rate for "existing" customers in ComEd territory averaged 3.6

7

FILED DATE: 9/29/2023 10:54 PM    2023CH08494

cents per kWh higher than the first month rate for "new" customers. During the final six (6) months of that two-year period, existing customers in ComEd territory on average paid approximately 5.0 cents per kWh more than the first month customers.

31.    In some of its written materials—but importantly, *not* during Residents' telephone solicitations—Residents refers to the first month rate as an "introductory" rate.

32.    After the first billing cycle, Residents' variable rate customers almost always pay a higher rate than the default utility rate paid by ComEd or Ameren customers in that service territory. The following chart, for January 2020 through September 2020, shows the difference between the average rate charged to Residents' "existing" (*i.e.*, non-first month) customers in ComEd territory, and the default utility rate paid by ComEd customers:

| ComEd "Default" Rate vs. Residents' Average Existing Customer Rate, in cents per kWh January-September 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jan. | Feb. | Mar. | Apr. | May | Jun. | Jul. | Aug. | Sep. |
| ComEd "Default" Rate | 6.8 | 7.3 | 6.6 | 6.7 | 7.4 | 6.5 | 6.6 | 6.9 | 6.5 |
| Residents' Average Customer Rate | 11.1 | 11.3 | 11.7 | 11.8 | 11.7 | 11.7 | 11.8 | 12.2 | 12.5 |

33.    Similar rate patterns exist for Residents' customers in Ameren territory, as well as in other months from at least 2018 to the present. For example, one customer who filed an ICC complaint against Residents in 2023 was charged 21.48 cents per kWh in January 2023, while the ComEd default rate was less than half that amount.

34.    Even when Residents' first month customers are included in the analysis, Residents' average rates are significantly higher than the average default public utility rate. For example, the average rate Residents charged its customers in ComEd territory from October 2018 through September 2020 was 10.6 cents per kWh, whereas the average ComEd rate during

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

this period was 6.8 cents per kWh. In other words, Residents' customers paid, on average, a 55% premium for their electricity during this two-year period.

35. The figures in Ameren territory are similar. The average rate Residents charged its customers in Ameren territory from October 2018 through September 2020 was 7.1 cents per kWh, whereas the average Ameren rate during this period was 4.6 cents per kWh—a premium of 54% during this two-year period.

36. Because Residents' customers consistently have paid higher rates, Residents' customers from 2016 to the present collectively paid millions of dollars more than they would have had they remained enrolled with the default utility company.

**Residents Directed and Controlled Marketing Vendors Who Acted as its Sales Agents**

37. Residents has conducted marketing activities in Illinois in the form of in-person solicitations and telephone solicitations.

38. Residents has employed third-party sales representatives to market its electricity in person and over the phone to Illinois consumers. Residents controlled the manner in which its sales representatives marketed and promoted its products.

39. Residents provided scripts to its sales representatives. The scripts instructed the sales representatives on how to interact with customers by telephone and in person and how to market Residents' products and services. The scripts instructed Residents' sales representatives to expressly identify themselves as Residents' sales representatives.

40. There is a two-step process that Residents' sales agents use to solicit and enroll new customers in Illinois. First, a sales representative attempts to convince the consumer to enroll with Residents. Second, when a consumer agrees to enroll, Residents confirms the enrollment using a statutorily-required third-party verification ("TPV") system or letter of agency.

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

41.     Illinois law prohibits sales representatives from performing both the enrollment and verification, and the verifier must be independent from both the electric supplier and its sales agent.

42.     Residents is responsible for selecting and contracting with third parties to perform the verifications.

### Residents' Misrepresentations, Omissions, and Other Unlawful Conduct

43.     Residents Energy and its sales representatives have engaged in unfair or deceptive acts or practices, including but not limited to the use of deception, fraud, false pretense, false promise, and misrepresentations, as well as the concealment, suppression, and omissions of material fact, and similar conduct that is unfair, has a tendency to deceive, and creates a likelihood of confusion or misunderstanding, with the intent that consumers rely on those misrepresentations, omissions, and other unfair or deceptive acts or practices.

#### *Failure to Immediately State the Purpose of the Telephone Solicitation*

44.     The Telephone Solicitations Act requires telephone solicitors to immediately state, among other things, "the purpose of the call." *See* 815 ILCS 413/15(b)(1).

45.     Residents' telemarketers violate the TSA at the very outset by failing to state the true purpose of the call.

46.     Instead, Residents' telemarketers conceal the true nature of the call by immediately promising consumers "money back" on their utility bill in the form of a rebate.  In recorded solicitation calls, Residents' agents routinely begin the call with a variation of the phrase, "We're just calling to issue money back on the electric account."  Examples include, "I'm calling about getting money back on the ComEd electric bill"; "I'm calling to issue the rebates on your electric

10

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

bill"; and "I was just giving you a call back, getting some money back rebates for the electric account."

47.     This deceptive sales pitch serves multiple purposes: *first*, it falsely suggests that the sales representative is affiliated with the utility company; *second*, it conceals the true purpose of the call, which is to switch the consumer from the utility to Residents; and *third*, it sets up the sales agent's deceptive request to "verify" or "confirm" information on the consumer's utility bill in order to effectuate the rebate—information that the Residents' agent does not actually possess. *See e.g.*, "So in order to get the money back issued out correctly, I would just need to confirm some basic customer information with you.  So in order to do that, we just ask if you can grab a copy of one of your electric bills."

48.     The purpose of the solicitation is not to "issue money back on the electric account," but rather to switch the customer to Residents Energy.  The sales agents' opening pitch conceals this fact and is deceptive and misleading.

### *Failure to Obtain Consumer's Consent to the Solicitation*

49.     The Telephone Solicitations Act also requires telephone solicitors to "inquire at the beginning of the call whether the person called consents to the solicitation." 815 ILCS 413/15(b)(2).

50.     Residents' telemarketers routinely violate the TSA by failing to obtain the consumer's consent to the solicitation.

### *Misrepresentations during Telephone Solicitations Regarding Affiliation with Public Utility*

51.     To further conceal the true nature of the solicitation call, Residents' sales agents have further misrepresented, expressly and impliedly, an association with ComEd or Ameren, as

FILED DATE: 9/29/2023 10:54 PM  2023CH08494

these are the public utilities that consumers know and depend upon to deliver their electricity and respond to emergencies.

52.    In recorded solicitation calls, Residents' sales representatives routinely represent that they are "working in cooperation with the utility" in order to provide rebates.  Other examples include: "We simply just work in cooperation with ComEd to get you the rebate on your bill"; "We work with Ameren"; "We work in cooperation with ComEd, Ameren, and Nicor."

53.    By falsely referencing "cooperation" with the public utility, Residents misleads consumers to believe its agents are calling on behalf or in connection with the public utility to provide a "rebate" on the ComEd or Ameren electric bill, rather than calling to switch consumers to a new electric supplier.

54.    Additionally, some agents assert that there have been "notices in your bill about a free program [to] actually giv[e] you some of your money back," and that they "couldn't tell" whether or not the customer responded—falsely suggesting that they have access to the customer's communications with the utility.  But Residents has no access to ComEd's or Ameren's systems or to consumers' information within those systems.

55.    By using such language, Residents' sales representatives portray the enrollment process as a clerical step toward claiming a rebate.  In fact, consumers are entering into a new contract with a new supplier.

56.    In addition to being deceptive in violation of Section 2 of the CFA, these misrepresentations also violate Section 2EE which provides that, "An alternative retail electric supplier shall not state or otherwise imply that the alternative retail electric supplier is employed by, representing, endorsed by, or acting on behalf of a utility." 815 ILCS 505/2EE(b)(2).

12

FILED DATE: 9/29/2023 10:54 PM 2023CH08494

*Misrepresentations Regarding "Verification" or "Confirmation" of the Utility Bill Information*

57.    Residents' agents' misrepresentation that information on the consumer's bill must be "verified" or "confirmed" is a deceptive practice in itself.  Nearly every Residents solicitation call includes this "verification" ruse, which is designed to conceal the fact that the agent does not have the consumer's account information, but needs to obtain it in order to effect the switch from the default public utility.

58.    By asking consumers to "verify" or "confirm" their public utility account number, a Residents sales agent falsely suggests that the agent already has the utility account number and that the consumer is merely verifying or confirming that number.  By pretending to know information that a public utility representative would know (but that Residents does not know), Residents intends for consumers to believe that its agents are endorsed by or acting on behalf of the utility.

59.    Residents' agents lie if necessary to maintain the fiction that they already have the account information.  On one recorded telephone solicitation call, a consumer balks at providing information from the bill and says, "Well, you've already got this information."  The agent falsely responds, "Correct.  They still have us gather it as it's on the bill."  On another call, after being asked twice for her account number, a consumer says, "You said earlier that you had all the information you needed and now you're asking me for it."  The agent responds, "Well, we do verify the information.  We don't send out random money to people."

*Misrepresentations Regarding a State or Public Utility "Program"*

60.    Residents' sales representatives have also intentionally misled consumers by falsely claiming they are entitled to savings and refunds on their electric bills through an "Energy Choice" program run by the State of Illinois or the public utility.

13

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

61.   Examples of such misrepresentations include the following:

- "I'm calling regarding money coming back in rebates for the electric bill. This is thanks to the Illinois Energy Choice Program. Have you heard about that program yet? …It's called your Illinois Energy Choice Program. Your State's been, you know, trying to have inserts in the bills. ComEd, Nicor and all those big companies are participating in this Statewide program."

- "It's just a free state program in the State of Illinois called Energy Choice Program to help the customers with their supply cost on the bill."

- "The State of Illinois stepped in and came up with this program quite a few years ago. It's called the Energy Choice Program to help customers with the supply cost on their bill."

62.   There is no such program.

63.   Nothing in Illinois law entitles consumers to reductions on their electricity bills. The Illinois Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILCS 5/16-101 *et seq.*, deregulated the market. But importantly, it does not create a "program" for consumers to join or the state or the public utility to run. In fact, the deregulation law precludes the ICC from regulating the prices charged by ARES like Residents. It is simply a statute that allows consumers to voluntarily decide whether to stay with their default public utility or select a retail electric supplier to provide their electric supply.

64.   By referring to a state or public utility "program," and telling consumers they are "eligible" for these benefits, Residents intends to associate its product with various benefit programs commonly offered by the default public utilities. For example, ComEd's website features a page titled "Payment Assistance" that explains various "financial assistance programs designed to lend a hand when you need it most," including bill payment assistance, a neighbor fund, and payment arrangements.[1] Ameren's website, in turn, discusses "Energy Assistance" for

---

[1] https://www.comed.com/my-account/customer-support/payment-assistance.

consumers "facing soaring electricity and natural gas prices."[2]  Residents incorporated references to such a "program" in its marketing scripts, and its sales representatives have made repeated and relentless appeals to this "program" in their customer solicitations, with the intent that consumers believed they are enrolling in something akin to one of the default public utilities' benefit programs.

<u>*Deception Regarding the First Month Introductory Rate*</u>

65.    During recorded telemarketing solicitations, Residents' sales agents routinely conceal the fact that the quoted rate is merely a first month introductory rate, and that the rate will never be that low again.  Residents' sales agents do not describe the quoted rate as an "introductory rate," a "first month's rate," a "special offer," or any other similar term that would disclose the true nature of the quoted price.

66.    The fact that the quoted price is a temporary, one-month price is a "material fact" for purposes of the Consumer Fraud Act, 815 ILCS 505/2, and Residents' telemarketers' failure to mention that fact during solicitations is a "concealment" and "omission" which Residents intends consumers to rely upon.

67.    Instead, Residents' sales representatives routinely describe the first month, introductory rate as the "current rate" or "current variable rate," thereby deceptively implying that the rate is typical of Residents' variable rates rather than a one-time, one-month offer.

68.    The agents use similar, carefully worded phrases to suggest that, while the variable rate may go up or down, the quoted rate is characteristic of Residents' variable rates, and the customer will be charged similar rates in the future.  The following examples are from Residents' recorded telemarketing calls:

---

[2] https://www.ameren.com/illinois/residential/energy-assistance.

15

- "So instead of paying about seven cents, you will now be paying 6.59 cents."

- "Right now you're at a 4.44. We're going to be able to drop that down to 3.3."

- "So you'd be paying like 3.3 cents per kilowatt hour."

- "Our rate as of now is underneath the [utility's] standard service rate. Our rate is at 3.3, so it's about three cents, three cents per kilowatt hour versus a six."

- "For Ameren, they are at 0.3517 and I can drop you down to 0.3120."

- "That will continue on the variable rate at the 3.31."

69.     Residents' agents further misrepresent that, had the consumer already enrolled with Residents as their supplier, they currently would be paying less than the default utility rate. For example, during a recorded telemarketing call in October 2018, the agent states: "You're at almost four cents per kilowatt. Had you already added your supplier to the bill, you'd only be paying 3.3 cents per kilowatt and getting some of your money back." In reality, had the consumer previously enrolled with Residents, they would no longer be paying the first month rate and now would be paying the higher rates charged to existing customers. During that month, in October 2018, existing Residents customers in Ameren territory were paying 5.1 cents per kWh on average, and over 7,000 existing Residents customers in Ameren territory were paying more than 6.5 cents per kWh.

70.     In sum, Residents intentionally omits any reference to an "introductory" or "first month" rate during its telemarketing solicitations in order to conceal that fact from potential customers and mislead them into believing that the quoted rate is typical of future rates. This is a clear violation of the CFA. 815 ILCS 505/2; 815 ILCS 510/2(a)(12).

16

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

FILED DATE: 9/29/2023 10:54 PM 2023CH08494

*Misrepresentations Regarding Savings*

71.    Residents' sales agents routinely misrepresent that Residents' rates are "low" and will save consumers money, as shown by the following examples of misrepresentations made during Residents' recorded telemarketing calls:

- "We're also gonna get you a new low variable rate every month."

- "We get you that new low rate, month in and month out."

- "…you are paying more than you have to."

- "…you will start paying the new low rate and see better results."

- "The whole point is to try to give you a little relief on the bill."

- "And we do adjust the rate and get you the lowest rate possible on the bill each and every month."

- "…we're able to shop around as a supplier and try to keep you cheaper than the default rate at all times."

- "if you're not already enrolled in this free program, you end up charged the standard service rate for the electricity.  So you end up paying more than you have to."

72.    As discussed above, Residents' variable rates after the first billing cycle are *not* low; rather, they are almost always higher than the default utility rate.  Nor does enrolling with Residents save consumers money.  Any suggestion that Residents' rates are "low" and will save consumers money in the future is a misrepresentation that Residents intends consumers to rely upon in choosing Residents as their supplier.

*Misrepresentations Regarding Residents' Historical Rates*

73.    Residents' agents further this deception by purporting to compare the "historical" rates of Residents and the utility, and falsely asserting that Residents' rates historically have been lower than the utility's rates.  However, instead of comparing the utility rate with the rates paid

17

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

by Residents' *existing* customers in any given past month, the agents present a false, apples-to-oranges comparison between the utility rate and Residents' introductory, first-month rate (of course, without explaining that it was only a first month rate). By making this false comparison, the agents falsely state that Residents' rates are "historically" lower than the utility company's rate.

74.    Examples of such false statements include:

- "We've been lower than the utility's rate for 10 straight months" (responding to consumer's question, "Okay so now when would *your* rate go up?").

- "…we are as of right now lower and historically has always been lower than the utility company."

- "We've been lower than the utility rate this year, 10 months in a row. Last year, all year."

- "We've been consistently lower than the utility."

- "I've never seen the [Residents'] rate actually be higher than, you know, what the default rate is."

75.    Such representations are false, deceptive, and misleading. Residents' existing (*i.e.*, non-first month) customers virtually always pay significantly more than the utility's rate.

### Misrepresentations Regarding Residents' Future Rates

76.    Residents' telemarketers also misrepresent Residents' probable *future* rates, misrepresenting that they are unlikely to rise above the utility's rates when the opposite is true. Examples from Residents' recorded telemarketing calls include:

- "I have to let you know that it could maybe, you know, one month be higher than, you know, what the utility has. I don't see that happening, but I have to let you know as a disclosure."

- "This is a variable rate sir, so it may—it hasn't happened but it could—go up or down." "Again sir, we might be higher, lower than the utility at any given month—it hasn't happened but it could—since it's all market."

18

FILED DATE: 9/29/2023 10:54 PM 2023CH08494

- "We have to let our customers know that the utility company may be able to beat our rate in any given month. I don't see that happening here because we shop the market every day…"

- "Now I don't see the utility company beating our rate."

77.     As these examples show, Residents' agents conveyed that, while the law requires a disclaimer that Residents' rates may go up or down and may be higher or lower than the utility's rate during any given period, Residents' rates are unlikely to exceed the utility's rate. Nothing could be further from the truth.

78.     The October 2018 through September 2020 sales data, for example show that, month in and month out, Residents' average rates were consistently higher than the utilities' rates, and that Residents customers paid a premium of more than 50% over the default utility rate. Moreover, Residents' customers collectively paid approximately $15 million more during that two-year period than they would have if they had remained enrolled with the utility. Following the first billing cycle, Residents' rates almost *always* went up, not down, and were nearly always higher than the utility's rates, not lower. Thus, Residents' telemarketers' statements that Residents' rates were unlikely to rise above the utility's rates are plainly false and deceptive.

*Misrepresentations Regarding the Electricity Market and Pricing*

79.     Residents' agents also attempt to persuade customers to switch suppliers by misrepresenting how the electricity market works. A particularly egregious example is frightening customers into believing that the utility is charging them "every time" they turn on an appliance, as shown by this recorded telemarketing exchange in October 2018:

19

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

| Residents' Agent: | "I just want you to be aware Ameren is currently charging you every time you open the refrigerator 3.710 cents every time you open the fridge." |
|---|---|
| Consumer: | "Oh my God." |

80.    On another recorded call in October 2018, a Residents telemarketer tells a consumer, "Every time you turn on the light switch, ComEd is charging you almost seven cents just to turn on the light switch." And on a recorded call in October 2019, a telemarketer states: "That means that every time you press start on a microwave, you turn on a ceiling fan, you do a load of laundry, [consumer's supplier] is charging you 19.3 cents." Such statements exploit the public's general lack of understanding about how electricity charges are calculated.

81.    Residents' agents also frequently misrepresent that Residents has a superior ability to "shop the market" to ensure low prices. (*See e.g.*, "[w]e're able to shop around as a supplier and try to keep you cheaper than the default rate at all times."). In reality, Residents consistently charges consumers more than the default utility rate, and its prices are untethered to its purported ability to "shop the market." On one recorded solicitation call, the Residents telemarketer invents a scenario in which "the utility company gets one day out of the whole month to shop for the energy for the entire month, doesn't matter what the prices they get that one day...if it's really really really bad, we don't have to buy it that day." However, the utilities' rates are reviewed and approved by the Illinois Commerce Commission, not by a utility company's one-day shopping.

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

### *Failure to Notify Customers of Monthly Rate Increases Greater than 20 Percent*

82.   Since 2017, Illinois regulations have required ARES to provide written notice to variable rate customers whenever their rate jumps by more than 20% from one month to the next. 83 Ill. Admin. Code § 412.165(e) (Rate Notice to Customers).[3]

83.   Consumers in recent years have filed complaints with the ICC alleging that their rate increased by more than 20% without receiving any notice from Residents.

84.   All such failures to provide proper notice constitute violations of §412.165(e) and constitute an unfair or deceptive act or practice in or affecting commerce.

### *Deception During In-Person Solicitations Regarding Affiliation with Public Utility*

85.   Residents' sales agents have further misrepresented, expressly and impliedly, an association with ComEd or Ameren during in-person solicitations.

86.   Scores of consumer complaints filed with the ICC since 2018 involve allegations that a Residents' in-person sales agent misrepresented that they were working for the consumer's current energy provider.  Numerous consumers have alleged that Residents' agents have come to their home, misrepresented or otherwise implied an affiliation with Ameren or ComEd, and enrolled the consumer with Residents without the consumer understanding that they were being switched to Residents.

87.   Given the significant number of similar complaints filed with the ICC, Residents has engaged in widespread and systemic deceptive practices during in-person solicitations.

---

[3] "If a residential variable rate customer's rate increases by more than 20% from one monthly billing period to the next, the ARES shall send a separate written, dated notice to the customer, informing the customer of the upcoming rate change and shall include the electric utility's PTC [Price to Compare]." 83 Ill. Admin. Code § 412.165(e)

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

*Enrolling Consumers with Residents Energy without their Knowledge or Consent ("Slamming")*

88.     Residents also repeatedly violated the CFA's enrollment requirements by "slamming" consumers, *i.e.*, enrolling them with Residents without their knowledge or consent. *See* 815 ILCS 505/2EE(a)(iv) (ARES must obtain the consumer's "express agreement to accept the offer" after disclosing all material terms.).

89.     Since at least 2018, numerous consumers have filed complaints with the ICC alleging that they were enrolled with Residents Energy without their knowledge or consent.

90.     Many complainants allege that an unknown individual completed the verification process, allegedly on the complainant's behalf.   These consumers allege that they became aware of the unauthorized enrollment only after reviewing subsequent utility bills, often with significantly higher rates than they previously had been paying.

91.     Some consumers have filed complaints with the ICC alleging manipulation of the audio recording of the solicitation call, or use of a forged electronic signature.

92.     These incidents are indicative of a widespread company practice.   Given the frequency with which these fraudulent enrollments occurred, it appears that Residents also failed to properly evaluate and maintain the quality of its vendors' services as required by law. 83 Ill. Admin. Code § 412.170(i) ("Each ARES shall monitor marketing and sales activities to ensure that its ARES sales agents are providing accurate and complete information and complying with all laws and regulations.").

### Representative Examples of Residents' Unlawful Solicitations

93.     On an October 1, 2018 recorded telemarketing call, a Resident sales agent identifies herself as "with Residents Energy" and states that she is calling about "getting some money back rebates for the electric account."   She asks whether the consumer is the "one that handles the

22

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

bill" and states, "[w]e simply just work in cooperation with the utility…to get you the rebate on your bill." The agent does not explain at the outset that she is calling to switch the consumer to Residents Energy. Rather, the agent states that "nothing changes with your local utility." She then tells the consumer to grab a copy of his bill to "confirm some real basic information" so that he can get his rebates. After the consumer provides his contact information, the agent promises to "shop the market to get you a better rate," and that instead of his current default rate of 6.99 per kWh, "I'm able to bring it down to a 6.59." She never explains that the quoted rate of 6.59 cents per kWh is an introductory rate, or a first month rate, or a special rate that will escalate after the first billing cycle. Although she explains that it's a variable rate that "may be higher or lower than the utility company's in any given month," she dismisses her statement as "just a disclosure" and claims: "I've never seen the rate actually be higher than, you know what the default rate is. We shop the market aggressively to make sure that that doesn't happen." In actuality, Residents' rates after the first billing cycle are almost always higher than the default utility's rate. In fact, Residents' sales data for October 2018 (the month that this call takes place) show that 98% (6,717 out of 6,847) of its existing Illinois customers in ComEd territory were paying more than 6.99 cents per kWh. Notwithstanding these facts, the Residents agent deceitfully states, "I have to let you know that it could maybe, you know, one month be higher than, you know what the utility has. *I don't see that happening.*" However, during the next two years (from October 2018 through September 2020), Residents' rates in ComEd territory were higher than ComEd's default rate more than 90% of the time.

94. On an October 2, 2018 recorded telemarketing call, a sales agent states that she is with Residents Energy, and says "I'm looking to speak with the person authorized on the electricity and gas bill regarding some rebates." The agent does not explain at the outset that she

23

is calling to switch the consumer to Residents Energy. The agent then refers to "some messages on the bill telling you about the energy choice program." There is no such program. Nonetheless, the agent asks, "Would you like to hear about the energy choice program and how you'd be entitled to some rebates?"—suggesting that the utility company has put messages on its bill regarding rebates issued by a fictitious "energy choice program." The agent continues by stating that this "energy choice program," which does not exist, "works in conjunction with your utility company such as Ameren, ComEd and Nicor," and offers a 5% rebate back on the supply section of the bill and a $25 gift card after 90 days "of participating with the program." By referring to "signing up" with a fictional "energy choice program" that "works in conjunction with" the utility, the agent deceptively attempts to give credibility to a sales solicitation designed to switch the consumer *from* the utility. The agent then misrepresents how the electricity pricing works, telling the consumer, "I just want you to be aware Ameren is currently charging you every time you open the refrigerator, 3.710 cents every time you open the fridge." The agent makes promises about "saving money" and "lower pricing" and claims that "we shop the market a lot more aggressively than the utility company." Claiming that "we were able to find it cheaper," the agent quotes a rate of 3.3 cents per kWh, without disclosing that this is only an introductory rate for the first billing cycle. Again, the agent misrepresents how electricity pricing works, claiming that "the utility company gets one day out of the whole month to shop for the energy for the whole month, doesn't matter what the prices are that one day," whereas "we have the ability to check out the market if it's really really really bad we don't have to buy it that day." The agent then falsely claims, "we are as of right now lower and historically has always been lower than the utility company." To support this false claim, the agent deceptively compares the utility's rate during past months with Residents' introductory rate during that

24

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

month—without explaining that Residents' customers who are beyond their first billing cycle pay much more.

95.     On an October 5, 2018 recorded telemarketing call, a Residents agent identifies himself and states, "I was calling you about some money we were trying to issue back to you on your electric bill"—suggesting that he is working with the utility company to issue a reimbursement on the electric bill.  The agent does not ask for, and does not receive, consent to solicit, nor does he explain that this is a sales solicitation whose purpose is to switch the consumer from her utility.  The agent then states that "there's been some notices in your bill about a free program while actually issuing you some of your money back.  We couldn't tell if you responded," thereby falsely suggesting that he has access to the consumer's electric account. Continuing the deception, the agent states that "it looks like you're gonna get some of your money back," as well as a rebate of 5% of the supply cost, without explaining that this is a sales solicitation offer.  The agent then states that the consumer is "eligible to get the best variable rate…month in and month out"—a false statement since the consumer will pay higher rates than she would if she remained with her utility.  Again, the agent conceals the fact that he is switching the consumer's enrollment, stating, "nothing changes with the utility company."  He then says, "it does look like you're paying more than you need to," and asks who her utility company is. Thus, the agent falsely tells the consumer that she's overpaying without even knowing who her utility company is.  Understandably, the consumer states that she's "a little mistrusting of things like this."  The agent responds by saying, "I do understand where you're coming from, but all we do is verify the bill information"—another false statement, since the agent does not have her account information.  The agent again asks for her account number, and tells her, "Trust me…there's nothing about this program that can hurt you at all."  The consumer states, "You

said earlier that you had all the information you needed and now you're asking me for it." The agent again lies, stating that he's "verifying" the information: "Well, we do verify the information, we don't send out random money to people." The agent states that, by remaining with Ameren, "you're paying more than you need to." Before providing her account information, the consumer asks, "This isn't a scam, right?" Later in the call, the agent states that the "current available rate" is 3.3 cents per kWh and that "we're gonna drop you down" from the utility rate of 4.0 cents per kWh, suggesting that the 3.3 cents rate will be typical of future rates. The agent does not explain that, in actuality, this is a first month, introductory rate, and Residents' rate will escalate substantially above the utility rate.

96. On an October 9, 2018 recorded telemarketing call, a Residents agent calls a consumer about getting "rebates ordered for your electric account." The agent does not explain at the outset that she is calling to switch the consumer to Residents Energy. The agent repeatedly promises a "new low rate" for the consumer's account. According to the agent, Ameren's default rate is 3.710 cents per kWh, "but we're able to get you 3.31" cents per kWh. The agent falsely promises to "get you that new low rate, month in and month out," and does not explain that the rate of 3.31 cents per kWh is an introductory rate for the first billing cycle only. The agent then states that "just as a disclosure, the utility company may be able to beat our rate in any given month, there's no guarantee of specific savings." But the agent immediately qualifies this disclosure by misrepresenting that, "Now I don't see the utility company beating our rate." In fact, over the next two years, Ameren beat Residents' rate each and every month. From October 2018 through September 2020, the average rate Residents charged its customers in Ameren territory was 7.1 cents per kWh, whereas the average Ameren rate during this period was 4.6

FILED DATE: 9/29/2023 10:54 PM    2023CH08494

FILED DATE: 9/29/2023 10:54 PM 2023CH08494

cents per kWh. Thus, far from beating Ameren's rate, Residents charged its customers, on average, a premium of 54% over Ameren's rate.

97. On an October 4, 2018 recorded telemarketing call, a Residents agent identifies himself and states, "I was calling about some money we were trying to issue back on the ComEd electric bill"—suggesting that he is working with ComEd to issue rebates. Continuing the ruse, the agent then refers to "some notices on the bill about a free program where we're actually giving you money back on the bill. We couldn't tell if you responded." The agent does not ask for, and does not receive, consent to solicit. Nor does the agent explain at the outset that this is a sales solicitation whose purpose is to switch the consumer from ComEd. The agent then says that "it looks like you're gonna get some of your money back on the bill" in the form of rebates, as well as "the best variable rate...month in and month out"—a clear misrepresentation given that Residents' rates are almost always higher than the utility's rate. He further misrepresents that "nothing changes with your utility company," and does not explain that the consumer will be switched from her utility company. He asks the consumer to grab her ComEd bill so that he can "verify" her bill, deceptively suggesting that he already has her account information, which he does not. Later in the call, he quotes "the current available rate" as 6.5 cents per kWh, without explaining that this is an introductory, first month rate. He also deceptively states that "we've been lower than the utility rate for ...ten straight months," even though Residents' existing customers almost always pay more than the default utility rate.

98. On an October 12, 2018 recorded telemarketing call, a Residents agent calls a consumer and states, "Hello, I'm calling to issue money back on the electric account"—falsely suggesting that he is working with the utility company to issue a reimbursement on the electric bill. The agent then tells the consumer that he is "eligible to receive some of your money back in

FILED DATE: 9/29/2023 10:54 PM    2023CH08494

the form of a rebate and also have some charges removed from the bill." Again, the agent's statement falsely suggests that the utility will issue money-back rebates and will remove charges from the bill—something that Residents will not (and has no authority to) do. The agent then asks the consumer to grab a copy of his electric bill to "confirm some basic customer information" in order to "get the money back issued out correctly." The agent does not ask for, and does not receive, consent to solicit. Nor does the agent explain at the outset that he is calling to switch the consumer to Residents Energy. Instead, the agent misrepresents that Residents participates in a "free state program in the state of Illinois called the Energy Choice Program to help the customers with their supply cost on the bill." There is no such program. Nevertheless, he promises that it will "give you some help on your supply costs." He then misrepresents that "right now our rate is lower" than the utility rate of 3.7 cents per kWh, without explaining that the quoted Residents rate of 3.3 cents per kWh is only a one-month, introductory offer, and that the Residents rate will escalate after the first billing cycle.

99. On an October 16, 2018 recorded telemarketing call, a Residents agent calls a consumer and asks to "speak to the person in charge of the electric bill, the Ameren bill" regarding "some notices on the bill about a free program where we're giving some money back on the bill continuously." The agent continues to falsely suggest that he's affiliated with the utility company by stating "we couldn't tell if anyone responded" to the notices on the bill. The agent then states that he is with Residents Energy and "work[s] with Ameren in the program," which is not true; he is competing with Ameren for the customer's business. He further misrepresents that he will do an "adjustment" so that, instead of paying almost four cents per kWh, the consumer would "only be paying 3.3 cents per kilowatt and getting some of your money back." The agent says that "[a]ll we do is verify the information on the bill." The agent

28

FILED DATE: 9/29/2023 10:54 PM  2023CH08494

does not explain that this is only a one-month, introductory rate, nor that the customer's rate will increase in subsequent months. Later during the call, in response to the consumer's question about Residents' rates, the agent claims that Residents' rate was lower than Ameren's rate in each of the past 10 months. In making this claim, the agent deceptively compares Ameren's rate during each month with Residents' introductory, first month rate, *not* the higher rates that Residents' existing customers paid.

### VIOLATIONS OF THE TELEPHONE SOLICITATIONS ACT, 815 ILCS 413/1 *et seq.*

#### Count I
#### Failure to Immediately State the Purpose of the Telephone Solicitation

100. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

101. The Telephone Solicitations Act provides that "[v]iolation of any of the provisions of this Act is an unlawful practice under Section 2Z of the Consumer Fraud and Deceptive Business Practices Act. All remedies, penalties, and authority granted to the Attorney General by that Act shall be available to him for the enforcement of this Act." 815 ILCS 413/25(e).

102. Defendant has initiated, or caused its agents to initiate, "telephone solicitation[s]" to Illinois consumers, as that term is defined in the Telephone Solicitations Act, 815 ILCS 413/5.

103. Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, requires telemarketers to immediately state, among other things, the "purpose of the call." 815 ILCS 413/15(b)(1).

104. As described herein, Residents has knowingly solicited customers without stating, at the beginning of the telephone solicitation, the purpose of the call.

105. A knowing violation of the Telephone Solicitations Act is an unlawful practice under Section 2Z of the Consumer Fraud Act, 815 ILCS 413/25(e) and 815 ILCS 505/2Z.

29

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

106. Residents' practices described herein constitute violations of Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, as well as Section 2Z of the Consumer Fraud Act, 815 ILCS 505/2Z.

107. Wherefore, the Plaintiff prays that this honorable Court:

(a) award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b) enter a permanent injunction to prevent future violations of the Telephone Solicitations Act and Consumer Fraud Act by Defendant;

(c) award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Telephone Solicitations Act and Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d) revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e) assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f) assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g) assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with a disability;

(h) require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i) provide such other and further equitable relief as justice and equity may require.

FILED DATE: 9/29/2023 10:54 PM    2023CH08494

**Count II**
**Telemarketing without Consent**

108. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

109. The Telephone Solicitations Act provides that "[v]iolation of any of the provisions of this Act is an unlawful practice under Section 2Z of the Consumer Fraud and Deceptive Business Practices Act. All remedies, penalties, and authority granted to the Attorney General by that Act shall be available to him for the enforcement of this Act." 815 ILCS 413/25(e).

110. Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15(b)(2), requires telemarketers to "inquire at the beginning of the call whether the person called consents to the solicitation."

111. Defendant has initiated, or caused its agents to initiate, "telephone solicitation[s]" to Illinois consumers, as that term is defined in the Telephone Solicitations Act, 815 ILCS 413/5.

112. As described herein, Residents has knowingly solicited customers without inquiring at the beginning of the call whether the person called consents to the solicitation.

113. A knowing violation of the Telephone Solicitations Act is an unlawful practice under Section 2Z of the Consumer Fraud Act, 815 ILCS 413/25(e) and 815 ILCS 505/2Z.

114. Residents' practices described herein constitute violations of Section 15 of the Telephone Solicitations Act, 815 ILCS 413/15, as well as Section 2Z of the Consumer Fraud Act, 815 ILCS 505/2Z.

115. Wherefore, the Plaintiff prays that this honorable Court:

(a) award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b) enter a permanent injunction to prevent future violations of the Telephone Solicitations Act and Consumer Fraud Act by Defendant;

FILED DATE: 9/29/2023 10:54 PM 2023CH08494

(c)    award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Telephone Solicitations Act and Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d)    revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e)    assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f)    assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g)    assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with a disability;

(h)    require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)    provide such other and further equitable relief as justice and equity may require.

## VIOLATIONS OF SECTION 2 OF THE
## CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

116.  Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, prohibits "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce."

117.  Unfair or deceptive acts or practices prohibited by the Consumer Fraud Act include, but are not limited to, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact." 815 ILCS 505/2. In addition, Section 2 of the Consumer Fraud Act prohibits "the use or

32

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act,'" *id.*, which in turn provides that "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person . . . engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(a)(12). Unfair or deceptive acts or practices are unlawful under the Consumer Fraud Act "whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

**Count III**
**Misrepresentations Regarding a State or Public Utility "Program"**

118.  Plaintiff incorporates the foregoing allegations as if fully set forth herein.

119.  As descried above, Residents has misrepresented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions that:

    (a)  there exists a state-sponsored or state-sanctioned "program" that offers consumers savings, refunds, and similar benefits upon enrollment; and

    (b)  the Residents sales representative is contacting the consumer to enroll the consumer in a state-sponsored or state-sanctioned "program.

120.  In truth and fact, though Residents has made the misrepresentations described above:

    (a)  there does not exist a state-sponsored or state-sanctioned "program" that offers consumers savings, refunds, and similar benefits upon enrollment; and

    (b)  the Residents sales representative is contacting the consumer to switch the consumer's electric supplier—not to enroll the consumer in a fictitious state-sponsored or state-sanctioned "program."

121.  The making of the misrepresentations and omissions with the intent that consumers rely on these misrepresentations and omissions as described herein constitutes an unfair or

deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer

Fraud Act, 815 ILCS 505/2.

    122. Wherefore, the Plaintiff prays that this honorable Court:

(a)   award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b)   enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c)   award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d)   revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e)   assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f)   assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g)   assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with disability;

(h)   require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)   provide such other and further equitable relief as justice and equity may require.

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

**Count IV**
**Misrepresentations Regarding "Verification" or**
**"Confirmation" of the Utility Bill Information**

123. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

124. As described above, Residents has misrepresented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that the consumer's public utility account information must be "verified" or confirmed," implying that the sales representative already has access to the confidential utility account information when in fact Residents' sales agents do not have the consumer's confidential account information and need to obtain it in order to effectuate the switch from the utility.

125. The misrepresentations and omissions set forth herein were made with the intent that consumers rely on them and constitute an unfair or deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

126. Wherefore, the Plaintiff prays that this honorable Court:

(a) award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b) enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c) award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d) revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e) assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice

35

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f)      assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g)      assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with disability;

(h)      require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)      provide such other and further equitable relief as justice and equity may require.

**Count V**
**Deception Regarding the First Month Introductory Rate**

127.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

128.   As described above, Residents has misrepresented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions that the quoted Residents variable rate is typical of Residents' rates on its variable rate product.

129.   Residents conceals the fact that its quoted rate is merely a one-time, introductory rate that is available only during the first month billing period, and that Residents' rates on its variable rate product will escalate substantially during subsequent months.

130.   The misrepresentations and omissions set forth herein were made with the intent that consumers rely on them and constitute an unfair or deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

131.   Wherefore, the Plaintiff prays that this honorable Court:

(a)      award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

but not limited to a preliminary injunction and the appointment of a receiver;

(b) enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c) award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d) revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e) assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f) assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g) assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with disability;

(h) require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i) provide such other and further equitable relief as justice and equity may require.

**Count VI**
**Misrepresentations Regarding "Low Rates" and Savings**

132. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

133. As described above, Residents has misrepresented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that Residents' rates are "low" and that consumers will save money on their electric bill if they enroll with Residents.

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

134. In truth and fact, where Residents has made the misrepresentations described above, Residents' rates are not "low" and consumers did not and do not save money by enrolling with Residents, but rather nearly always paid more than they would have if they had purchased electricity directly from their utility.

135. The making of the misrepresentations and omissions with the intent that consumers rely on these misrepresentations and omissions as set forth and described above constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

136. Wherefore, the Plaintiff prays that this honorable Court:

(a) award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b) enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c) award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d) revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e) assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f) assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

(g)    assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with a disability;

(h)    require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)    provide such other and further equitable relief as justice and equity may require.

**Count VII**
**Misrepresentations Regarding Residents' "Historical" Rates**

137.  Plaintiff incorporates the foregoing allegations as if fully set forth herein.

138.  As described above, Residents has misrepresented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that Residents' rates are "historically" lower than the default utility company's rates.

139.  In truth and fact, where Residents has made the misrepresentations described above, Residents' rates are not historically lower than the default utility company's rates.

140.  The making of the misrepresentations and omissions with the intent that consumers rely on these misrepresentations and omissions as set forth and described above constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

141.  Wherefore, the Plaintiff prays that this honorable Court:

(a)    award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b)    enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c)    award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including

39

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d)  revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e)  assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f)  assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g)  assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with disability;

(h)  require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)  provide such other and further equitable relief as justice and equity may require.

## Count VIII
### Misrepresentations Regarding Residents' Future Rates

142.  Plaintiff incorporates the foregoing allegations as if fully set forth herein.

143.  As described above, Residents has misrepresented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that Residents' future rates are unlikely to rise above the default utility company's rates.

144.  In truth and fact, Residents' misrepresentations aside, Residents' variable rates month after month are consistently higher than the utility company's rates.

145.  The making of these misrepresentations and failure to disclose material information with the intent that consumers rely on these misrepresentations and omissions as set forth herein

constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

146. Wherefore, the Plaintiff prays that this honorable Court:

(a) Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b) Enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c) Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d) Revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e) Assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f) Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g) Assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with disability;

(h) Require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i) Provide such other and further equitable relief as justice and equity may require.

41

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

FILED DATE: 9/29/2023 10:54 PM    2023CH08494

**Count IX**
**<u>Misrepresentations Regarding the Electricity Market and Pricing</u>**

147.  Plaintiff incorporates the foregoing allegations as if fully set forth herein.

148.  As described above, Residents has made misrepresentations, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, regarding pricing in the electricity market, including but not limited to misrepresentations regarding the manner in which public utility companies purchase electricity, and Residents' purported ability to purchase electricity at lower prices.

149.  The making of the misrepresentations and omissions with the intent that consumers rely on these misrepresentations and omissions as set forth and described herein constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

150.  Wherefore, the Plaintiff prays that this honorable Court:

(a)  award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b)  enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c)  award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d)  revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e)  assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act.  In the event the Court finds the method, act, or

42

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f)   assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g)   assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with disability;

(h)   require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)   provide such other and further equitable relief as justice and equity may require.

### Count X
### Failure to Notify Customers of Monthly Rate Increases Greater than 20 Percent

151.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

152.   Defendant deceptively sells consumers its product by using an artificially low introductory rate. Defendant also misrepresents Residents' historical rates, and then tells consumers that Residents' rates are unlikely to increase above the default utility company's rates in the future. After using these deceptive tactics to lure consumers into purchasing Residents' product, Defendant then fails to inform consumers when their rate increases significantly from one month to the next.

153.   This conduct injures consumers in that they may continue to pay much higher prices for their electricity, possibly without realizing it. And the injury cannot be avoided by consumers because they aren't provided the information.

154.   The conduct is also immoral, unethical, and a violation of public policy. Since 2017, Illinois regulations have required ARES to provide written notice to variable rate

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

customers whenever their rate increases by more than 20% from one month to the next. Ill. Admin. Code tit. 83, § 412.165(e) (Rate Notice to Customers).

155. As described herein, Residents has raised customer rates by more than 20% without providing written notice as required by Illinois law, in violation of § 412.165(e).

156. Residents' failure to provide notice to its variable rate customers when their rate significantly increases from one month to the next constitutes an unfair or deceptive practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

157. Wherefore, the Plaintiff prays that this honorable Court:

(a) award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b) enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c) award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d) revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e) assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f) assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g) assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with a disability;

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

(h)    require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)    provide such other and further equitable relief as justice and equity may require.

<div align="center">

**VIOLATIONS OF SECTION 2EE OF THE**
**CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

</div>

158.    Section 2EE of the Consumer Fraud Act, 815 ILCS 505/2EE, specifically addresses fraud by electricity service providers, such as Residents.

<div align="center">

**Count XI**
**Enrolling Consumers without their Knowledge or Consent**

</div>

159.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

160.    Pursuant to 85 ILCS 505/2EE(a)(iv), an ARES "shall not submit or execute a change in a consumer's selection of a provider of electric service unless and until…the [ARES] has obtained the consumer's express agreement to accept the offer after the disclosure of all material terms and conditions of the offer."

161.    As described herein, Residents has enrolled customers without their knowledge or consent, in violation of 85 ILCS 505/2EE(a)(iv).

162.    Wherefore, the Plaintiff prays that this honorable Court:

(a)    award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b)    enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c)    award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

<div align="center">45</div>

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

(d)    revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e)    assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f)    assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g)    assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with a disability;

(h)    require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)    provide such other and further equitable relief as justice and equity may require.

## Count XII
### Misrepresentations Regarding Affiliation with Public Utility

163.   Plaintiff incorporates the foregoing allegations as if fully set forth herein.

164.   Under Section 2EE of the Consumer Fraud Act, "[a]n alternative retail electric supplier shall not utilize the name of a public utility in any manner that is deceptive or misleading, including, but not limited to implying or otherwise leading a consumer to believe that an alternative retail electric supplier is soliciting on behalf of or is an agent of a utility." 815 ILCS 505/2EE(b)(1).

165.   Section 2EE of the Consumer Fraud Act further provides that, "[a]n alternative retail electric supplier shall not state or otherwise imply that the alternative retail electric supplier is employed by, representing, endorsed by, or acting on behalf of a utility or utility program[.]" 815 ILCS 505/2EE(b)(2).

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

166. As described herein, during solicitations, Residents has represented, directly or indirectly, expressly or by implication, with the intent that consumers rely on these misrepresentations and omissions, that its sales representative is affiliated with the public utility by, for example:

(a) asking to speak with the person who handles the "electric bill," or using similar language;

(b) telling the consumer that the representative is following up on a notice in the electric bill, and representing that they could not tell if the consumer responded;

(c) telling the consumer that they were calling to issue "money back on the electric bill" or a "rebate on the electric bill," or similar language;

(d) telling the consumer that they are "working in cooperation with the utility" to provide rebates, or similar language;

(e) asking to "verify" or "confirm" the consumer's ComEd or Ameren account number, implying that the sales representative already has access to this confidential utility account information and is merely verifying or confirming it; and

(f) misrepresenting or implying an affiliation with the public utility during in-person solicitations.

167. In truth and fact, despite Residents' sales representatives making these representations:

(a) The sales representative is not affiliated with the public utility but is instead attempting to switch the consumer's electric supplier;

(b) The sales representative is not affiliated with the public utility, has no access to the consumer's account information, and therefore is not in a position to know whether or not the consumer responded to a purported notice in the bill;

(c) The sales representative is not affiliated with the public utility, and it is the sales representative's job to switch the consumer's electric supplier—not issue money back or rebates on the consumer's ComEd or Ameren account;

(d) The sale representative is not "working in cooperation with the utility," but rather is competing with the utility to switch the consumer's account;

47

(e)     The sales representative is not affiliated with the public utility, and the sales representative cannot "verify" or "confirm" the consumer's public utility account number because the sales representative does not have access to this information.  In fact, the sales representative is attempting to switch the consumer's electric supplier to Residents; and

(f)     The sales representative is not affiliated with the public utility.

168.  The making of the representations and omissions as set forth and described herein, with the intent that the consumer relies on those misrepresentations and omissions, constitutes a deceptive or misleading use of the name of the public utility in violation of Section 2EE(b)(1) of the Consumer Fraud Act, 815 ILCS 505/2EE(b)(1), as well as an unlawful practice under Section 2EE(b)(2) of the Consumer Fraud Act, 815 ILCS 505/2EE(b)(2) .

169.  The making of such representations and omissions furthermore constitutes an unfair or deceptive act or practice in or affecting commerce in violation of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2.

170.  Wherefore, the Plaintiff prays that this honorable Court:

(a)     award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action, and to preserve the possibility of effective final relief, including but not limited to a preliminary injunction and the appointment of a receiver;

(b)     enter a permanent injunction to prevent future violations of the Consumer Fraud Act by Defendant;

(c)     award such relief as the Court finds necessary to redress injury to consumers resulting from Defendant's violations of the Consumer Fraud Act, including but not limited to, restitution, rescission of contracts entered into between the Defendant and Illinois consumers, the refund of monies paid, and the disgorgement of ill-gotten monies;

(d)     revoke Defendant's Certificate of Service Authority to operate as an alternative retail electric supplier in the State of Illinois;

(e)     assess a civil penalty as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, of up to $50,000 for any method, act, or practice declared unlawful by the Act. In the event the Court finds the method, act, or practice

48

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

FILED DATE: 9/29/2023 10:54 PM   2023CH08494

to have been entered into with the intent to defraud, the Court should impose a civil penalty of $50,000 per violation;

(f)    assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(1), of $50,000 for each violation against an elderly consumer, defined as a person 60 years of age or older;

(g)    assess a civil penalty as provided in Section 2FF of the Consumer Fraud Act, 815 ILCS 505/2FF(2), of $50,000 for each violation against a person with disability;

(h)    require Defendant to pay all costs for the prosecution and investigation of this action, as provided by Section 10 of the Consumer Fraud Act, 815 ILCS 505/10; and

(i)    provide such other and further equitable relief as justice and equity may require.

Respectfully submitted,
THE PEOPLE OF THE STATE OF
ILLINOIS, BY KWAME RAOUL,
Attorney General of the State of Illinois

Dated:  September 29, 2023

By:    _____

Susan N. Ellis
One of the Attorneys for Plaintiff

Thomas J. Verticchio
Assistant Chief Deputy Attorney General
Susan N. Ellis
Chief, Consumer Protection Division
100 W. Randolph St., 11th Fl.
Chicago, IL 60601
(312) 814-3659
thomas.verticchio@ilag.gov
susan.ellis@ilag.gov
Atty. No: 99000

49

FILED DATE: 9/29/2023 10:54 PM 2023CH08494

Benjamin Blustein
Robert S. Libman
Matthew Owens
Paul S. Balik
Special Assistant Attorneys General
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
(312) 751-1170
bblustein@lawmbg.com
rlibman@lawmbg.com
mowens@lawmbg.com
pbalik@lawmbg.com
Atty. No. 44720

Christopher J. Wilmes
Tory Tilton
Special Assistant Attorneys General
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison St., Ste. 4000
Chicago, IL 60602
(312) 580-0100
cwilmes@hsplegal.com
ttilton@hsplegal.com
Atty. No. 45667

Jay Edelson
Ari Scharg
Jimmy Rock
Shantel Chapple Knowlton
Michael Ovca
Special Assistant Attorneys General
Edelson PC
350 N. LaSalle St., 14th Fl.
Chicago, IL 60654
(312) 589-6370
jedelson@edelson.com
ascharg@edelson.com
jrock@edelson.com
schappleknowlton@edelson.com
movca@edelson.com
Atty. No. 62075

# Exhibit 6

Hearing Date: 7/10/2025 10:00 AM - 10:05 AM
Location: <<CourtRoomNumber>>
Judge: Calendar, 1

FILED
6/27/2025 12:19 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2023CH08494
Calendar, 1
33341124

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT CHANCERY DIVISION

|  |  |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) ) |
|  | ) No. 2023 CH 08494 |
| Plaintiff, | ) |
|  | ) The Honorable Thaddeus L. Wilson |
| v. | ) |
|  | ) Calendar 1 |
| RESIDENTS ENERGY LLC, a New York limited liability corporation, | ) ) ) |
| Defendant. | ) ) |

## MOTION FOR ENTRY OF CONFIDENTIALITY ORDER

Pursuant to Illinois Supreme Court Rule 201(c)(1), Plaintiff People of the State of Illinois *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("Plaintiff" or "Attorney General") hereby moves for entry of the proposed Confidentiality Order attached hereto as Exhibit A to govern discovery in this enforcement action against Residents Energy, LLC ("Defendant" or "Residents") for violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("Consumer Fraud Act" or "CFA"), and the Illinois Telephone Solicitations Act, 815 ILCS 413/1 *et seq.* ("Telephone Solicitations Act" or "TSA").

As explained in greater detail below, the parties are mostly in agreement on the terms of the proposed Confidentiality Order and have narrowed their disagreements to two issues: (1) whether Plaintiff should be permitted to share information received during discovery with other State Attorneys General and other law enforcement agencies for legitimate law enforcement purposes, provided that they agree to be bound by the terms of the Confidentiality Order in this

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

case or an order with materially similar terms; and (2) whether the Confidentiality Order should align with Plaintiff's responsibilities under the Illinois Freedom of Information Act (FOIA), 5 ILCS 140/1 *et seq.*, including the exceptions to disclosure set forth in that statute, or whether the Order should attempt to abrogate Plaintiff's responsibilities under FOIA and give Defendant's confidential information even greater protection than the statute provides.

Regarding the first contested issue, the public reasonably expects law enforcement officers, including Plaintiff, to follow the facts where they lead and share information with sister States and agencies, as needed, to enforce their laws. Defendant would turn that principle on its head and bar Plaintiff from sharing information that could be critical to protecting consumers and enforcing other laws. The Court should not sanction that effort to depart from basic law enforcement principles.

Regarding the second contested issue, Plaintiff is a "public body" under the Illinois FOIA statute and therefore has disclosure obligations unless one or more of the exemptions enumerated at 5 ILCS 140/7 applies. Plaintiff cannot, as Defendant suggests, use a Confidentiality Order to narrow its statutory disclosure obligations, essentially contracting around FOIA to shield otherwise disclosable information from public access. The Court should not sanction that effort to undermine the important public policy goals embodied in the FOIA statute.

## **LEGAL STANDARD**

Under Illinois Supreme Court Rule 201(c)(1), "[t]he court may at any time on its own initiative, or on motion of any party or witness, make a protective order as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression." The committee comments note that the phrase "as justice requires" confers "broad discretion [on the trial court] to make protective

orders" and does not purport to limit the types of protective orders that might be appropriate depending on the needs of the case.

Pursuant to Illinois Supreme Court Rule 201(k), Plaintiff certifies that the parties met and conferred in good faith over a period of several months and reached agreement on most terms of the proposed Confidentiality Order to govern the handling of "confidential information" that might be produced during discovery in this case. After the "personal consultation and reasonable attempts to resolve differences" required by Rule 201(k), Plaintiff states that the parties were unable to reach accord on two discrete but important issues that Plaintiff now brings to the Court for resolution.

## **ARGUMENT**

**A.     Plaintiff is a law enforcement officer and has a responsibility to share relevant information with counterparts who enforce other laws.**

Paragraph 5(d) of Plaintiff's proposed Confidentiality Order defines the following as a permissible use of information that Defendant designates as confidential during discovery:

> Confidential Information may be shared with other state Attorneys General that have executed a materially similar protective order or confidentiality agreement, or that agree to be bound by the terms of this Order by signing Exhibit A. Such information may also be shared with other law enforcement agencies provided they agree to use the materials for legitimate law enforcement purposes and otherwise agree in writing to be bound by the terms of this Order by signing Exhibit A.

After Defendant attempted to delete this provision without explanation, Plaintiff explained the importance of this provision on May 16, 2025: "The Attorney General, as the chief law enforcement officer of Illinois, must be able to share materials with other law enforcement bodies when he has relevant knowledge of information requested by those bodies." To address any concern that information shared with other Attorneys General or law enforcement agencies would be unprotected from further dissemination, Plaintiff also explained, "This paragraph

3

FILED DATE: 6/27/2025 12:19 PM    2023CH08494

provides Residents the assurance that any confidential information properly designated will be shared under the conditions of this Order or materially similar orders or agreements."

In response, on June 6, 2025, Defendant "reject[ed] the notion that Plaintiff here should have broader rights to disclose confidential material produced in this litigation than any other civil litigant would." In addition to opposing paragraph 5(d), Defendant contends that subparagraph 5(a) should read: "Confidential Information shall not be used or disclosed by the parties, counsel for the parties or any other persons identified in subparagraph (b) *for any purpose whatsoever other than in this litigation, including any appeal thereof*." Although the italicized language comes from the U.S. District Court for the Northern District of Illinois' Model Confidentiality Order,[1] Plaintiff has explained to Defendant that its proposed language is specific to private party litigation and not appropriate for a law enforcement action by the Illinois Attorney General. In place of the italicized language above, Plaintiff's proposed Confidentiality Order simply provides that confidential information shall not be used or disclosed "except as provided for in this Order."

The fundamental flaw in Defendant's argument is the presumed equivalence between the Attorney General and a private plaintiff, especially regarding cooperation with sister law enforcement agencies. But the Attorney General is not like any other civil litigant in this respect and has authority and responsibilities under the statutes Defendant is charged with violating that go beyond the narrower interests of a private litigant. Under Section 15 of the Illinois Constitution, the Attorney General is "the legal officer of the State" and has "the duties and power that may be prescribed by law." As relevant here, the Illinois Attorney General has

---

[1] *See* https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_judges/gilbert/Confidentiality-Protective%20Order.pdf (last visited June 23, 2025).

4

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

enforcement authority under Section 7 of the Consumer Fraud Act and may seek a broader set of remedies than private parties suing under Section 10a of the Act. *Compare* 815 ILCS 505/7 (public enforcement) *with id.* at 505/10a (private enforcement). Similarly, under the Telephone Solicitations Act, the Attorney General has broader enforcement authority and remedial powers than a private litigant suing for actual damages. *Compare* 815 ILCS 413/25(e) (public enforcement) *with id.* at 413/25(d) (private enforcement). As those provisions illustrate, the Attorney General is not an ordinary civil litigant and has a broader set of responsibilities to protect the public against fraud and seek relief in appropriate cases.

More generally, the role of a law enforcement agency is to follow the facts where they lead, which sometimes requires sharing information with law enforcement officials in other jurisdictions. *See e.g.,* 15 ILCS 205.6.5(d) (authorizing the Attorney General to share information obtained from the Illinois Commerce Commission "with other law enforcement officials," including information "that is designated as and that qualifies for confidential treatment"). Limiting the Attorney General's ability to share information with sister States and agencies for legitimate law enforcement purposes would create a regime of following the facts only up to State borders. Imposing those types of informational firewalls between States might reduce Defendant's potential exposure for unlawful activities in other jurisdictions, but Defendant does not have a legitimate interest in using a confidentiality order to evade scrutiny by law enforcement in other jurisdictions. To be sure, Defendant has a legitimate interest in ensuring that information properly designated as confidential does not become public, which the proposed Confidentiality Order ensures by requiring any law enforcement recipient of information to agree to the terms of the Order or a materially similar one. But the Court should

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

not allow Defendant to conflate its legitimate interest in confidentiality with an illegitimate interest in law evasion.

The law enforcement sharing provision in paragraph 5(d) of Plaintiff's proposed Confidentiality Order gives Defendant the same protections it would have if this were a federal law enforcement action led by the Federal Trade Commission (FTC). Under the FTC's regulations, "the Commission may disclose such information [obtained in the course of an investigation] to officers and employees of appropriate Federal law enforcement agencies or to any officer or employee of any State law enforcement agency upon the prior certification of an officer of any such Federal or State law enforcement agency that such information will be maintained in confidence and will be used only for official law enforcement purposes[.]" 15 U.S.C. §46(f); *see also Jaymar-Ruby, Inc. v. FTC*, 651 F.2d 506, 507 (7th Cir. 1981) (observing that even before the FTC's regulations expressly authorized information-sharing with law enforcement, "[t]he Commission interpreted its authority under this law to permit disclosure of investigative files to state attorneys general conducting similar investigations" and two courts agreed with the Commission's position). Here, as in an FTC investigation, information obtained from Defendant would be shared with sister States and agencies only for legitimate law enforcement purposes and only upon the receiving party's agreement to be bound by the terms of the proposed Confidentiality Order or a materially similar agreement. In that sense, paragraph 5(d) of Plaintiff's proposed Confidentiality Order simply creates symmetry with the information-sharing that would already be permitted in a federal FTC investigation.

In short, paragraph 5(d) of Plaintiff's proposed Confidentiality Order is central to Plaintiff's law enforcement mission and maintaining its collaborative relationship with sister States and agencies. The terms of the information-sharing provision are also consistent with the

6

FTC's procedures and would require any State Attorney General or other law enforcement agency to use Defendant's information only for law enforcement purposes and subject to the terms of the Confidentiality Order or a materially similar agreement. Against those weighty interests, Defendant has proffered nothing more than a desire for the Attorney General to be treated like a private party with narrower rights and responsibilities than a public law enforcement agency. The Court should reject this false equivalence between the Attorney General and a private party on this issue and enter paragraph 5(d) as proposed.

**B.      Plaintiff has statutory responsibilities under FOIA and cannot agree to abrogate those responsibilities in a confidentiality order.**

Paragraph 13 of Plaintiff's proposed Confidentiality Order addresses the handling of confidential information that is "Subpoenaed, Ordered Produced, or Requested by a Third Party [(*e.g.*, under FOIA)]." Defendant takes the position that "[t]here is no reason for any confidential information to be disclosed outside the scope of this proceeding pursuant to a FOIA request" and opposes the language in paragraph 13 that accounts for the possibility of "non-governmental third-party requests" and Plaintiff's obligation to respond to FOIA requests within ten business days of receipt. *See* 5 ILCS 140/3(d)-(e).

The Attorney General *cannot* agree to a confidentiality order that abrogates its statutory disclosure obligations, which would essentially entail contracting around FOIA. Nothing in FOIA or any other statute provides the Attorney General with the authority to voluntarily circumvent the Attorney General's FOIA obligations. FOIA admonishes public bodies like the Attorney General that "it is the public policy of the State of Illinois that access by all persons to public records promotes the transparency and accountability of public bodies at all levels of government." 5 ILCS 140/1. "Such access is necessary to enable the people to fulfill their duties of discussing public issues fully and freely, making informed political judgments and monitoring

FILED DATE: 6/27/2025 12:19 PM    2023CH08494

FILED DATE: 6/27/2025 12:19 PM    2023CH08494

government to ensure that it is being conducted in the public interest." *Id.* Thus, "[i]t is a *fundamental obligation* of government to operate openly and provide public records as expediently and efficiently as possible in compliance with [FOIA]." *Id.* (emphasis added).

Contrary to the public policy animating FOIA, as well as the Attorney General's "fundamental obligation" to operate openly, Defendant has mistakenly proposed during the parties' discussions that it might be permissible for the Attorney General to agree in a confidentiality order to abrogate the Attorney General's FOIA obligations by agreeing to disclose records received from Residents only in response to subpoenas or court orders, *not* FOIA requests. Residents cites *Better Government Ass'n v. Office of the Special Prosecutor (In re Appointment of Special Prosecutor)*, 2019 IL 122949, for this mistaken proposition. That case affirmed the appellate court's grant of judgment on the pleadings in favor of City of Chicago's decision not to disclose certain documents under FOIA when such disclosure would be contrary to a criminal court's earlier protective orders because "'respect for judicial process' requires that a lawful court order must take precedence over the disclosure requirements of FOIA and that a public body refusing to disclose documents because a court order commands it to do so does not always withhold those documents 'improperly.'" *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶66 (quoting and affirming *City of Chicago v. Office of the Special Prosecutor (In re Special Prosecutor)*, 2017 IL App (1st) 161376, ¶46). Importantly, *In re Appointment of Special Prosecutor* did not involve a situation in which the public entity that denied the FOIA request— the City in that case—requested the protective order. *Id.* ¶65 ("The BGA argues that this court 'should not allow public bodies to benefit from protective orders they were involved in procuring.' This argument has no basis in the record. The criminal court issued its original, June 2012, protective order at the request of the OSP—not the City.")

8

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

That clarification is important is because a court in Illinois can order that certain records not be disclosed under FOIA for a certain amount of time when there is "the need for confidentiality in particularized circumstances." *In re Special Prosecutor*, 2017 IL App (1st) 161376, ¶52. But the Attorney General cannot participate in or acquiesce to the curtailment of his responsibilities under FOIA. "[A]n agency cannot—through its own participation, action, collusion, or acquiescence—help obtain a court order and then claim that the order prevents it from releasing otherwise disclosable records." *Id.* ¶49 (explaining upshot of *Carbondale Convention Center, Inc. v. City of Carbondale*, 245 Ill. App. 3d 474 (1993) and *Watkins v. McCarthy*, 2012 IL App (1st) 100632); *see also GTE Sylvania v. Consumers Union of United States*, 445 U.S. 375, 386 (1980) ("The concerns underlying the Freedom of Information Act are inapplicable, for the agency has made no effort to avoid disclosure; indeed, it is not the CPSC's decision to withhold the documents at all."). Here, Defendant is asking the Attorney General to do just that: to participate or acquiesce to obtain an order from this Court that would prevent the Attorney General from releasing otherwise disclosable records. The Attorney General cannot do that, and this Court should not abet Defendant's attempts to circumvent FOIA.

There is no reason why records disclosed in the context of this litigation should be categorically exempted from FOIA by court order. Again, Illinois has a "strong policy" of transparent governance, codified in FOIA. *See In re Appointment of Special* Prosecutor, 2019 IL 122949, ¶25 ("Based on [FOIA's] clear expression of legislative intent, this court has held that public records are presumed to be open and accessible.") (citation omitted); *In re Special Prosecutor*, 2017 IL App (1st) 161376 ¶49 ("Our supreme court has relied on FOIA's strong policy statement in support of rulings requiring release of governmental records to public review") (citations omitted); *Chicago Sun-Times v. Chicago Police Department*, 2022 IL App

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

(1st) 201262-U, ¶25 ("Under FOIA, public records are presumed to be open and accessible.") (citations omitted). FOIA explains that "[r]estraints on access to information…are limited exceptions to the principle that the people of this State have a right to full disclosure of information relating to the decisions, policies, procedures, rules, standards, and other aspects of government activity that affect the conduct of government and the lives of any or all of the people." 5 ILCS 140/1. That is why "[a]ll records in the custody or possession of a public body are presumed to be open to inspection or copying." 5 ILCS 140/1.2.

That does not mean, however, that the records disclosed in this litigation are without protection. Section 7 of FOIA itself provides exemptions to protect certain documents from public disclosure, including for certain "trade secrets and commercial or financial information." 5 ILCS 140/7(1)(g). From the extensive list of FOIA exemptions, *see* 5 ILCS 140/7(1)(a)-(tt), it is clear that the statute has been carefully crafted by the Illinois legislature to balance the public's interest in "transparency and accountability[,]" 5 ILCS 140/1, with the need to exempt certain records, 5 ILCS 140/7. This is a delicate balance, and this Court should reject Residents' attempts to upset it by categorically exempting from FOIA's reach any document that Defendant stamps as "confidential."

In sum, the Attorney General cannot agree to narrow its FOIA obligations, and this Court should not create a personalized exemption for records turned over by Defendant in this litigation.

FILED DATE: 6/27/2025 12:19 PM    2023CH08494

## CONCLUSION

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that the Court

enter the proposed Confidentiality Order attached hereto as Exhibit A.

Respectfully submitted,

THE PEOPLE OF THE STATE OF ILLINOIS,
by KWAME RAOUL, Attorney General
of the State of Illinois

Susan N. Ellis
Chief, Consumer Protection Division
Elizabeth A. Blackston
Greg Grzeskiewicz
Assistant Attorneys General
Chiefs, Consumer Fraud Bureau
115 S. LaSalle St., 26th Fl.
Chicago, IL 60603
Susan.Ellis@ilag.gov
Attorney No: 99000

By:      /s/ Benjamin Blustein
Benjamin Blustein
Robert S. Libman
Grayson Sang Walker
Bernardo M. Lopez
Special Assistant Attorneys General
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170
bblustein@lawmbg.com
rlibman@lawmbg.com
gwalker@lawmbg.com
blopez@lawmbg.com
Atty. No. 44720

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

Christopher J. Wilmes                    Jay Edelson
Tory Tilton                              Ari Scharg
Special Assistant Attorneys General      Jimmy Rock
Hughes Socol Piers Resnick & Dym         Michael Ovca
70 W. Madison St., Ste. 4000             Special Assistant Attorneys General
Chicago, IL 60602                        Edelson PC
(312) 580-0100                           30 N. LaSalle St., 14th Fl.
cwilmes@hsplegal.com                     Chicago, IL 60654
ttilton@hsplegal.com                     (312) 589-6370
Atty. No. 45667                          jrock@edelson.com
                                         movca@edelson.com
                                         Atty. No. 62075

<u>CERTIFICATE OF SERVICE</u>

Lisa Mecca Davis certifies that she served the foregoing Motion on all counsel of record, by this Court's Odyssey electronic-filing system, this 27th day of June 2025.


/s/ Lisa Mecca Davis
Lisa Mecca Davis

12

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT CHANCERY DIVISION

<div style="margin-left:2em">

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

</div>

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) ) |
| Plaintiff, | ) No. 2023 CH 08494 ) |
| v. | ) The Honorable Thaddeus L. Wilson ) Calendar 1 |
| RESIDENTS ENERGY LLC, a New York limited liability corporation, | ) ) ) |
| Defendant. | ) ) |

<u>CONFIDENTIALITY ORDER</u>

The Court having determined that the terms set forth herein are appropriate to protect the parties' respective interests; accordingly, it is ORDERED:

1.    **Scope and Purpose.** This Confidentiality Order is entered for the purpose of facilitating the exchange of documents, materials, testimony, transcripts, videos, recordings, and other information (electronic and otherwise) among the parties. All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively "documents"), may qualify for protection and be subject to this Order concerning Confidential Information as defined below.

2.    **Confidential Information.** As used in this Order, "Confidential Information" means information designated as "CONFIDENTIAL-SUBJECT TO CONFIDENTIALITY ORDER" by the producing party that falls within one or more of the following categories: (a) information prohibited from disclosure by statute; (b) information that is proprietary or reveals trade secrets; (c) sensitive research, technical, commercial, operational, strategic, financial, or

Exh. A

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

other information that the party has maintained as confidential; (d) medical information

concerning any individual; (e) personal identifying information; (f) income tax returns (including

attached schedules and forms), W-2 forms and 1099 forms; or (g) personnel or employment

records of a person who is not a party to the case.

 3. **Designation.**

 (a) A party may designate a document as Confidential Information for protection

under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO

CONFIDENTIALITY ORDER" on the document and on all copies in a manner that will not

interfere with the legibility of the document. As used in this Order, "copies" includes electronic

images, duplicates, extracts, summaries or descriptions that contain the Confidential Information.

The marking "CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER" shall be

applied prior to or at the time of the documents are produced or disclosed. Applying the marking

"CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER" to a document does not

mean that the document has any status or protection by statute or otherwise except to the extent

and for the purposes provided in this Order. Any copies that are made of any documents marked

"CONFIDENTIAL - SUBJECT TO CONFIDENTIALITY ORDER" shall also be so marked,

except that indices, electronic databases or lists of documents that do not contain substantial

portions or images of the text of marked documents and do not otherwise disclose the substance

of the Confidential Information are not required to be marked.

 (b) The designation of a document as CONFIDENTIAL-SUBJECT TO

CONFIDENTIALITY ORDER is a certification by an attorney or a party appearing *pro se* that

the document contains Confidential Information as defined in this order. Information or

documents available to the public or disclosed to others without restriction are not subject to this

Confidentiality Order.

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

4. **Depositions.**

Unless all parties agree on the record at the time the deposition testimony is taken, all deposition testimony taken in this case shall be treated as Confidential Information until the expiration of the 60th day after the transcript is delivered to any party or the witness. Within this time period, a party may serve a Notice of Designation to all parties of record as to specific portions of the testimony that are designated Confidential Information, and thereafter only those portions identified in the Notice of Designation shall be protected by the terms of this Order. The failure to serve a timely Notice of Designation shall waive any designation of testimony taken in that deposition as Confidential Information, unless otherwise ordered by the Court. Pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

5. **Protection of Confidential Material.**

(a)     General Protections. Confidential Information shall not be used or disclosed by the parties, counsel for the parties, or any other persons identified in subparagraph (b) except as provided for in this Order.

(b)     Limited Third-Party Disclosures. The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any third person or entity except as set forth below. Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

(1)   The Attorney General. The Attorney General and employees or other persons acting under the authority of the Attorney General, including but not limited to Special Assistant Attorneys General and their employees and contractors who have responsibilities relating to this action;

(2)   Residents Energy. Residents Energy, or other persons acting under the authority of Residents Energy, including but not limited to Residents

3

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

Energy's counsel and employees or contractors working under the supervision of Residents Energy's counsel;

(3)   Parties. Individual parties and employees of a party but only to the extent counsel determines in good faith that the employee's assistance is reasonably necessary to the conduct of the litigation in which the information is disclosed;

(4)   Counsel to the parties and persons employed by counsel to assist counsel in the conduct of the litigation;

(5)   The Court and its personnel;

(6)   Court Reporters and Recorders. Court reporters and recorders engaged for depositions or for court proceedings, and their staffs;

(7)   Contractors. Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

(8)   Consultants and Experts. Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action;

(9)   Witnesses. For purposes of a deposition, interview, or hearing, witnesses in this action to whom disclosure is reasonably necessary. Witnesses shall not retain a copy of documents containing Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts.

(10)  Author or recipient. Persons who previously received or had prior knowledge of the document or Confidential Information or who previously received, reviewed, or had a right of access to a document containing the Confidential Information, including but not limited to any person who is an author or recipient of the document (not including a person who received the document in the course of litigation);

(11)  Mediators. Any mediatory or settlement officer, and their supporting personnel; and

(12)  Others by Consent or by Order of the Court. Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(c)   Confidential Information may be disclosed to an individual pursuant to subparagraphs (8) through (9) only after such person completes the certification contained in

4

Attachment A, Acknowledgment of Understanding and Agreement to Be Bound

("Acknowledgement and Agreement"), except as otherwise provided herein. Counsel for the

party obtaining the person's signature on the Acknowledgment and Agreement will retain a

copy.

      (d)    Confidential Information may be shared with other state Attorneys General

that have executed a materially similar protective order or confidentiality agreement, or that

agree to be bound by the terms of this Order by signing Exhibit A. Such information may also be

shared with other law enforcement agencies provided they agree to use the materials for

legitimate law enforcement purposes and otherwise agree in writing to be bound by the terms of

this Order by signing Exhibit A;

      (e)    Control of Documents. Counsel for the parties shall make reasonable efforts to

prevent unauthorized or inadvertent disclosure of Confidential Information. Counsel shall

maintain the originals of the forms signed by persons acknowledging their obligations under this

Order for a period of three years after the termination of the case.

      **6.**    **Inadvertent Failure to Designate.** An inadvertent failure to designate a document

as Confidential Information does not, standing alone, waive the right to so designate the

document; provided, however, that a failure to serve a timely Notice of Designation of deposition

testimony as required by this Order, even if inadvertent, waives any protection for deposition

testimony. If a party designates a document as Confidential Information after it was initially

produced, the receiving party, on notification of the designation, must make a reasonable effort

to assure that the document is treated in accordance with the provisions of this Order. No party

shall be found to have violated this Order for failing to maintain the confidentiality of material

during a time when that material has not been designated Confidential Information, even where

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

the failure to so designate was inadvertent and where the material is subsequently designated Confidential Information.

7. **Inadvertent Disclosure of Protected Material.** If a receiving party learns that, by inadvertence or otherwise, it has disclosed Confidential Information to any person or in any circumstances not authorized under this Order, the receiving party must immediately (a) notify in writing the designating party of the unauthorized disclosures; (b) use its best efforts to retrieve all unauthorized copies of the protected material; (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order; and (d) request such person or persons to execute Exhibit A.

8. **Filing of Confidential Information.** This Order does not, by itself, authorize the filing of any document under seal. Any party wishing to file a document designated as "Confidential" in connection with a motion, brief, or other submission to the Court must comply with all applicable rules and legal requirements.

9. **No Greater Protection of Specific Documents.** Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.

10. **Challenges by a Party to Designation as Confidential Information.** The designation of any material or document as Confidential Information is subject to challenge by any party. The following procedure shall apply to any such challenge.

(a) Meet and Confer. A party challenging the designation of Confidential Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party. In conferring, the challenging party must explain the basis for

6

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

its belief that the confidentiality designation was not proper and must give the designating party an opportunity to review the designated material, to reconsider the designation, and, if no change in designation is offered, to explain the basis for the designation. The designating party must respond to the challenge within twenty (20) business days.

(b)     Judicial Intervention. A party that elects to challenge a confidentiality designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge. Each such motion must be accompanied by a competent declaration that affirms that the movant has complied with the meet-and-confer requirements of this procedure. The burden of persuasion in any such challenge proceeding shall be on the designating party. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information under the terms of this Order.

**11.   Action by the Court.** Applications to the Court for an order relating to materials or documents designated Confidential Information shall be by motion. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

**12.   Use of Confidential Documents or Information at Trial.** Nothing in this Order shall be construed to affect the use of any document, material, or information at any trial, hearing, or other litigation proceedings. A party that intends to present or that anticipates that another party may present Confidential information at a hearing or trial shall bring that issue to the Court's and parties' attention by motion or in a pretrial memorandum without disclosing the Confidential Information. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial or in connection with litigation of this matter.

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

**13.    Confidential Information Subpoenaed, Ordered Produced, or Requested by a Third Party.** The obligations of the Attorney General are subject to the provisions of all applicable laws, rules, and regulations of the State of Illinois regarding the maintenance and disclosure of documents and information supplied to the Attorney General, including but not limited to the provisions of the Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq.*, and the State Records Act, 5 ILCS 160/1 et seq.

(a)    If a receiving party is served with a non-governmental subpoena or an order or a non-governmental third-party request, or receives a subpoena, order, or request from a governmental agency or entity that does not agree in writing to be bound by the terms of Paragraph 5(d) of this Order, and that subpoena, order, or request would compel disclosure of any material or document designated in this action as Confidential Information, the receiving party must so notify the designating party, in writing as soon as practicable, and in no event more than three court days after receiving the subpoena, order, or request. Such notification must include a copy of the subpoena, order, or request.

(b)    The receiving party also must promptly inform in writing the party who caused the subpoena, order, or request to issue that some or all of the material covered by the subpoena, order, or request is the subject of this Order. In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena, order, or request to issue.

(c)    If the designating party has not moved for a protective order within five (5) days after having been provided the notification required by subparagraph (a), above, the receiving party may produce the requested information or items.

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

(d)     The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Confidential Information in the court from which the subpoena or order issued. The designating party shall bear the burden and the expense of seeking protection in that court of its Confidential Information, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody or control Confidential Information by the other party to this case.

**14.     Challenges by Members of the Public to Sealing Orders.** A party or interested member of the public has a right to challenge the sealing of particular documents that have been filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

**15.     Obligations on Conclusion of Litigation.**

(a)     Order Continues in Force. Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b)     Obligations at Conclusion of Litigation. Within ninety (90) days after dismissal or entry of final judgment not subject to further appeal, all Confidential Information and documents marked "CONFIDENTIAL-SUBJECT TO CONFIDENTIALITY ORDER" under this Order, including copies as defined in ¶3(a), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction to the extent practicable in lieu of return; or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has

done so. In addition, the following are exceptions to these obligations : (a) backup tapes or other disaster recovery systems that are routinely deleted or written over in accordance with an established routine system maintenance practice; and (b) documents and materials that must be preserved by the Attorney General as government records or in compliance with other statutory, regulatory, or legal authorities, in which case the Attorney General shall maintain the materials in a manner consistent with this Order.

> (c)    Retention of Work Product and One Set of Filed Documents. Notwithstanding the above requirements to return or destroy documents, counsel may retain (1) attorney work product, including an index that refers or relates to designated Confidential Information so long as that work product does not duplicate verbatim substantial portions of Confidential Information; (2) one complete set of all documents filed with the Court including those filed under seal; and (3) one complete set of all depositions and hearing transcripts, with all exhibits. Any retained Confidential Information shall continue to be protected under this Order. An attorney may use his or her work product in subsequent litigation, provided that its use does not disclose or use Confidential Information.

15.    **Order Subject to Modification.** This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

16.    **No Prior Judicial Determination.** This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information by counsel or the parties is entitled to protection

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

FILED DATE: 6/27/2025 12:19 PM   2023CH08494

under Illinois Supreme Court Rule 201(c)(1) or otherwise until such time as the Court may rule on a specific document or issue.

17. **Persons Bound.** This Order shall take effect when entered and shall be binding upon all counsel of record and their law offices, the parties, and persons made subject to this Order by its terms.

_____
The Honorable Thaddeus L. Wilson
Judge, Circuit Court of Cook County

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT CHANCERY DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) ) |
| Plaintiff, | ) No. 2023 CH 08494 ) |
| v. | ) The Honorable Thaddeus L. Wilson ) |
| RESIDENTS ENERGY LLC, a New York limited liability corporation, | ) Calendar 1 ) ) |
| Defendant. | ) ) ) |

<u>ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND</u>

The undersigned hereby acknowledges that he/she has read the Confidentiality Order

dated _____ in the above-captioned action and attached hereto, understands the terms

thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the

Circuit Court of Cook County, Illinois in matters relating to the Confidentiality Order and

understands that the terms of the Confidentiality Order obligate him/her to use materials

designated as Confidential Information in accordance with the Order solely for the purposes of

the above-captioned action, and not to disclose any such Confidential Information to any other

person, firm or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in

penalties for contempt of court.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

Date: _____

Signature _____

# Exhibit 7

Hearing Date: No hearing scheduled
Location: <<CourtRoomNumber>>
Judge: Calendar, 1

FILED
8/1/2025 5:35 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2023CH08494
Calendar, 1
33844538

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT CHANCERY DIVISION

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

| | |
|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, *ex rel.* KWAME RAOUL, Attorney General of the State of Illinois, | ) ) ) ) |
| Plaintiff, | ) No. 2023 CH 08494 ) |
| v. | ) The Honorable Thaddeus L. Wilson ) |
| RESIDENTS ENERGY LLC, a New York limited liability corporation, | ) Calendar 1 ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S REPLY IN SUPPORT OF
## MOTION FOR ENTRY OF CONFIDENTIALITY ORDER

The law enforcement sharing and Freedom of Information Act (FOIA) provisions in the Confidentiality Order proposed by Plaintiff People of the State of Illinois *ex rel.* Kwame Raoul, Attorney General of the State of Illinois ("Plaintiff" or "Attorney General") and opposed by Residents Energy, LLC ("Defendant" or "Residents") are sound, legally supported, and should be entered as proposed.

As the Court acknowledged at the presentment hearing on the present motion, the Attorney General, as the chief law enforcement officer of the State of Illinois, should be permitted to share documents obtained during the course of an investigation or litigation with other law enforcement officials in the State. More generally, paragraph 5(d) of Plaintiff's proposed Confidentiality Order—which permits Plaintiff to share documents with other State Attorneys General or law enforcement officials, on a confidential basis and only for law enforcement purposes—is similar to provisions entered in other Attorney General enforcement

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

actions and substantively identical to section 6(f) of the Federal Trade Commission (FTC) Act, 15 U.S.C. § 46(f), which Defendant has not meaningfully distinguished.

Regarding the handling of potential FOIA requests for discovery materials in this case, documents that Defendant designates as confidential should be subject to the standard protections and exemptions in Illinois' Freedom of Information Act, 5 ILCS 140/1 *et seq.*, without any additional or bespoke protections for Defendant. FOIA is designed to shed light on government officials' decision-making processes, so documents reviewed by the Attorney General in making law enforcement decisions in this case are central to FOIA's purposes. At the same time, FOIA's exemptions protect Defendant's sensitive documents and Plaintiff's Proposed Confidentiality Order allows Defendant to seek judicial relief if it disagrees with any FOIA determinations. 5 ILCS 140/7; Pl.'s Prop. Conf. Ord. ¶ 13. If the Court rules against Plaintiff on this issue, Plaintiff respectfully requests that the Court add language to the end of paragraph 1 of the Interim Confidentiality Order clarifying that, "Unless otherwise stated, the obligations under this Order apply notwithstanding other provisions of law, including the Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq.*"

**A.    Plaintiff's proposed law enforcement sharing provision should permit confidential sharing with other law enforcement entities with authority over the Defendant.**

Paragraph 5(d) of Plaintiff's proposed Confidentiality Order would allow the Attorney General to share documents that Defendant marks as "confidential" with other State Attorneys General or law enforcement agencies, provided that they agree to use the document(s) for law enforcement purposes only and sign the Confidentiality Order in this case or a materially similar agreement.

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

The Attorney General has statutory authority to request information pursuant to the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/3 ("Consumer Fraud Act"), and that authority contains no constraints on the Attorney General's use or sharing of that information for law enforcement purposes. Using and sharing that information with other law enforcement entities with authority to investigate the business practices in question is entirely consistent with the statutory grant of authority to the Attorney General to request information.

State Attorneys General very often and for decades have collaborated on consumer protection matters involving the same defendant when that defendant operates in multiple states. When collaborating and sharing information with other State Attorneys General as to a common investigative target, Plaintiff often enters into a confidentiality agreement with the target that expressly allows this type of information sharing with other law enforcement entities that have the authority to investigate the practices in question.

Here, the Attorney General may choose to share documents that Defendant marks as confidential with federal or other state law enforcement officials if, for example, Defendant's documents show that its fraudulent and deceptive marketing practices were deployed in other states. Defendant argues that the Attorney General "identifies no valid law-enforcement concerns in this case that would require or justify unrestricted sharing of Residents' confidential business information with Attorneys General in other states or other law enforcement agencies." Def.'s Opp'n at 2. Defendant ignores the Complaint, which alleges that Residents has used illegal and deceptive marketing practices to trick thousands of consumers into paying millions more for their electricity. Because Residents operates in other states, it is quite possible that similar deceptive conduct was used in those states, something that certainly raises valid law enforcement concerns. Moreover, Defendant has yet to produce a single document during discovery, so asking

the Attorney General to identify a specific concern that might necessitate the sharing of a confidential document with other law enforcement officials is demanding clairvoyance as to future document productions

In Defendant's view, the Attorney General should be prohibited from sharing such documents with other relevant law enforcement entities, even when the sharing is for a law enforcement purpose and the documents will be held in confidence by the receiving party. Just as law enforcement officials ask the public to abide by the maxim, "If you see something, say something," so too the public expects law enforcement officials to collaborate across jurisdictional lines, subject to appropriate safeguards, to protect the public. Defendant's position would turn that principle on its head ("If you see something, keep it to yourself") and create document-sharing firewalls across state and federal-state lines—all to the detriment of the public and for the benefit of a private party seeking to limit its potential exposure for unlawful activity.

Defendant faults the Attorney General for not citing any case where "any court has ever accepted this argument [in favor of law enforcement sharing] or otherwise held that such…sharing powers should be bestowed on any state Attorney General, anywhere, in any kind of case." Def.'s Opp'n at 3. Contrary to Defendant's assertion, many other courts have entered confidentiality orders that permit the Attorney General to share documents designated as confidential with law enforcement colleagues. *See e.g.*, Exhibit A (confidentiality order in *People of the State of Ill., ex rel. Raoul v. Juul Labs, Inc.*, Case No. 19 CH 14302 (Cook Cty. Cir. Ct.) (Jacobius, J.) at ¶ 32); Exhibit B (confidentiality order in *People of the State of Ill. v. Am. Ass'n for Wartime Veterans, LLC et al.*, Case No. 17 CH 13919 (Cook Cty. Cir. Ct.) (Allen, J.) § III, ¶ 9); Exhibit C (confidentiality order entered in *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, No. 4:22-MD-03047, MDL No. 3047

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

4

(N.D. Cal.) at ¶ 7.1(a)); *see also SEC v. AA Capital Partners, Inc.*, No. 06-51049, 2009 U.S. Dist. LEXIS 102374, at *7-8 (E.D. Mich. Nov. 3, 2009) (denying motion for protective order that would have prohibited the SEC from sharing information with other law enforcement agencies).

Defendant objects to paragraph 5(d) in Plaintiff's proposed Confidentiality Order on the ground that it deprives Defendant of notice and an opportunity to object before any document that Defendant designates as confidential is shared with another law enforcement agency. Def.'s Opp'n at 2. Defendant does not cite any case law in support of its due process objection or articulate how the Attorney General's sharing of a lawfully obtained document in its possession with other law enforcement officials—on a confidential basis and only for legitimate law enforcement reasons—constitutes a deprivation of Defendant's property without adequate due process. Nor has Defendant explained why parallel language in section 6(f) of the FTC Act, 15 U.S.C. § 46(f), has not prompted due process concerns in the more than 45 years since Congress added that language to the statute.

In addition to the Attorney General's (and other State Attorneys Generals') authority to share information with other law enforcement authorities, the FTC Act specifically allows the FTC to similarly share. As amended in 1980, section 6(f) of the FTC Act provides: "[T]he Commission may disclose such information [obtained in the course of an investigation] to officers and employees of appropriate Federal law enforcement agencies or to any officer or employee of any State law enforcement agency upon the prior certification of an officer of any such Federal or State law enforcement agency that such information will be maintained in confidence and will be used only for official law enforcement purposes[.]" 15 U.S.C. §46(f). Some examples of how this parallel sharing ability play out when State Attorneys General and

5

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

the FTC engage in collective enforcement actions are attached. *See* Exhibit D (protective order entered in *State of Arizona et al. v. Michael D. Lansky, L.L.C.*, No. CV-23-00233-TUC-CKJ (D. Ariz.) at ¶ 7(g)).

Paragraph 5(d) of Plaintiff's proposed Confidentiality Order permits the same type of law enforcement sharing with the same safeguards as has happened in numerous other Attorney General enforcement actions and in combined State Attorney General/FTC enforcement actions. As in the FTC Act: (1) sharing is permitted only for law enforcement purposes; and (2) receiving parties must agree to maintain any document received as confidential, either by signing the Confidentiality Order or a materially similar agreement. Those safeguards undermine Defendant's contention that paragraph 5(d) is "chilling in its breadth and absence of limiting principles." Def.'s Opp'n at 4.[1]

Defendant's attempts to distinguish the FTC provision are meritless. There is no rationale to distinguish investigatory material from that obtained during litigation; the same public interest goals apply as to both. Moreover, by the time a matter progresses to litigation that is public and supported by sufficient allegations of unlawful activity, the rationale for information-sharing among law enforcement officials is arguably stronger than during a pre-suit investigation, but certainly no weaker.

Regarding the absence of express statutory authorization for the Attorney General to share information similar to that in section 6(f) of the FTC Act, this is a distinction with no meaning. The authority granted to the Attorney General to request and receive information

---

[1] The purpose-based limitation in paragraph 5(d)—namely, that sharing is permitted only for law enforcement purposes—also undermines Defendant's suggestion at the July 10 presentment hearing that the Special Assistant Attorneys General in this case are attempting to use Defendant's confidential documents to "drum up business" in other States, which would not be a legitimate law enforcement purpose.

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

relevant to an investigation into a possible violation of the Consumer Fraud Act has no specific statutory limitations on sharing. And sharing information with other law enforcement agencies for law enforcement purposes is entirely consistent with that authority. For these reasons, the Attorney General often shares relevant investigatory information with other State Attorneys General and federal agencies tasked with enforcing consumer protection laws. Similarly, courts have upheld the FTC's ability to share information for law enforcement purposes, even without express statutory authorization, before Congress made that authority explicit.

> The Commission interpreted its authority under this law to permit disclosure of investigative files to state attorneys general conducting similar investigations. Although § 6(f) did not explicitly authorize such disclosure, the Commission's view was upheld in *Interco Inc. v. FTC*, 478 F. Supp. 103 (D.D.C.1979), *appeal dismissed*, No. 79-1423 (D.C. Cir. 1980) and *Martin Marietta Corp. v. FTC*, 475 F. Supp. 338 (D.D.C.1979), *affirmed as modified*, No. 79-1783 (D.C. Cir. 1980).

*Jaymar-Ruby, Inc. v. FTC*, 651 F.2d 506, 507-08 (7th Cir. 1981).

In short, Defendant's attempts to distinguish section 6(f) of the FTC Act are unpersuasive, the Attorney General has a long history of sharing law enforcement information with relevant law enforcement partners for law enforcement purposes, and Defendant's objections to paragraph 5(d) of Plaintiff's proposed Confidentiality Order lack merit. To the extent the Court is persuaded that Defendant is entitled to notice before any of its documents are shared with federal or other state law enforcement officials, Plaintiff submits for the Court's consideration confidentiality order provisions that would provide notice to Defendant, either with or without the option for Plaintiff to seek permission from the Court to forego notice to protect a confidential investigation in another jurisdiction. *See* Exhibit E (confidentiality order entered in *People of the State of Illinois v. Alta Colleges, Inc. et al.*, No. 12 CH 1587 (Cook Cty. Cir. Ct.))

at ¶ 11[2]); *see also* Exhibit F (confidentiality ordered entered in *People of the State of Ill. v. CMK Investments, Inc. et al.*, No. 14 C 2783 (N.D. Ill.) (Alonso, J.) at ¶ 5(d)[3]).

**B.     FOIA requests for documents related to this litigation should be subject to standard public records procedures and protections.**

Paragraph 13 of Plaintiff's Proposed Confidentiality Order respects Defendant's interest in the confidentiality of its records while maintaining Plaintiff's duty of transparency to the public under Illinois' Freedom of Information Act, 5 ILCS 140/1 *et seq*. But Defendant objects, proposing a blanket rule that would allow Defendant's confidentiality designations to control the Attorney General's statutory responsibilities to the public. Def.'s Opp'n at 5. Defendant's proposed rule would frustrate the purposes of FOIA and unnecessarily use prosecutorial and judicial resources to scrutinize every one of Defendant's confidentiality designations to ensure they are not simply a mechanism to evade FOIA and keep embarrassing information from the public eye.

Illinois' FOIA was enacted to secure the public's "right to full disclosure of information relating to the decisions, policies, procedures, rules, standards, and other aspects of government activity that affect the conduct of government and the lives of any or all of the people." 5 ILCS

---

[2] Paragraph 11 of the confidentiality order entered in the *Alta Colleges* litigation provides: "Nothing herein shall prevent the Attorney General from sharing and discussing Confidential Material with other State Attorney General Offices and other law enforcement agencies empowered to investigate laws, regulations or rules to which [defendants] are subject, [provided] that such agency agrees to abide by the terms of this Protective Order. In the event that the Attorney General shares documents designated as Confidential Material with a State Attorney General's Office or other law enforcement agency, the Attorney General shall notify [defendants] of the identity of the State Attorney General's Office or other law enforcement agency with whom Confidential Material is shared. However, in the event the Attorney General wishes to share confidential material without revealing the identity of such State Attorney General's Office or other law enforcement agency, the Attorney General shall first file a motion with the Court, for in camera review and such other relief as the court deems appropriate, to protect the identity of such State Attorney General's Office or other law enforcement agency before sharing Confidential Material with such non-disclosed State Attorney General's Office or other law enforcement agency."
[3] Paragraph 5(d) of the confidentiality order entered in *CMK Investments* provides: "Nothing herein shall prevent the Illinois Attorney General from sharing or discussing Confidential Information with any federal or state governmental agency with regulatory or enforcement authority over Defendant. In the event the Illinois Attorney General shares Confidential Information with a federal or state governmental agency, the Illinois Attorney General shall notify Defendant of the identity of the agency with whom the Confidential Information is shared."

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

140/1. To secure this right, FOIA created a presumption that "[a]ll records in the custody or possession of a public body are . . . open to inspection or copying." 5 ILCS 140/1.2. In this way, FOIA gives the public a window into the decision-making of governmental bodies—including the evidence and information that drives those decisions. FOIA allows the public the opportunity to assess the government's actions, including those made by the Attorney General in civil enforcement matters.

Defendant's out-of-context citation to the Seventh Circuit's decision in *Lakin Law Firm, P.C. v. FTC*, 352 F.3d 1122 (7th Cir. 2003), does not alter this purpose. *Lakin Law* upheld the FTC's decision in the context of a FOIA request to release substantive sections of requested customer complaints while withholding the names and addresses of the private consumers who filed those complaints. *Id.* at 1123. When the Attorney General receives a FOIA request for consumer complaints and determines it is appropriate to produce such complaints, it routinely redacts "private information" under a specific FOIA exemption, 5 ILCS 140/7(b), but otherwise produces the substance of the complaint, just as the FTC did in *Lakin Law.*

FOIA also has built-in protections for Defendant's legitimate business interests such as trade secrets. Rather than forcing Residents to "undertake[] burdensome, emergency action to prevent disclosure of material that already should be subject to protection," Def.'s Opp'n at 5, Plaintiff's proposed order maintains FOIA's robust protections for materials that "should be subject to protection" *and* grants Defendant notice and an opportunity to dispute any FOIA determination with which it disagrees. Section 7 of FOIA provides over forty-five distinct exemptions, including exemptions for "[p]rivate information" and "[t]rade secrets and commercial or financial information." 5 ILCS 140/7(1)(b, g); *see generally* 5 ILCS 140/7(1)(a)-(tt). These exemptions were calibrated by the legislature to balance transparency for the public

9

with legitimate privacy concerns. *Cf.* 5 ILCS 140/1 ("The Act is not intended to cause an unwarranted invasion of personal privacy."). Allowing Defendant to claim an automatic and categorical exemption from FOIA for any document it designates as confidential—without regard to whether a statutory exemption applies—would frustrate that careful calibration between transparency and privacy and override the legislature's public policy choice on this issue.

Illinois courts rigorously enforce the statute's protections for privacy rights. *See, e.g.*, *Mancini L. Grp., P.C. v. Schaumburg Police Dep't*, 2021 IL 126675, ¶ 57 (declining to require the production of unredacted traffic reports); *Watkins v. McCarthy*, 2012 IL App (1st) 100632, ¶ 13 (distinguishing between police personnel records, which are exempt from disclosure, and police misconduct allegations, which are not necessarily exempt from disclosure). Courts give similarly measured consideration to the trade-secrets exemption. *See, e.g.*, *City of Chicago v. Janssen Pharmaceuticals*, 2017 IL App (1st) 150870, ¶ 25 (declining to apply the trade-secrets exemption only because the relevant party "did not argue that disclosure of its documents would cause it competitive harm.").

Plaintiff's Proposed Confidentiality Order also conserves prosecutorial and judicial resources. Under Plaintiff's proposed Order, the parties and the Court would only have to assess potential FOIA disputes *after* a member of the public sought access to documents Defendant designates as confidential and which Plaintiff then determined should be produced. Plaintiff's proposal thus avoids litigation of purely hypothetical issues and limits FOIA determinations to concrete factual scenarios that require the parties and the Court to consider the applicability of a FOIA exemption to a particular document. Under Defendant's proposed framework, in contrast, Defendant's decision to designate a document as confidential triggers an automatic and

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

categorical exemption from disclosure under FOIA, incentivizing Plaintiff and this Court to scrutinize each confidentiality designation at the outset to ensure that Defendant is not over-designating information—for instance, documents that are not private or sensitive, but merely embarrassing—to sidestep FOIA. *See* Def's Opp'n at 5.

Defendant has not shown any need for protection that sweeps more broadly than FOIA's existing guarantees, which paragraph 13 of Plaintiff's proposed Confidentiality Order would preserve in full. FOIA's existing mechanisms provide a carefully-calibrated framework for balancing the interests in transparency and privacy, which Residents should not be permitted to disrupt through sweeping and automatic self-exemptions from FOIA's requirements.

If this Court rejects Plaintiff's proposed language and instead grants Defendant an extra-statutory exemption from FOIA, Plaintiff respectfully requests that the Court add language to the end of paragraph 1 of the Interim Confidentiality Order clarifying that, "Unless otherwise stated, the obligations under this Order apply notwithstanding other provisions of law, including the Illinois Freedom of Information Act, 5 ILCS 140/1 *et seq*."

<u>**CONCLUSION**</u>

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that the Court enter its proposed Confidentiality Order.

Respectfully submitted,

THE PEOPLE OF THE STATE OF ILLINOIS,
by KWAME RAOUL, Attorney General
of the State of Illinois

Susan N. Ellis
Chief, Consumer Protection Division
Elizabeth A. Blackston
Greg Grzeskiewicz
Assistant Attorneys General
Chiefs, Consumer Fraud Bureau

11

FILED DATE: 8/1/2025 5:35 PM    2023CH08494

FILED DATE: 8/1/2025 5:35 PM   2023CH08494

115 S. LaSalle St., 26th Fl.
Chicago, IL 60603
Susan.Ellis@ilag.gov
Attorney No: 99000

By:    /s/ Benjamin Blustein
       Benjamin Blustein
       Robert S. Libman
       Grayson Sang Walker
       Bernardo M. Lopez
       Special Assistant Attorneys General
       Miner, Barnhill & Galland, P.C.
       325 N. LaSalle St., Ste. 350
       Chicago, IL 60654
       312.751.1170
       bblustein@lawmbg.com
       rlibman@lawmbg.com
       gwalker@lawmbg.com
       blopez@lawmbg.com
       Atty. No. 44720

Christopher J. Wilmes                    Jay Edelson
Tory Tilton                              Ari Scharg
Special Assistant Attorneys General      Jimmy Rock
Hughes Socol Piers Resnick & Dym         Michael Ovca
70 W. Madison St., Ste. 4000             Special Assistant Attorneys General
Chicago, IL 60602                        Edelson PC
(312) 580-0100                           30 N. LaSalle St., 14th Fl.
cwilmes@hsplegal.com                     Chicago, IL 60654
ttilton@hsplegal.com                     (312) 589-6370
Atty. No. 45667                          jrock@edelson.com
                                         movca@edelson.com
                                         Atty. No. 62075

FILED DATE: 8/1/2025 5:35 PM   2023CH08494

CERTIFICATE OF SERVICE

      Janet Bahena certifies that she served the foregoing Motion on all counsel of record, by this Court's Odyssey electronic-filing system, this 1st day of August 2025.


/s/ Janet Bahena
Janet Bahena

# Exhibit 8

# MINER, BARNHILL & GALLAND, P.C.

PAUL S. BALIK
DAVID BALTMANIS
CHARLES BARNHILL, JR. (Retired)
BENJAMIN BLUSTEIN **
ROISIN DUFFY-GIDEON †
SCOTT A. ENTIN ¥
ALLISON K. LEE *ˇ
ROBERT S. LIBMAN
BERNARDO LOPEZ
WILLIAM A. MICELI
RYAN MILLER *¥
JUDSON H. MINER (Retired)
MATTHEW J. OWENS
DEANNA N. PIHOS ˇ
SARAH E. SISKIND *†¥

Of Counsel:
ELIZABETH J. EBERLE *¥
GEORGE F. GALLAND, JR.
MIA SEGAL
GRAYSON SANG WALKER

325 NORTH LASALLE STREET
SUITE 350
CHICAGO, ILLINOIS 60654
(312) 751-1170
TELEFAX: (312) 751-0438

www.lawmbg.com

WISCONSIN OFFICE
44 EAST MIFFLIN STREET
SUITE 803
MADISON, WISCONSIN 53703
(608) 255-5200
TELEFAX: (608) 255-5380

* NOT LICENSED IN ILLINOIS
** ALSO LICENSED IN DISTRICT OF COLUMBIA
† ALSO LICENSED IN NEW YORK
ˇ ALSO LICENSED IN CALIFORNIA
¥ ALSO LICENSED IN WISCONSIN

June 24, 2025

<u>BY E-MAIL</u>

Jason Cyrulnik, Esq. (jcyrulnik@cf-llp.com)
Michael M. Pomerantz, Esq. (mpomerantz@cf-llp.com)
Cyrulnik Fattaruso LLP
55 Broadway, Third Fl.
New York, NY 10006

Bennett Lasko, Esq. (blasko@laskolegal.com)
Lasko Legal Services, Ltd.
Two North Riverside Plaza, Ste. 1850
Chicago, IL 60606

Re:     *People of the State of Illinois, ex rel. Kwame Raoul v. Residents Energy, LLC*
        *Circuit Court of Cook Cty (Chancery) No. 23 CH 8494 (Cal. 1, Hon. Thaddeus L. Wilson)*

Dear Counsel:

We are writing on behalf of the Attorney General regarding certain provisions in individual settlement and releases sent by Residents Energy ("Residents") to Illinois consumers stemming from some consumers' complaints about Residents' marketing practices.

The Attorney General has obtained unsigned examples of settlement and releases sent by Residents to some consumers who filed complaints with the Illinois Commerce Commission (and perhaps other entities, including Residents). Exhibit A. The proposed settlement and releases contain confidentiality, non-cooperation, and non-disparagement provisions, each of which could be construed to restrict the Attorney General from communicating with consumers and thereby prevent the Attorney General from fully investigating Residents' alleged violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act") and the Illinois Telephone Solicitations Act.

Specifically, the confidentiality provision provides that "RELEASOR hereby covenants to keep the terms of this RELEASE confidential…." The non-cooperation provision provides that the Releasor will not "institute, prosecute, or in any way aid in the institution or prosecution of any claim, demand, action, or cause of action at law or otherwise against the RELEASEES, for damages, injuries, costs, loss of service, expenses or compensation, which RELEASOR…ever had, now have, or hereafter can, shall, or may have…." The non-disparagement provision prohibits statements that are "derogatory or detrimental, in any way, to the good name or business reputation" of Residents.

Jason Cyrulnik, Esq.
Michael M. Pomerantz, Esq.
Bennett Lasko, Esq.
Page 2
June 24, 2025

It is well-settled that private agreements that violate public policy will not be enforced. *See Holstein v. Grossman*, 246 Ill.App.3d 719, 725 (1993) ("[a]s a general rule, courts will not enforce a private agreement which is contrary to public policy"). The aforementioned provisions are unenforceable as violative of Illinois public policy given that they interfere with the State's interest in enforcing its own laws and restrict citizen cooperation with law enforcement. *See Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 132, (1981) ("[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens") (citing the Illinois Constitution); *Signapori v. Jagaria*, 2017 IL App (1st) 160937, ¶20, (2017) (the court "would not enforce a contract that purports to bar a party from reporting another party's alleged misconduct…given the magnitude of the public policy interest" in disclosure). Federal and sister state case law provides further support for Illinois' strong state interest in enforcing its own laws and facilitating citizen cooperation with legitimate law enforcement actions.

Please confirm that Residents does not contend that the confidentiality, non-cooperation, and non-disparagement provisions are applicable in the context of the Attorney General's Consumer Fraud Act and Telephone Solicitations Act litigation against Residents. As a purely precautionary measure, the Attorney General has asked complainants at the outset of conversations whether the consumer has signed any settlement and releases with Residents to try to avoid speaking with consumers who have.

Please provide your response no later than Wednesday, July 2, 2025, and do not hesitate to contact us if you have any questions regarding this matter.

Sincerely,

/s/ Bernardo Lopez

Bernardo Lopez
Special Assistant Attorney General

lmd

Enclosure

cc: Elizabeth Blackston
    Greg Grzeskiewicz
    Chiefs, Consumer Fraud Division
    Office of the Illinois Attorney General
    Ben Blustein
    Bob Libman
    Grayson Sang Walker

## SETTLEMENT AND RELEASE

In settlement of a dispute, I, ▇▇▇▇▇▇, residing at ▇▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇ ("RELEASOR"), for the sole consideration of ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, to be paid by RESIDENTS ENERGY, LLC., have remised, released and forever discharged, and for our heirs, executors, administrators, representatives and assigns do hereby remise, release, and forever discharge, RESIDENTS ENERGY, LLC., together with its subsidiaries and affiliates and each of their respective officers, directors, employees, principals, successors and assigns (collectively, "RELEASEES"), of and from any and all claims, demands, rights, and causes of action of whatsoever kind and nature, which against the RELEASEES, that the RELEASOR, or its heirs, executors, administrators, and assigns ever had, now have or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever relating to the RELEASEES' marketing (including, without limitation, telemarketing), sale and supply of energy to the RELEASOR.

RELEASOR hereby covenants to keep the terms of this RELEASE confidential and not to institute, prosecute or in any way aid in the institution or prosecution of any claim, demand, action or cause of action at law or otherwise against the RELEASEES, for damages, injuries, costs, loss of service, expenses or compensation, which RELEASOR or its heirs, executors, administrators, and assigns ever had, now have, or hereafter can, shall, or may have for, or by reason of, any matter, cause or thing whatsoever relating to the RELEASEES' marketing (including, without limitation, telemarketing), sale and supply of energy to the RELEASOR. RELEASOR hereby further covenants that it will not at any time, in any way, disparage the RELEASEES or any individuals associated with the RELEASEES, including its present or former officers, directors, agents and employees, by making, posting or soliciting any comments, statements or the like to the media, to others, or on any form of social media, whether orally, in writing, in video or other format, which may be considered to be derogatory or detrimental, in any way, to the good name or business reputation RELEASEES or individuals associated with RELEASEES. RELEASOR acknowledges and agrees that an impending or existing violation of these covenants would cause irreparable injury to RELEASEES for which there is no adequate remedy at law, and agrees that RELEASEES shall be entitled to obtain immediate injunctive relief prohibiting such impending or existing violation in addition to any other rights and remedies available to it, including without limitation, any remedy for damages, and hereby waive any requirement for the securing or posting of a bond in connection with any such equitable relief.

It is further understood and agreed that the payment of the said sum to RELEASOR is not to be construed as an admission on the part of the RELEASEES of any liability whatsoever. The Parties hereby acknowledge that this Settlement and Release affects certain of their legal rights, they have been provided with the opportunity to discuss with counsel before signing, and that they are freely and voluntarily signing this document in exchange for the benefits provided herein.

## [SIGNATURES ON FOLLOWING PAGE]

Exh. A

**IN WITNESS WHEREOF**, the RELEASOR has executed this RELEASE this
_____ day of _____, 20___.

_____

_____

STATE OF _____ : COUNTY OF _____

On the _____ of _____, 20___, before me, the undersigned, personally
appeared _____, personally known to me, or proved to me on the basis of
satisfactory evidence to be the individual whose name is subscribed to the within
instrument and acknowledged to me that (s)he executed the same in his/her capacity and
that by his/her signature on the instrument, the individual, or the person on behalf of
which the individual acted, executed the instrument.

_____
Notary Public

# Exhibit 9

# MINER, BARNHILL & GALLAND, P.C.

PAUL S. BALIK
DAVID BALTMANIS
CHARLES BARNHILL, JR. (Retired)
BENJAMIN BLUSTEIN **
ROISIN DUFFY-GIDEON †
SCOTT A. ENTIN ¥
ALLISON K. LEE *ˆ
ROBERT S. LIBMAN
BERNARDO LOPEZ
WILLIAM A. MICELI
RYAN MILLER *¥
JUDSON H. MINER (Retired)
MATTHEW J. OWENS
DEANNA N. PIHOS ˆ
SARAH E. SISKIND *†¥

Of Counsel:
ELIZABETH J. EBERLE *¥
GEORGE F. GALLAND, JR.
MIA SEGAL
GRAYSON SANG WALKER

325 NORTH LASALLE STREET
SUITE 350
CHICAGO, ILLINOIS 60654
(312) 751-1170
TELEFAX: (312) 751-0438

www.lawmbg.com

WISCONSIN OFFICE
44 EAST MIFFLIN STREET
SUITE 803
MADISON, WISCONSIN 53703
(608) 255-5200
TELEFAX: (608) 255-5380

* NOT LICENSED IN ILLINOIS
** ALSO LICENSED IN DISTRICT OF COLUMBIA
† ALSO LICENSED IN NEW YORK
ˆ ALSO LICENSED IN CALIFORNIA
¥ ALSO LICENSED IN WISCONSIN

June 16, 2025

## BY E-MAIL TO COUNSEL FOR IDT ENERGY, INC.

Jason Cyrulnik, Esq.
Michael M. Pomerantz, Esq.
Cyrulnik Fattaruso LLP
55 Broadway, Third Floor
New York, NY 10006
jcyrulnik@cf-llp.com
mpomerantz@cf-llp.com

Bennett Lasko, Esq.
Lasko Legal Services Ltd.
Two North Riverside Plaza, Ste. 1850
Chicago, IL 60606
blasko@laskolegal.com

Re: *Notice of IDT's Noncompliance with June 18, 2019 Consent Decree*

Dear Counsel:

We write to notify you of the determination of the Office of the Illinois Attorney General ("Attorney General") that IDT Energy, Inc. ("IDT") has violated multiple provisions of the Consent Decree signed by IDT and the Attorney General and entered by the Cook County Circuit Court on June 18, 2019, a copy of which is attached as Exhibit A ("Consent Decree" or "Decree").

As detailed below, the Attorney General has reviewed substantial evidence, including an overwhelming number of complaints filed by Illinois consumers, indicating that IDT is engaged in acts and practices that are permanently enjoined by Paragraphs 14 and 15 of the Consent Decree, including "slamming" consumers, conducting solicitations without consent in prohibited locations, and misrepresenting that consumers will save money by enrolling with IDT. These violations indicate that IDT also has failed to adequately implement the training policies and procedures required by Paragraphs 17-21 of the Decree. Pursuant to Paragraph 37 of the Decree, IDT has thirty

Notice of IDT's Noncompliance with Consent Decree
Page 2
June 16, 2025

(30) calendar days from the date of this letter to provide a good-faith written response including specific information outlined in Paragraph 37.[1]

## I. IDT'S VIOLATIONS OF THE CONSENT DECREE

According to the compliance reports submitted by IDT pursuant to the Decree, IDT has engaged in a massive consumer outreach campaign since resuming marketing in September 2023. During the one-and-one-half year period from September 2023 through the first fiscal quarter of 2025, the company enrolled 82,094 consumer accounts, made 4,557,147 telemarketing solicitation calls, and conducted 330,382 door-to-door sales solicitations. Such intense consumer outreach is particularly worrisome given the widespread violations of the Consent Decree and Illinois law described below.

### A. Noncompliance with Injunctive Provisions

Paragraph 14 of the Consent Decree permanently enjoins IDT from engaging in certain acts or practices in connection with its marketing. Additionally, Paragraph 15 requires IDT, *inter alia*, to make certain disclosures and perform other actions in connection with its marketing. Based upon a review of extensive materials—*e.g.*, sales recordings, IDT contracts, enrollment documentation, and affidavits from numerous Illinois consumers which are attached as Exhibit B—the Attorney General has determined that IDT has violated both Paragraphs 14 and 15 from at least late-2023 to the present. IDT's violations include the following non-exhaustive categories of misconduct:

**Conducting Solicitations in Public Housing.** Paragraph 14.f. of the Consent Decree permanently enjoins IDT from "[c]onducting door-to-door solicitations at any building or property owned by any public housing authority." Despite this injunction, IDT solicited affiant D.J. (ICC Complaint 2024-02196), who attests that in early March 2024 a door-to-door salesman for IDT solicited at his public-housing building managed by the Montgomery County Housing Authority at 212 S. State St., Litchfield, IL. Exh. B13, D.J. Aff. ¶¶2-3. The Montgomery County Housing Authority Properties Map, which can be found online, includes D.J.'s building, the Brown Shoe Loft Apartments, as one of its properties: https://montgomeryhousing.org/locations/. When D.J. asked the agent how he had entered his public-housing building, the IDT agent "made it sound like he worked for Ameren and that he was going around making sure we had the proper electric rate." *Id.* ¶4. The agent then deceived D.J. to provide his account information and sign something to supposedly certify that the salesman had "been there and done his job" of checking that D.J. had the proper rate through Ameren. *Id.* This conduct violates Paragraph 14.f. of the Decree, as well as Paragraph 14.j.'s prohibition against mispresenting an affiliation with the utility company as discussed *infra*.

---

[1] "The written response shall include (A) a statement explaining why IDT believes it is in compliance with this Consent Decree; or (B) a detailed explanation of how the alleged violation(s) occurred, and (i) a statement that the alleged violation has been addressed and how, or (ii) a statement that the alleged violation cannot be reasonably cured within 30 days from receipt of the notice, but (a) IDT has begun to take corrective action(s), (b) IDT is pursuing such corrective action(s) with reasonable diligence, and (c) IDT has provided the Attorney General with a reasonable timetable for addressing the alleged violation." Exhibit A, ¶37.

Notice of IDT's Noncompliance with Consent Decree
Page 3
June 16, 2025

**Conducting Solicitations without Consent in Buildings Prohibiting Solicitations, and Failing to Obtain Individualized Consent to Solicit in Multi-Unit Buildings**. Paragraph 14.g. of the Consent Decree permanently enjoins IDT from "[c]onducting door-to-door solicitations where the building or property is clearly marked as prohibiting solicitations or where IDT has received notice that solicitations are prohibited at the building or property." Despite this injunction, several affiants attest that IDT has solicited at buildings that prohibit solicitation. For instance, affiant M.H., the manager of the leasing department for the University Group, a property management company in the Champaign-Urbana area which caters to students at the University of Illinois, explains that IDT agents have repeatedly solicited in "no solicitation" and secured-entry buildings. Exh. B11, M.H. Aff. ¶¶1-2, 5-12. M.H. points to several specific complaints, including a tenant who complained to the leasing department about IDT agents ignoring the building's "do not trespass rule" while "insisting they had permission" to be in the property, a "secured-entry building." *Id.* ¶8. That tenant told M.H. that IDT's agents made the tenant feel unsafe. *Id.* Similarly, affiant G.A. (ICC Complaint 2025-01892) attests that IDT agents made her feel "unnerved" and "uncomfortable" when they solicited her despite her building having a "'No Trespassing' sign to the left of the front door to the building." Exh. B1, G.A. Aff. ¶¶4, 7-8. According to G.A., her building has security camera footage of these IDT agents "drifting in behind an Amazon delivery person rather than identifying themselves and asking someone in the building to enter." *Id.* ¶6.

This type of conduct appears to be common for IDT agents. M.H. explains that she has experienced agents "buzzing all the apartments to have someone let them in or following residents in." Exh. B11, M.H. Aff. ¶5. Affiant L.C. (ICC Complaint 2024-11131) similarly attests that IDT agents were engaged in unauthorized solicitation in her multi-unit building; when she asked her management company whether the IDT agents were authorized, "the management company told [her] that they were not authorized and to call security if they came back." Exh. B5, L.C. Aff. ¶7. Affiant S.M. (ICC Complaints 2024-07274 and 2024-07276), who lives in a building with "No Solicitation" signs, likewise affirms that she asked an IDT agent whether "he had permission to solicit in the building." Exh. B16, S.M. Aff. ¶5. The agent lied that "he did have permission from building management." *Id.* When she called his bluff and dialed building management, management told her that "these agents do not have permission to solicit and that [she] should not sign anything." *Id.* Following the fraudulent enrollment of his account, affiant G.I. (ICC Complaint 2024-11066) was told by his building management "that there had been individuals claiming to be from the energy company knocking on every door in the building." Exh. B12, G.I. Aff. ¶4. Affiants J.D. (ICC Complaint 2024-09869) and R.G. (ICC Complaint 2024-00149) have similar experiences of IDT agents soliciting in locked, multi-unit buildings with "no solicitation" policies. Exh. B10, R.G. Aff. ¶5; Exh. B6, J.D. Aff. ¶¶3, 7.

The above conduct violates Paragraph 14.g. of the Consent Decree. It also violates the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), which provides as follows:

> The alternative retail electric supplier shall not conduct any in-person solicitations of consumers at any building or premises where any sign, notice, or declaration of any

Notice of IDT's Noncompliance with Consent Decree
Page 4
June 16, 2025

description whatsoever is posted that prohibits sales, marketing, or solicitations. The alternative retail electric supplier shall obtain consent to enter multi-unit residential dwellings. Consent obtained to enter a multi-unit dwelling from one prospective customer or occupant of the dwelling shall not constitute consent to market to any other prospective consumers without separate consent.

815 ILCS 505/2EE(c)(2).

**Misrepresenting Savings.** Paragraph 14.h. of the Consent Decree permanently enjoins IDT from "[m]isrepresenting, expressly or by implication, that Consumers will save money unless IDT guarantees that the Consumer will save money for a particular term and clearly and conspicuously discloses the term during which Consumers will experience such savings and such guaranteed savings are calculated before any rebates, rewards, or other promotional offers are applied." Yet IDT agents promised G.A. that they were there to save her "tons of money." Exh. B1, G.A. Aff. ¶5. An IDT agent addressed affiant H.A. (ICC Complaint 2024-05187)'s question about whether she would be changing anything by saying that "no, that he was actually lowering [her] bill." Exh. B2, H.A. Aff. ¶4. An agent similarly introduced himself to S.M. as being with IDT but "there on behalf of ComEd to make sure that we were receiving he lowest rates possible." Exh. B16, S.M. Aff. ¶3. Affiant B.W. (ICC Complaint 2025-01149) was told by an IDT agent that "he was going to lower [her] energy rates to get [her] a better deal, or something to that effect." Exh. B24, Aff. ¶4. An agent told affiant S.G. (ICC Complaint 2024-10896)—after lying about being from Ameren—that "he would adjust her bill so that [she] wasn't paying so much." Exh. B9, S.G. Aff. ¶3. L.C. was told by the agent that she was there to update her to the "'sale price' on behalf of ComEd." Exh. B5, L.C. Aff. ¶3. The IDT agents who solicited G.I. claimed—without clarifying that they were switching his supplier—that "signing their paperwork would lower [his] electricity bill." Exh. B12, G.I. Aff. ¶3. Affiant E.J. (2025-02939), who was grieving the recent passing of his grandchild and thus in an emotional state of mind, was told by an IDT agent claiming to be from ComEd that "he could offer [E.J.] a lower price." Exh. B14, E.J. Aff. ¶¶2-3. When the bill came, E.J. "noticed it was much higher than expected." *Id.* ¶4.

Paragraph 14.i. of the Decree also enjoins IDT from "[m]isrepresenting, expressly or by implication, that IDT's rebates, rewards, or other promotional offers save Consumers money on their electricity bills." Yet an IDT agent told affiant S.N. (ICC Complaint 2024-10729) that "she was helping ComEd with rebates and discounts on our electricity bills." Exh. B17, S.N. Aff. ¶3. Similarly, an IDT agent visited affiant J.K. (ICC Complaint 2024-09879) and told him that "he was there to see if J.K. was eligible for rebates or coupons from ComEd. [The agent] said that the process was free and that nothing would change for [him] other than potentially receiving these rebates or coupons." Exh. B15, J.K. Aff. ¶4. The agents who marketed to G.A. initiated their pitch by asking her if "[she] was interested in getting a rebate on [her] energy bill and asked her to see a copy of that bill." Exh. B1 G.A Aff. ¶3. An IDT agent told affiant M.F. (ICC Complaint 2025-03373) that the agent "was there to give [her] a rebate on [her] bill because [she] was being overcharged." Exh. B8, M.F. Aff. ¶2. The same thing happened to affiant S.T. (ICC Complaint 2024-07214), who was told that he was being overcharged and would have a refund coming back to him. Exh. B21, S.T. Aff. ¶2.

Notice of IDT's Noncompliance with Consent Decree
Page 5
June 16, 2025

Similar practices occur in IDT's telemarketing. In an audio recording of a February 23, 2024 telemarketing solicitation, an IDT telemarketer begins a call by saying she is calling from IDT in regard to the "price adjustments for the ComEd electric bill" and again "about the ComEd electric bill for the price adjustment." Exhibit C. The agent further says that this is a statewide program called the customer choice program "adjusting one of the largest prices on the bill[,]" the supply portion. *Id.* The agent claims that IDT can "adjust that rate down at the next available meter read." *Id.* Ultimately, the agent claims that IDT can shop in "bulk quantities," something that the agent claims the public utilities cannot do, meaning that IDT can get a better price. The agent boasts that it "is hard for anyone to beat [IDT's] rates." *Id.* She compares IDT to big-box retail stores like Sam's Club or Costco supermarkets that get better prices because they buy in bulk, unlike the electric and gas utility companies. The agent ultimately falsely promises the consumer that had he already enrolled with IDT in the last 12 months, the consumer would have already saved money on his electric supply. *Id.*

On a similar call on March 23, 2024, the IDT agent tells the consumer about a purported Illinois Commerce Commission program that the state has put together. Exhibit D. Throughout the call, the agent refers to this so-called program, which the agent says is free and state- implemented. *Id.* The agent tells the consumer that compared to what the consumer has been paying, the consumer should see a noticeable difference in the next bill. *Id.* As with the call above, the agent explains that IDT as a supplier gets better rates on the open market than the default utilities, telling the customer that unfortunately the customer has been paying the retail pricing plan through ComEd. *Id.* The agent says that being with IDT is like shopping at Sam's Club or Costco because IDT buys in bulk and gets a discount. *Id.* The agent finishes by saying that no matter how high prices go, the consumer will not be subjected to volatility or inflation with IDT. *Id.* Instead, the customer will get the "lowest possible price at every billing cycle" and won't want to cancel because the consumer won't want to go from IDT's lower rates back to the default utility higher rates. *Id.* Of course, after enrolling the consumer *did* try to cancel her contract with IDT, which by IDT's own analysis had cost the consumer $663.09 for electric overpayments and $351.32 for gas overpayments compared to the default utility prices.

These two calls from February and March 2024 demonstrate that at least one of IDT's vendors, IntelliMark, which handled both calls, was not properly trained or supervised. This is particularly concerning since IntelliMark is an affiliate of IDT, and part of same parent company, Genie Energy Ltd.

Two other examples of such false promises of savings in telemarketing are attached as Exhibits E and F. In those Spanish-language calls, IDT agents promise consumers that they will get a new low price without knowing—because the telemarketers do not ask—what each consumer was then paying for energy. The agents describe these supposed low prices, along with promised rebate checks of 10% every 6 months, as "benefits." They are not benefits. And the agents in these calls had no basis to know whether the consumers would in fact receive lower prices than what they were paying. The similarity in the misrepresentations in these two calls—based on the falsehood that IDT

Notice of IDT's Noncompliance with Consent Decree
Page 6
June 16, 2025

saves consumers money through lower prices and benefits, like rebates—suggests a lack of training or oversight as required by Section IV of the Consent Decree.

In addition to violating the Decree, such unjustified promises of savings constitute violations of Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, which prohibits "unfair or deceptive acts or practices...in the conduct of any trade or commerce."

**Misrepresenting IDT's Affiliation to the Public Utilities**. Paragraph 14.j. of the Consent Decree permanently enjoins IDT from "[m]isrepresenting, expressly or by implication, that IDT is affiliated with the Consumer's public electric utility or a government-sanctioned program or benefit." IDT has repeatedly violated this provision as shown by the illustrative examples below.

1. H.A. attests that the agent "did not tell [her] he was from IDT Energy[,]" but rather that "he was from ComEd." Exh. B2, H.A. Aff. ¶3.
2. The same thing happened to L.C. Exh. B5, L.C. Aff. ¶3.
3. An IDT agent falsely told J.D. that the agent was there to update his server and that everyone in the "apartment building was doing it, that [his] building complex knew [the agent] was there, and that it was standard practice," warning that J.D.'s "electricity bills would increase if [he] did not update [his] server." Exh. B6, J.D. ¶2. J.D. did not find out that the agent represented IDT Energy until after the agent left. *Id.* ¶¶4-5.
4. An IDT agent falsely told M.F. that the agent was "working with Ameren." Exh. B8, M.F. Aff. ¶2.
5. When S.G. asked the IDT agent if he was from Ameren, the agent falsely said "yes" and that he would "adjust [her] electricity bill so that [she] wasn't paying so much." Exh. B9, S.G. Aff. ¶3. (Another false promise of savings.)
6. The agents who spoke to R.G. identified themselves as being from IDT, "but said that ComEd had switched to IDT as their energy supplier and that [she] needed to sign some paperwork to complete the switch. They made it sound mandatory." Exh. B10, R.G. Aff. ¶3.
7. The agents who came to G.I.'s door "identified themselves as being with IDT but affiliated with Ameren." Exh. B12, G.I. Aff. ¶3. He agreed to do what the agents asked "only because it seemed like it was not an option to not sign up since the agents made it seem like this was an opportunity from Ameren." *Id* ¶¶4.
8. The IDT agent who spoke to D.J. at the public-housing building "claimed to be affiliated with Ameren." Exh. B13, D.J. Aff. ¶4.
9. An IDT agent told E.J. that he "was from ComEd and had a badge on him with ComEd's logo." Exh. B14, E.J. Aff. ¶2. Only when the agent left and E.J. got a notification on his phone informing him of a switch to IDT Energy did E.J. realize he had "been tricked." *Id.* ¶3.
10. An IDT agent falsely told J.K. that "he was there to see if [J.K.] was eligible for rebates or coupons from ComEd." Exh. B15, J.K. Aff. ¶4.

Notice of IDT's Noncompliance with Consent Decree
Page 7
June 16, 2025

11. S.M. affirms that an IDT agent falsely told her "that he was there on behalf of ComEd to make sure that we were receiving the lowest rates possible." Exh. B16, S.M. Aff. ¶3. What's more, the IDT agent made the preposterous misrepresentation that "he was there signing people up because this had been 'court ordered.'" *Id* ¶4.

12. M.H., the manager of leasing for the University Group, attests that she has received "multiple reports of IDT Energy agents misrepresenting themselves to residents, claiming that they are with Ameren, saying that Ameren sent them[.]" Exh. B11, M.H. Aff. ¶6. Her affidavit provides examples. *Id.* ¶¶7, 9.

13. S.N. was falsely told by an IDT agent that the agent "was helping ComEd with rebates and discounts[.]" Exh. B17, S.N. Aff. ¶3.

14. Affiant M.P. (ICC Complaint 2024-09419) did not realize that he was talking to a non-utility representative until the IDT agents left and he received a notification that he had signed up for IDT Energy. Exh. B18, M.P. Aff. ¶¶3-4. In introducing himself, the agent, who had a supervisor with him, asked M.P. whether he was "willing to complete a survey to make sure [he] was being billed the correct rate for [his] electricity services." *Id.*

15. S.T. attests that an IDT salesman came to his door and identified himself "as being from ComEd and said that [he] was being overcharged on [his] electricity bill and would have a refund coming back to [him]." Exh. B21, S.T. Aff. ¶2.

16. Affiant S.W. (ICC Complaint 2025-02590) declares that the IDT salesperson "did not say she was from IDT Energy…[but] explained she was from ComEd and said something to the effect that I was one of the last people in the building she needed to talk to…[because] the code to my meter was going to be changed, and she asked for my ComEd account number." Exh. B22, S.W. Aff. ¶3. Indeed, S.W. does not remember IDT's agent pitching her any services with IDT, nor mentioning IDT at all, nor any "document shown to her that had IDT's information or mentioned IDT." *Id.* ¶4.

17. Affiant J.W. (ICC Complaint 2024-05444) attests that an IDT agent falsely stated that "he worked with the utility companies and the Illinois Commerce Commission." Exh. B23, J.W. Aff. ¶4. When J.W. challenged him on this lie, the agent became irate. *Id* ¶¶5-6. Eventually, J.W. got the agent on the phone with the ICC, which cautioned the IDT agent not to misrepresent himself. *Id.* ¶¶6-7.

18. The agent who solicited B.W. "did not identify himself initially as being from IDT. He said he was with ComEd and needed to see my bill to get my usage." Exh. B24, B.W. Aff. ¶4.

In addition to violating the Consent Decree, this conduct also violates the Consumer Fraud Act, which provides, in relevant part, that "[a]n alternative retail electric supplier shall not utilize the name of a public utility in any manner that is deceptive or misleading, including, but not limited to

Notice of IDT's Noncompliance with Consent Decree
Page 8
June 16, 2025

implying or otherwise leading a consumer to believe that an alternative retail electric supplier is soliciting on behalf of or is an agent of a utility." 815 ILCS 505/2EE(b)(1).

**Misrepresenting IDT's role in the Illinois Energy Market and/or Mischaracterizing Public "Programs."** Paragraphs 14.k.-m. of the Consent Decree prohibit IDT from suggesting that it is part of a state-sponsored or public program to save consumers money, or otherwise mischaracterizing the nature of the market. Notwithstanding this prohibition, IDT agents suggest to consumers that IDT is part of an "Energy Choice Program" or "statewide program" under which a consumer can "opt-in" and get savings. Exhibit C. J.W. was told by an IDT agent that he was there on behalf of the ICC. Exh. B23, J.W. Aff. ¶4. Likewise, S.G. was told by an IDT agent that the charges on her Ameren supply bill were somehow "illegal" after the agent misrepresented himself as being from Ameren. Exh. B9, S.G. Aff. ¶¶3-4. IDT agents also suggest that consumers are entitled to "benefits" on their energy bills without clarifying that such supposed benefits constitute a switch to a new electric or gas supplier. Exhibits D-F. To boot, in the March 23, 2024 call summarized above, the IDT agent told a consumer about a non-existent Illinois Commerce Commission program that the state had put together. Exhibit D. Such conduct violates the Decree.

**Requesting Account Information before Consumers Agree to Enroll with IDT.** Paragraph 14.p. of the Consent Decree permanently enjoins IDT from "[a]sking a Consumer to provide their utility account numbers" or "a copy of their utility bill" "before the Consumer affirmatively agrees to enroll with IDT." Yet since resuming marketing, IDT agents have routinely asked customers for this information at the beginning of a solicitation before they have agreed to enroll with IDT. For example, the agents who marketed to G.A. "kept pressuring [her] to get a copy of the bill" before she showed *any* interest in signing up. Exh. B1, G.A. Aff. ¶7. The same thing happened to H.A., who was "asked to see [her] ComEd bill" and was told she was paying too much immediately after the IDT agent introduced himself as being from ComEd. Exh. B2, H.A. Aff. ¶3. The agent used the account information on the bill to enroll H.A. without her consent. *Id.* ¶4. Similarly, L.C., J.D., S.G., D.J., E.J., S.N., M.P., S.T., M.F., and S.W.—ten affiants—were all asked for the information on their bill before they agreed to switch. What's worse, these ten affiants provided their account information after being told by an IDT agent that the agent was in some way affiliated with the public utilities. B.W. was also asked for her bill after saying "multiple times" that she did not want to switch suppliers to a third party. Exh. B24, B.W. Aff. ¶4. She showed the IDT agent her bill because the agent "insisted again that he was with ComEd and was helping gather customers' information for potential lower rates." *Id.* S.M. kept being pressed for her bills despite affirmatively stating she "was not interested." Exh. B16, S.M. Aff. ¶3. M.F. continued to be harried even after reiterating that she did not want to switch her energy services. Exh. B8, M.F. Aff. ¶3.

This conduct violates both the Decree and Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, which prohibits "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce."

**Failure to confirm public-assistance status before enrolling consumers receiving LIHEAP or PIPP.** Paragraph 15.e. of the Consent Decree requires that IDT "[c]onfirm before enrolling a Consumer that the Consumer is not receiving financial assistance from the Low Income Home

Notice of IDT's Noncompliance with Consent Decree
Page 9
June 16, 2025

Energy Assistance Program or the Percentage of Income Payment Plan." And Paragraph 14.r. of the Decree permanently enjoins IDT from "enrolling any Consumer who has confirmed he or she receives" such financial assistance. Nevertheless, IDT enrolled both B.W. and S.T. despite the fact that they received LIHEAP energy assistance. Exh. B24, B.W. Aff. ¶3; Exh. B21, S.T. Aff. ¶6. M.F. affirmatively told "the IDT agent that [she] was on LIHEAP and had just renewed [her] public energy assistance." Exh. B8, M.F. Aff. ¶2. The agent ignored that disclosure and continued to solicit M.F., "refusing to take no for an answer[,]" and continuing to ask to see the electricity bill. *Id.* ¶¶2-5.

This conduct violates both the Decree as well as the Consumer Fraud Act, which bars ARES from enrolling LIHEAP or PIPP recipients. 815 ILCS 505/2EE(c)(10). By law, such enrollments are "void and unenforceable." 220 ILCS 5/16-115E(c).

**Failure to Make Necessary Disclosures to Consumers.** IDT also has breached the provisions of the Consent Decree that require IDT to make certain disclosures to consumers in any solicitation. Paragraph 15.c. of the Decree requires that IDT agents *immediately* disclose their names, the entity they represent (*i.e.* IDT Energy), and the purpose of the solicitation, specifically "to solicit a change in the Consumer's supplier of electricity." The same Paragraph also requires IDT agents to ask for consent to solicit and discontinue the solicitation if the consumer does not consent. *Id.* As set forth in the preceding paragraphs, IDT agents have routinely lied about who they represent, falsely stating that they represent the public utilities and/or other public entities. IDT agents also obfuscate the true purpose of their solicitation, which is to get a consumer to switch suppliers. Instead, they claim their purpose is to provide rebates or coupons, *see* Exh. B1, G.A. Aff ¶3 and Exh. B15, J.K. Aff. ¶4, lower the electricity bill, *see* Exh. B2, H.A. Aff. ¶3, update the server, *see* Exh. B6, J.D. Aff. ¶2, change the code to the meter, *see* Exh. B22, S.W. Aff ¶3, or provide money back on the energy bills, *see* Exh. B16, S.M. Aff. ¶3, among other things. *See* Exhibits C-F. Furthermore, IDT agents do not obtain consent to solicit but rather ignore consumers who state that they're not interested. *See* Exh. B16, S.M. Aff. ¶3 ("I said I was not interested, but he kept pressing me, asking me to show him my bills."); Exh. B8, M.F. Aff. ¶3 ("I kept reiterating that I didn't want to switch my energy services, and she said that she wasn't there to switch my energy services, only to give me a discount or rebate. She kept inching closer and closer to me, almost standing on the threshold of my home, and was refusing to take no for an answer. It was making me very uncomfortable and agitated."). The IDT agent soliciting M.F. flat-out refused to tell M.F. her name or show her "badge up close." *Id.* ¶4.

Paragraph 15.d. of the Consent Decree additionally requires that, in any solicitation, IDT disclose rate details, the utility price to compare, and whether the contract being offered is for a fixed or variable rate. IDT agents do not make these necessary disclosures. For instance, the IDT telemarketers in Exhibits E and F do not provide rate details or the utility price to compare. And there is no indication that door-to-door salespersons are providing the utility price to compare or any of the details necessary for a consumer to make an informed decision about whether to enroll with IDT.

Notice of IDT's Noncompliance with Consent Decree
Page 10
June 16, 2025

This conduct violates the Decree, the Consumer Fraud Act, and the Telephone Solicitations Act. *See* 815 ILCS 505/2EE(a)(ii) (price to compare); 815 ILCS 505/2EE(c) (disclosures for electricity marketing); 815 ILCS 413/15 (disclosures required by Telephone Solicitations Act).

**Failure to Comply with State Laws, including Laws Prohibiting "Slamming**." Paragraph 15.a. of the Consent Decree requires IDT to "[c]omply with all federal, state, and local laws, regulations, and ordinances related to the sale and marketing of energy supply." As explained *supra*, since resuming marketing after the entry of the Consent Decree, IDT has routinely violated the Consumer Fraud Act and Telephone Solicitations Act by conducting marketing without consent in multi-unit buildings, including buildings prohibiting solicitation; misrepresenting savings; misrepresenting IDT's affiliation with the public utilities; misrepresenting IDT's role in the Illinois energy market and/or mischaracterizing public "programs"; requesting account information before consumers agree to enroll with IDT; enrolling individuals on LIHEAP and PIPP; and failing to make required legal disclosures during telemarketing and in-person solicitations.

IDT also frequently "slams" consumers, *i.e.*, enrolls them without their consent or knowledge by tricking them, impersonating them, and/or forging their signatures. Such conduct blatantly violates the Consumer Fraud Act. 815 ILCS 505/2EE(a)(iv) (ARES must obtain the consumer's "express agreement to accept the offer" after disclosing all material terms). The enclosed affidavits provide multiple examples of "slamming." For example, after repeatedly declining IDT's services, S.M. was told by the IDT agent that she needed "to sign paperwork to be taken off the list that 'ComEd had given [him].'" Exh. B16, S.M. Aff. ¶4. That fraudulently acquired signature was then used to enroll S.M. without her permission. *Id.* ¶¶6-7 ("Since I had signed something that I thought would remove me from his rolls, I asked him to make sure that I was not enrolled for any of the services he was selling. He pointed to a green check on his tablet and said that my enrollment had been cancelled. A few weeks later, I received a letter in the mail saying that I had enrolled with IDT Energy."). M.P. was also slammed by providing a signature. He signed paperwork purportedly for the purpose of completing a survey and to make sure he was being billed "the correct rate for [his] electricity services." Exh. B18, M.P. Aff. ¶¶3-4.

Moreover, IDT forged signatures to enroll affiants H.B. (ICC Complaint 2025-00800), E.C.C. (ICC Complaint 2024-02216), R.D. (ICC Complaint 2025-03178), J.A.S. (ICC Complaint 2023-10160), J.S. (2025-00553), and L.Y. (ICC Complaint 2025-00655). IDT forged the signature of H.B.'s husband, who had passed away three weeks before the date he supposedly enrolled with IDT. Exh. B3, H.B. Aff. ¶5. J.A.S. and her husband were slammed by an IDT agent who forged her husband's authorization using a false email, with their last name misspelled. Exh. B19, J.A.S. Aff. ¶¶6-7. J.S. had never even heard about IDT Energy before receiving a note that she and her husband had been enrolled with the company. Exh. B20, J.S. Aff. ¶3. Her "husband's signature was clearly forged." *Id.* ¶6. L.Y. had likewise never heard about IDT Energy before being slammed. The first time she heard of it was when she received letters "saying [her] electricity carrier would be changing to IDT Energy." Exh. B25, L.Y. Aff. ¶3. Her enrollment signature was forged. *Id.* ¶¶5-6. R.D. was similarly slammed by agents who forged his son's signature, a forgery made worse by the fact that his son was not even authorized to make changes to the account. Exh. B7, R.D. Aff. ¶¶4-5. E.C.C.'s signature

Notice of IDT's Noncompliance with Consent Decree
Page 11
June 16, 2025

was also forged on enrollment documentation written in English—E.C.C. does not even know how to read well in English. Exh. B4, E.C.C. Aff. ¶5.

IDT agents also use false phone numbers and emails to slam individuals. For instance, S.W. was told by an IDT agent that the agent was there on behalf of ComEd because her meter was going to be changed. Exh. B22, S.W. Aff. ¶3. S.W. shared her account information based on that lie. *Id* ¶4. The agent in turn used that information, plus a false phone number and email that S.W. does not recognize, to sign her up for IDT without her knowledge or consent. *Id.* ¶6. S.W. was only made aware of the fraud when she received an email from ComEd or Chase Bank informing her that there had been a change to her ComEd account. *Id.* ¶5.

This conduct violates both Section 2EE of the Consumer Fraud Act, 815 ILCS 505/2EE(a)(iv) (ARES must obtain the consumer's "express agreement to accept the offer" after disclosing all material terms), and Section 2 of the Act, 815 ILCS 505/2, which prohibits "unfair or deceptive acts or practices...in the conduct of any trade or commerce."

### B. Noncompliance with Training Policies and Procedures Provisions

The volume of consumer complaints about IDT to the ICC—over 100 since 2023— as well as the affidavits obtained by the Attorney General indicate that IDT does not engage in sufficient oversight of its agents. This violates Paragraph 21 of the Decree, which explicitly requires IDT to "ensure that all third-party vendors comply with the terms of this Consent Decree as implemented in the training policy and procedures" The foregoing summary of unlawful marketing practices further indicates that IDT is non-compliant with Paragraph 18 of the Decree which requires IDT to "develop and implement training policies and procedures designed to ensure that all sales representatives marketing on behalf of IDT in the State of Illinois comply with the terms of this Consent Decree."

To ensure compliance, Paragraph 19.b. of the Decree requires IDT to maintain written records of the completion of Consent Decree training by all sales representatives. ***Please produce to the Attorney General no later than 30 days from the date of this letter all such records since IDT resumed marketing after entry of the Consent Decree. Furthermore, please produce by the same date records sufficient to show IDT's procedures "for regular auditing of sales representatives' activities including, but not limited to, telemarketing and in-person solicitations[,]" as well as for reviewing and taking appropriate action in response to consumer complaints and in response to agents who do not comply with the law or the Consent Decree, as required by Paragraphs 19.c.-e. of the Decree***.

### C. Failure to Produce Annual Report for March 2024 to March 2025

Finally, the Attorney General has not received one of the compliance reports required by Paragraph 32 of the Consent Decree, which provides the following:

> In addition to the quarterly report described in Paragraph 31, one hundred eighty
> (180) days from the date that IDT resumes marketing in Illinois, and annually

Notice of IDT's Noncompliance with Consent Decree
Page 12
June 16, 2025

thereafter for a period of three (3) years, IDT shall provide an annual written report to the Attorney General, which is true and correct and sworn to under penalty of perjury, setting forth *in detail* the manner and form in which it has complied and is complying with this Consent Decree. This report *shall include, but not be limited to a reasonably detailed description of all compliance and monitoring activity* taken by IDT pursuant to Sections II and III of this Consent Decree." [Emphasis added.]

IDT produced its initial report on March 11, 2024, 180 days after resuming marketing. To the best of our knowledge, it has not produced the report for the subsequent year, and ***we request that IDT produce that report within 30 days of the date of this letter***.

In compiling the new report, IDT should keep in mind that the initial report lacked sufficient detail regarding the compliance and monitoring activity undertaken by IDT under Section III (Injunctive Relief) of the Decree. For instance, Paragraph 2 of the initial report states that IDT's new scripts comply with Paragraph 14 of the Decree but does not describe the substantive changes made to the new scripts, nor does it affirm that these scripts also comply with Paragraph 15 of the Decree (nor how they comply with Paragraph 15). Similarly, Paragraphs 3-5 of the initial report explain that all sales representatives are trained by IDT but do not describe the content of the training, nor what exact information is included in the "Supplemental Training Materials for Illinois" or the "Training Acknowledgement Form" that agents need to sign before resuming marketing. IDT should provide those scripts, trainings, materials, and acknowledgments to demonstrate its compliance with the Decree.

Similarly, the initial report's description of the monitoring done by IDT's Compliance Department audit group is both insufficient and inadequately detailed. Paragraph 7 of the report indicates that live monitoring of telemarketing vendors occurs twice a week but does not describe *how* that live monitoring is undertaken nor for how long it is done nor for what volume of consumer outreach. It also does not explain how many recorded sales recordings are reviewed nor the procedure for reviewing such calls. The report should contain information regarding the volume of telemarketing calls being reviewed and the manner in which they are reviewed. Many questions are left unanswered by the report including: How are calls reviewed? Are only completed sales calls reviewed? Are reviewers listening to entire calls? How many per week? What percentage of the whole number of calls per week, per vendor are reviewed? How are reviewers trained to identify compliance?

Paragraph 7 of the initial report likewise affirms that the Sales Department does site visits to call centers but does not state how often those visits occur nor how they are undertaken. The report states only that conduct on the floor is observed and monitored. It does not provide information regarding how long the conduct is monitored, or the way it is monitored and observed, nor for how long and across how many agents and calls the monitoring occurs. The same lack of detail plagues Paragraph 9 of the report, in which the Compliance Department's audit team is said to visit door-to-door marketing teams at least once every 6-8 weeks. Again, numerous questions are left unanswered, *e.g.*, does this mean that the door-to-door marketing teams are otherwise left unsupervised? Why every 6-8 weeks? Why not more often? How many door-to-door sales presentations are being observed every

Notice of IDT's Noncompliance with Consent Decree
Page 13
June 16, 2025

6-8 weeks per vendor? What percentage of total door-to-door sales does that constitute? How are reviewers trained to identify compliance? Similarly, Paragraph 9 states that the Sales Department also visits the door-to-door marketing teams, but no information is provided regarding the frequency of the visits nor *how* sales and compliance policies and procedures are reviewed.

In summary, the Consent Decree requires that IDT set forth "in detail" the manner and form in which it has complied and is complying with this Consent Decree. IDT's report for the year from March 2024 to March 2025 should include the detail lacking in its initial report.

## II.     IMMEDIATE ACTION TO REMEDY IDT'S VIOLATIONS OF THE CONSENT DECREE

In light of the above, the Attorney General requests that IDT do the following within 30 days of the date of this letter:

1. Provide a good-faith written response to the notice of violations set forth in this letter including the specific information required by Paragraph 37 of the Consent Decree;
2. Produce training records under Paragraphs 18 and 19 of the Consent Decree;
3. Produce the annual report due under Paragraph 32 which includes the details lacking from the company's initial report;
4. Immediately pause all marketing in Illinois until the Attorney General is satisfied that IDT is in full compliance with the Consent Decree and has remedied the violations described in this letter;
5. Agree to hire an independent monitor to ensure IDT's future compliance with the reporting, injunctive, and training provisions of the Consent Decree; and
6. Until further notice, preserve all evidence of solicitations, including but not limited to all telemarketing sales recordings across all vendors, since IDT resumed marketing in Illinois following entry of the Consent Decree.

Should IDT fail to take the above actions and remedy the violations described in this letter, the Attorney General will initiate any proceedings necessary to obtain available relief for Illinois consumers harmed by IDT's post-Decree conduct, including but not limited to a motion or petition to show cause why IDT should not be held in contempt. As you are aware, Paragraph 42 of the Decree provides that the Court retained jurisdiction to enforce the Decree. *See also Brigando v. Republic Steel Corp.*, 180 Ill. App. 3d 1016, 1020 (1st Dist. 1989) ("a trial court may retain jurisdiction to enforce its own orders…."). And since "[a] valid consent decree is binding upon the parties and is enforceable as are other judgments … [a] court may enforce its judgments through contempt proceedings." *Comet Casualty Co. v. Schneider*, 98 Ill. App. 3d 786, 790 (1st Dist. 1981) (citations omitted); *see also 47th & State Currency Exchange, Inc. v. B. Coleman Corp.*, 56 Ill. App. 3d 229, 235 (1st Dist. 1977) ("By its action, the plaintiff in a contempt proceeding assists the court in enforcing its decrees against those who choose to ignore the orders of the court."). Through contempt proceedings, the Court has the power to coerce compliance with its final judgment in the

Notice of IDT's Noncompliance with Consent Decree
Page 14
June 16, 2025


form of the Consent Decree, as well as award costs and attorneys' fees. *See Edwards v. Pekin Memorial Hospital*, 2023 IL App (3d) 210005, ¶49. (citation omitted).

We look forward to your response.

<div style="margin-left: 40%;">

Sincerely,

MINER, BARNHILL & GALLAND, P.C.

/s/ Benjamin Blustein

Benjamin Blustein
Robert Libman
Grayson Sang Walker
Bernardo Lopez
Special Assistant Attorneys General
on behalf of the State of Illinois

</div>

lmd

Enclosures

cc:    Susan Ellis, Chief, Consumer Protection Division
       Elizabeth Blackston, Chief, Consumer Fraud Bureau
       Greg Grzeskiewicz, Chief, Consumer Fraud Bureau
       Office of the Illinois Attorney General